## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| TINTRI, INC.,[1] | ) | Case No.: 18-11625 (___) |
| | ) | |
| Debtor. | ) | |
| | ) | |

## DECLARATION OF ROBERT J. DUFFY IN SUPPORT OF FIRST DAY MOTIONS

I, Robert J. Duffy, hereby declare that the following is true to the best of my knowledge, information and belief:

1.     I am the Chief Restructuring Officer of the above-captioned debtor and debtor in possession ("Tintri" or the "Debtor"). I submit this declaration (the "Declaration") in support of the Debtor's petition and "first day" motions and pleadings, described further below (collectively, the "First Day Motions"). Except as otherwise indicated, all statements in this Declaration are based upon my personal knowledge, my review of the Debtor's books and records, relevant documents and other information prepared or collected by the Debtor's employees, or my opinion based on my experience with the Debtor's operations and financial condition. In making my statements based on my review of the Debtor's books and records, relevant documents and other information prepared or collected by the Debtor's employees, I have relied upon these employees accurately recording, preparing or collecting such documentation and other information.

---

[1] The Debtor and the last four digits of its taxpayer identification number is: Tintri, Inc. (6978). The headquarters and service address for the above-captioned Debtor is: 303 Ravendale Drive, Mountain View, California 94043.

2.   I am and have been a Managing Director with Berkeley Research Group, LLC ("BRG"), effective as of May 24, 2016.  BRG is a professional services firm with an office located at 2200 Powell Street, Suite 1200, Emeryville, California 94608.

3.   BRG's practice consists of senior financial, management consulting, accounting, and other professionals who specialize in providing financial, business, and strategic assistance typically in distressed business settings.  BRG serves troubled companies, debtors, and secured and unsecured creditors, equity holders, and other parties in both in-court and out-of-court engagements similar to the Debtors in the State of Delaware and elsewhere.  BRG's professionals have experience working on cases with similar fact scenarios in which they were presented with issues and performed analyses similar to the work at hand in this case.

4.   Before joining BRG in 2016, I spent fourteen (14) years at FTI Consulting, Inc. and fourteen (14) years at PricewaterhouseCoopers.  Most recently before joining BRG, I was the Global Practice Leader of the FTI Consulting Corporate Finance/Restructuring practice having joined FTI Consulting, Inc. following its 2002 acquisition of the restructuring practice at PricewaterhouseCoopers.  Between 1988 and 2002, I worked in restructuring at PricewaterhouseCoopers and was as a Partner at the time of the sale of its restructuring practice to FTI Consulting, Inc. in 2002.  I have over thirty years of experience in the restructuring industry serving as an advisor to private equity firms, corporations, lenders and boards of directors of underperforming businesses and companies in transition.  I have an undergraduate degree from Babson College and a MBA degree from the Kellogg Graduate School of Management at Northwestern University.  Among other organizations, I have been

active in American Bankruptcy Institute, Turnaround Management Association and Association

of Insolvency Accountants.  I am a Fellow of the American College of Bankruptcy.

        5.      If I were called to testify as a witness, I could and would competently

testify to each of the facts set forth herein based upon my personal knowledge, review of

documents, or opinion.  I am authorized to submit this Declaration on behalf of the Debtor.

        6.      Part I of this Declaration describes the business of the Debtor, the

developments that led to its filing for relief under chapter 11 of title 11 of the United States Code

(the "Bankruptcy Code").  Part II sets forth the relevant facts in support of the First Day Motions

filed by the Debtor concurrently herewith in support of its chapter 11 case.

## PART I

## BACKGROUND

**A.**      **Description and History of the Debtor's Business**

        7.      Tintri is an enterprise cloud storage company founded in 2008 with the

initial objective to solve the mismatch caused by using old, conventional physical storage

systems with applications in virtual machine (VM) environments.  The company created storage

products that are optimized for virtualization and cloud computing platforms.  Over time, the

company has expanded its focus to also address the cloud needs of enterprise customers.  Its

customers include leading enterprises across a broad range of industry segments, including

education, financial services and insurance, healthcare, manufacturing and automotive

technology, as well as cloud service providers (CSPs). As of January 31, 2018, Tintri's customer

base consisted of more than 1,500 customers, including seven of the top 15 Fortune 100

companies and 21 of the Fortune 100 companies.  Tintri's customers include Avaya, Comcast, SONY, Toyota, Chevron, NASA and AMD.  Tintri is headquartered at 303 Ravendale Drive, Mountain View, California 94043.  The company has additional locations in McLean, Virginia; Chicago, Illinois; London, England; Munich, Germany; Singapore; and Tokyo, Japan.

8.     The Debtor provides large organizations and cloud service providers with an enterprise cloud platform that offers public cloud capabilities inside their own data centers and that can also connect to public cloud services.  Its enterprise cloud platform delivers many of the benefits of public cloud infrastructure and also gives organizations the control and functionality to run both enterprise and cloud-native application in their own private cloud.

9.     The Debtor's customers use its enterprise cloud platform for a variety of workloads and use cases, including virtualized desktop infrastructure (VDI), development and test environments (DevOps), which are sometimes referred to as Continuous Integration Continuous Delivery (CI/CD), and other virtualized workloads, including virtualized servers, databases, and mixed workloads.  The Debtor's software products are sold separately from its core enterprise cloud platform solution, enabling customers to tailor their infrastructure to their specific needs.

10.     The Debtor's revenues are generated from the sales of products and related support and maintenance offerings.  Product revenue, which is generally recognized upon shipment, is derived from sales of all-flash and hybrid storage systems and stand-alone software licenses for use in connection with the Debtor's's systems. While purchasing support is not mandatory, substantially all products are purchased together with a support contract, which includes software patches, bug fixes, updates, upgrades, hardware repair and replacement parts,

and technical support. Support and maintenance revenue is recognized over the term of the support contracts. To date, substantially all customers either renew their support and maintenance subscriptions or purchase new support and maintenance subscriptions together with replacement products. The average length of the Debtor's support and maintenance contracts is approximately two years.

**B.    Debtor's Prepetition Capital Structure**

**The SVB Loan Agreement**

11.    The Debtor and Silicon Valley Bank ("SVB") are parties to an *Amended and Restated Loan and Security Agreement* dated as of April 30, 2018 (as amended, modified or supplemented from time to the time, the "Prepetition Revolving Loan Agreement.")[2] Pursuant to the Prepetition Revolving Loan Agreement and associated documentation the Debtor borrowed certain funds under a revolving credit facility tied to the Debtor's eligible accounts receivable up to a maximum principal amount of $12.5 million with a maturity date of May 2, 2019.

12.    As of the Petition Date, approximately $4,708,073 remains outstanding under the Prepetition Revolving Loan Agreement, comprised of 4,708,073 in outstanding principal obligations, plus additional amounts on account of accrued and unpaid interest, fees, costs and charges.

13.    Subject to certain validly perfected prior liens (*i.e.,* Permitted Liens), the obligations under the Prepetition Revolving Loan Agreement are secured by a first priority, senior lien on substantially all personal property of the Debtor, including all of the Debtor's

---

[2] The Prepetition Revolving Loan Agreement is an amendment and restatement in its entirety of that certain *Loan and Security Agreement* dated as of May 14, 2013.

intellectual property rights and assets[3] and all cash collateral as defined in section 363(a) of the

Bankruptcy Code ("Cash Collateral").

**The TriplePoint Loan Agreement**

14.     The Debtor and TriplePoint Capital LLC ("TriplePoint") are parties to a

*Plain English Growth Capital Loan and Security Agreement* dated as of February 6, 2015 (as

amended, modified or supplemented from time to the time, the "Prepetition Term Loan

Agreement."). Pursuant to the Prepetition Term Loan Agreement and associated documentation

the Debtor borrowed certain funds under a series of growth capital promissory notes in the

aggregate original principal amount of $50 million with a maturity date of August 31, 2019.

15.     As of the Petition Date, approximately $56,485,521 remains outstanding

under the Prepetition Term Loan Agreement, comprised of $50,000,000 in outstanding principal

obligations, plus additional amounts on account of accrued and unpaid interest, fees, costs and

charges.

16.     Subject to certain validly perfected prior liens (*i.e.,* Permitted Liens), the

obligations under the Prepetition Term Loan Agreement are secured by a first priority, senior

lien on substantially all personal property of the Debtor, including all of the Debtor's intellectual

property rights and assets[4] and all Cash Collateral.

17.     SVB and TriplePoint are parties to that certain Subordination Agreement

dated as of February 6, 2015 (as amended, modified or supplemented from time to the time, the

"Subordination Agreement"). Pursuant to the Subordination Agreement, the parties agreed,

---

[3] The Debtor and SVB are also parties to that certain *Intellectual Property Security Agreement*, dated as of December 10, 2014, as amended and supplemented from time to time.

[4] The Debtor and TriplePoint are also parties to that certain *Plan English Intellectual Property Security Agreement* dated as of February 6, 2015, as amended and supplemented from time to time.

among other rights and obligations, that TriplePoint's rights to payment and performance under the Prepetition Term Loan Agreement and all liens and security interests securing such debt would be subordinated to SVB's rights to full and prior payment and performance under the Prepetition Revolving Loan Agreement.

**The Convertible Notes**

18.     The Debtor and certain investors are parties to a Note Purchase Agreement dated as of May 4, 2017 (as amended, modified or supplemented from time to the time, the "Prepetition Note Agreement."). Pursuant to the Prepetition Note Agreement, the Debtor borrowed certain funds under a series of subordinated, unsecured convertible promissory notes in the aggregate original principal amount of $25 million with a maturity date of August 20, 2019 (the "Convertible Notes").

19.     The Convertible Notes are contractually subordinated to the Debtor's obligations under the Prepetition Revolving Loan Agreement as well as the Prepetition Term Loan Agreement.

**Other Indebtedness**

20.     As of June 30, 2018, the Debtor has certain outstanding purchase money or capital lease indebtedness in the aggregate principal amount of approximately $144,000 that is secured by the Debtor's equipment. In particular, the Debtor is a party to certain unexpired leases for (a) Kyocera copiers, scanners and printers (three agreements with an aggregate monthly payment of approximately $1,056), and (b) Cisco Systems networking and computer equipment (one agreement with a monthly payment of approximately $7,304).

21.     As of the Petition Date, the Debtor's preliminary estimate of general

unsecured debt totals approximately $8,800,000 million, which estimate is subject to change and

includes potential unliquidated and/or contingent claims.

22.     The Debtor's common stock was publicly listed on the NASDAQ

exchange in June 2017 under the trading symbol "TNTR." As of the Petition Date, the Debtor

had issued approximately 33,920,522 million shares of common stock to approximately 83

shareholders of record and approximately six beneficial holders.

23.     The Debtor's cash balance as of the Petition Date in its deposit and

securities accounts totals approximately $200,000.

**B.      Events Leading to the Bankruptcy Filing**
    **and Commencement of the Chapter 11 Case**

24.     The company's revenue increased from $86 million in fiscal 2016 to

$125.1 million in fiscal 2017, and to $125.9 million in fiscal 2018, representing year-over-year

growth of 45% and 1%, respectively. The company's net loss was $101.0 million, $105.8

million, and $157.7 million in fiscal 2016, 2017, and 2018, respectively. Total assets decreased

from $158.1 million as of the end of fiscal 2016 to $104.9 million as of the end of fiscal 2017,

and to $76.2 million as of the end of fiscal 2018, representing year-over-year change of 34% and

27%, respectively. The company attributed flat revenue growth in fiscal 2018 in part due to

delayed and reduced purchases of products as a result of customer concerns about Tintri's

financial condition, as well as a shift in its product mix toward lower-priced products, offset

somewhat by increased support and maintenance revenue from its growing installed customer

base. Ultimately, the company's sales levels have not experienced a level of growth sufficient to address its cash burn rate and sustain its business.

25.    Following the company's initial public offering in July 2017, four class action lawsuits were filed against it. In September 2017, a class action lawsuit was commenced in the United States District Court for the Northern District of California under the caption *Tuller v. Tintri, Inc. et al.*, No. 4:17- CV-05714-YGR (filed September 18, 2017). A consolidated complaint has been filed in the *Tuller* action, which, in addition to the Debtor, names as defendants its then-Chief Executive Officer, then-Chief Financial Officer, and Chief Technology Officer, and alleges violations of the Securities Act of 1933. Three substantially similar lawsuits were subsequently filed in California state court in the County of San Mateo against the same parties, as well as the then-serving members of the Board, the underwriters of the company's initial public offering, and entities associated with several institutional investors that invested in Tintri prior to the initial public offering. These suits also allege violations of the Securities Act of 1933, and are captioned *Clayton v. Tintri, Inc.* et al., No. 17CIV04312 (filed September 20, 2017), *Nurlybayev v. Tintri, Inc. et al.*, No. 17CIV04321 (filed September 21, 2017), and *Golosiy v. Tintri, Inc. et al.*, No. 17CIV04618 (filed October 6, 2017). The actions have yet to be consolidated and a consolidated complaint has yet to be filed. All four class action lawsuits are in their initial stages and are based on similar allegations that the company made false and misleading statements in the registration statement and prospectus filed with the SEC in connection with its initial public offering (IPO). Each lawsuit is purportedly brought on behalf of a putative class of all persons who purchased shares of common stock pursuant or traceable to

the initial public offering, and seeks, among other things, compensatory damages and attorney's

fees and costs on behalf of the putative class.

26.    The company's IPO raised less capital than anticipated. Tintri's orders for

new products declined, it lost a few key customers and, consequently, its declining revenues led

to the company's difficulties in meeting day-to-day expenses, as well as long-term debt

obligations. A few months after its IPO, in December 2017, Tintri announced that it was in the

process of considering strategic options and had retained investment bank advisors to assist it in

this process.

27.    In March 2018, the Board approved a restructuring and reduction in force

plan of approximately 20% of the Debtor's global workforce.

28.    On June 15, 2018, Tintri filed a form 8-K with the Securities and

Exchange Commission, indicating that, as of April 30, 2018, and May 31, 2018, Tintri held

aggregate cash and cash equivalents of $30.9 million and $11.5 million, respectively. It stated

that, based on the company's current cash projections, and regardless of whether its lenders were

to choose to accelerate the repayment of the company's indebtedness under its credit facilities,

the company likely did not have sufficient liquidity to continue its operations beyond June 30,

2018. The company also cautioned that, even if it were able to successfully pursue a sale

transaction, there was a significant possibility that the company may file for bankruptcy

protection, which could result in a complete loss of shareholders' investment.

29.    As of April 30, 2018, the company had $15.4 million of principal

indebtedness outstanding under its line of credit with SVB, and $50.0 million under its credit

facility with TriplePoint, and lacked borrowing capacity available under either credit facility.

Since May 31, 2018, the company was not in compliance with certain financial and other covenants under these credit facilities. In its form 8-K, the company revealed that it then did not, and may not in the future, have sufficient liquidity to repay amounts outstanding under its debt facilities should they become immediately due and payable.

30.    The company's financial condition led existing and potential customers and suppliers to express concerns regarding the company's financial condition, which negatively impacted the company's ability to sell and ship products and services. The company's financial condition also adversely affected its ability to continue to attract and retain key personnel and other employees. Due to continued deterioration in the Debtor's cash flow, the Debtor, following consultation with its advisors and other professionals, determined that the best course of action under the present circumstances would be to file a Chapter 11 petition and to seek the Court's approval for the prompt sale of substantially all its assets.

C.    **The Debtor's Sale of Assets**

31.    Shortly after the filing of the petition, the Debtor plans to file a motion seeking approval of the sale of its assets and bid procedures. Prior to the Petition Date, the Debtor and its advisors have been marketing the company as a going concern. The Debtor will continue its efforts to sell its assets as a going concern but if that is not feasible the Debtor will seek to sell all or substantially all of its intellectual property portfolio and related assets.

## PART II

## FIRST DAY MOTIONS AND APPLICATIONS

32.    In order to enable the Debtor to minimize the adverse effects of the commencement of the chapter 11 case, the Debtor has requested various types of relief in the First Day Motions filed simultaneously with this Declaration.  A summary of the relief sought in each First Day Motion is set forth below.

33.    I have reviewed each of these First Day Motions (including the exhibits and schedules thereto).  The facts stated therein are true and correct to the best of my knowledge, information and belief, and I believe that the type of relief sought in each of the First Day Motions:  (a) is necessary to enable the Debtor to operate in chapter 11 with minimal disruption; and (b) is essential to maximizing the value of the Debtor's assets for the benefit of their estates and creditors.

**D.    Motion for Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364 and 507 (i) Approving Postpetition Financing, (ii) Authorizing Use of Cash Collateral, (iii) Granting Liens and Providing Superpriority Administrative Expense Status, (iv) Granting Adequate Protection, (v) Modifying Automatic Stay, (vi) Granting Related Relief, and (vii) Scheduling a Final Hearing ("DIP Financing Motion")**

34.    On July 9, 2018, the Debtor executed the definitive documentation set forth in that certain Superpriority Secured Debtor-in-Possession Credit Facility Term Sheet dated July 9, 2018 (the "DIP Term Sheet").  Pending the final hearing and entry of the final order regarding its financing, the Debtor seeks authority to obtain credit and incur debt (the "DIP Loans") on an interim basis under the DIP Term Sheet which is attached as Exhibit "A" to the DIP Financing Motion.

35.    Prior to the Petition Date, the Debtor and its advisors canvassed various sources of prospective postpetition financing, including financing from the company's existing lenders and other third parties.  In particular, BRG requested a binding commitment from TriplePoint (the Debtor's second lien term loan lender) and then used that proposal in order to solicit alternative indications of interest from other potential lenders.  SVB (the Debtor's first lien revolving loan lender), indicated that it was not willing to extend additional credit to the Debtor but has agreed, to participate with TriplePoint in the proposed DIP Loans by allowing limited ongoing borrowings by the Debtor pursuant to the terms of the Prepetition SVB Documents.

36.    None of the parties contacted by the Debtor expressed an interest in providing postpetition financing.  Simultaneously, during this time, the Debtor continued to negotiate with TriplePoint to obtain the most favorable lending terms for the benefit of the estate. In considering its options, the Debtor recognized that the pre-petition obligations owed to SVB and TriplePoint are secured by substantially all of the Debtor's property and that such liens would either have to be primed in order to obtain postpetition financing or the Debtor would need to locate a lender willing to extend credit that would be junior to the liens of SVB and TriplePoint.  Borrowing from another postpetition lender that required security senior to that of SVB and TriplePoint likely could only be accomplished through an extended, contested hearing on whether the requirements of section 364(d) of the Bankruptcy Code had been satisfied.

37.    Following the Debtor's careful evaluation of TriplePoint's financing proposal, and the Debtor's ability under that proposal to meet its post-petition budgeted obligations for the period contemplated therein, and in light of the risks involved, the fees and

expenses that would be incurred, and economics offered by the proposed DIP Lender, the Debtor determined that the proposed DIP Term Sheet is the best financing available under the circumstances.

38.     The Debtor, the DIP Lender and SVB engaged in extensive, arm's length negotiations with respect to the terms and conditions of the proposed DIP Credit Facility and the use of Cash Collateral in accordance with its sound business judgment. The Debtor and its advisors as at BRG directly handled the evaluation and negotiation of the various DIP financing drafts and the ensuing DIP Term Sheet (with input on certain operational and corporate issues from officers of the Debtor). The DIP Term Sheet has been entered into by the Debtor and the DIP Lender without collusion, as a result of vigorous, well-advocated negotiation and with each of the parties represented by independent counsel and advisors. The DIP Term Sheet permits the Debtor to request the advance of the Interim DIP Loan from the DIP Lender and use Cash Collateral of the Pre-Petition Lenders pending this Court's entry of the Final Order. I believe that this interim commitment will ensure that the Debtor will be able to meet its administrative obligations during the early stages of the Chapter 11 Case as well as provide adequate liquidity to operate its business.

39.     The Debtor's budget has been carefully crafted to provide the Debtor with the minimum liquidity required to prudently operate its business and meet their anticipated post-petition operating and non-recurring expenses. The amounts that the Debtor seeks to borrow under the interim order approving the DIP financing reflect the payment of expenses that, in my business judgment, are necessary to avoid immediate and irreparable harm to the estate pending the final hearing to approve the DIP financing.

40.     The Debtor seeks an emergency interim hearing (the "Interim Hearing") on the DIP Financing Motion for the Court to consider entry of an interim order, which authorizes the Debtor to (x) borrow under the DIP Term Sheet on an interim basis, up to an aggregate principal amount not to exceed $2,952,000 and up to $5,493,000 on a final basis, and (y) use cash collateral on an interim basis in accordance with the Approved Budget.  The Debtor also seeks to schedule a final hearing on the DIP Financing Motion within thirty (30) days after the petition date to consider entry of the final order authorizing the balance of the borrowings under the DIP Term Sheet and authorizing the Debtor to use cash collateral in accordance with the Approved Budget on a final basis.

41.     The DIP Term Sheet and the proposed Interim Order also contemplates a modification of the automatic stay (to the extent applicable) to permit the Debtor to (a) grant the liens and superpriority claims described above to the DIP Lender and to perform such acts as may be requested to assure the perfection and priority of such liens; (b) permit the DIP Lender to exercise, upon the occurrence and during the continuance of an Event of Default (as defined in the DIP Term Sheet) and after three business days' notice thereof, its rights and remedies under the DIP Term Sheet; and (c) to otherwise implement the terms of the proposed DIP Orders.  Stay modifications of this kind are ordinary and standard features of postpetition debtor financing facilities and, in my business judgment, are reasonable and fair under the present circumstances.

42.     Upon entry of the Final Order, and subject to the terms and conditions set forth in the DIP Term Sheet, the Debtor will be permitted to request the final two advances under the DIP Credit Facility up to an aggregate amount not to exceed the Maximum Commitment, less the amount of the Interim DIP Loan.  The Debtor, the DIP Lender and SVB have agreed upon

the Approved Budget, projecting cash flow for the expected duration of this case. This budget

contemplates that the Debtor will have use of Cash Collateral during that time. The Debtor

believes that the Approved Budget is achievable and will allow the Debtor to operate without the

accrual of unpaid administrative expenses.

43.    Importantly, the DIP Term Sheet also provides critical assurances to the

Debtor's employees that the company's aggregate payroll expenses (commencing on the Petition

Date through the Final Closing Date, *i.e.,* the first month of the Chapter 11 Case) will be

***reserved in advance*** (upon entry of the Interim Order), by a deposit to the Payroll Reserve. I

believe that this funding will provide a key incentive to the Debtor's workforce to remain with

the company during the sale process. On the Final Closing Date, the Debtor will make a similar

deposit to the Payroll Reserve to provide assurances that the Debtor's additional projected

Payroll Expenses (as that term is used in the DIP Term Sheet), will be met for the period from

such date through the Outside Date. Absent these pre-funding assurances, I believe that the

Debtor would suffer further employee attrition over the course of the Chapter 11 Case that will

be extremely deleterious to its sale efforts. The DIP Lender and SVB are each willing to make

this significant accommodation in order to allay any concerns among the Debtor's workforce that

the company's payroll obligations will not be satisfied.

44.    Approval of the DIP Term Sheet and authorization for the use of Cash

Collateral will provide the Debtor with immediate and ongoing access to cash to ensure payment

of its operating expenses for the anticipated duration of the Chapter 11 case. Without

authorization to enter into the DIP Term Sheet and to use Cash Collateral, the Debtor will suffer

material deterioration in employee, vendor and customer confidence as such constituencies may

harbor doubt with respect to the Debtor's liquidity and ability to sustain operations until the consummation of a Sale. Thus, the implementation of the DIP Term Sheet and authorization to use cash collateral will promote a successful Sale and maximize value for the Debtor's estate. Accordingly, I believe that the timely approval of the relief requested herein is imperative.

45.     I believe the borrowing under the DIP Term Sheet is critically necessary to preserve and enhance the value of the Debtor's estate for the benefit of all stakeholders in this chapter 11 case. In addition, the availability under the DIP Term Sheet will provide confidence to the Debtor's vendors and will be viewed favorably by the Debtor's employees (particularly in light of the assurances given by the DIP Lender that Payroll Expenses will be reserved in advance), thereby aiding in the administration of the case and promoting a successful reorganization. Accordingly, I believe the timely approval of the relief requested in the DIP Financing Motion is imperative and should be approved.

46.     I further believe that the Debtor has met the requirements of the Bankruptcy Code to obtain the DIP financing because the Debtor is unable to obtain credit otherwise, relevant secured creditors are adequately protected, and the proposed financing is in the best interests of the estate. The orderly liquidation of the Debtor's business is not possible without access to sufficient working capital and liquidity through the incurrence of postpetition financing under the DIP Term Sheet and the use of Cash Collateral. The use of Cash Collateral alone is insufficient to meet the Debtor's postpetition liquidity needs. I believe that the Debtor is unable to obtain (a) adequate unsecured credit, (b) adequate credit secured by (i) a senior lien on unencumbered assets of the Debtor's estate and (ii) a junior lien on encumbered assets, or (c) secured credit from sources other than the DIP Lender on terms more favorable than the terms of

the DIP Term Sheet. I also believe that the only source of secured credit available to the Debtor,

other than the use of Cash Collateral, is the DIP Term Sheet. After considering all of the

Debtor's alternatives, I believe that the financing to be provided by the DIP Lender pursuant to

the terms of the DIP Term Sheet represents the best financing presently available to the Debtor.

47.    Moreover, I understand that the loan terms and pricing provided under the

DIP Term Sheet are within the range of comparable financing arrangements recently effectuated

in other chapter 11 cases. The other terms and conditions of the DIP Term Sheet are the best

possible under the circumstances of these cases, and were negotiated in good faith and at arm's-

length with all parties represented by experienced counsel. Accordingly, the DIP Lender should

be provided with the benefit and protection of section 364(e) of the Bankruptcy Code, such that

if any of the provisions of the DIP Term Sheet are later modified, vacated, or terminated by

subsequent order of this or any other Court, the DIP Lender will be fully protected with respect

to any amounts previously disbursed.

48.    I also believe that the proposed "roll up" of the Debtor's obligations under

the Prepetition TriplePoint Documents that is contemplated by the DIP Term Sheet is appropriate

under the circumstances and will not prejudice the Debtor or its estate. The validity,

enforceability and priority of the liens granted by the Debtor under the Prepetition TriplePoint

Documents is subject to the "challenge" rights of a statutory committee. Hence, insofar as the

roll-up of the Prepetition TriplePoint Documents is premised upon the validity of the liens

granted by the Debtor under such documents, a committee will have an opportunity to examine

the propriety of such validation.

49.     In addition, the Debtor satisfies the standard under the Bankruptcy Code to obtain financing that is secured by a "priming lien" that is senior or equal to existing liens against property of the estate. Here, the priming lien granted to the DIP Lender is subordinate to the SVB Liens. Moreover, SVB has not only consented to the relief requested in the DIP Financing Motion, but its interests in the DIP Collateral are protected by the adequate protection relief proposed herein. I also believe that the Debtor has satisfied the standard under the Bankruptcy Code for use of cash collateral because SVB consents to the Debtor's use of Cash Collateral on the terms set forth in the Approved Budget and the DIP Financing Motion.

50.     I believe that the authorization to obtain the DIP Loans and use of Cash Collateral pending a Final Hearing will preserve the value of the Debtor's business only if authorization is granted immediately. In this instance, the Debtor must have immediate use of the funds provided under the DIP Term Sheet and the Cash Collateral to the extent contemplated herein to pay its ongoing operational expenses and to maximize the value of the estate. Funds are urgently needed to meet all of the Debtor's liquidity needs and to administer the case in an orderly and efficient manner. In the absence of immediate postpetition financing, I believe that the Debtor's ability to preserve the value of its assets will be immediately and irreparably jeopardized, resulting in significant harm to the estate and its constituents. The Debtor seeks authorization on an interim basis to borrow up to $2,952,000 under the DIP Term Sheet and to use Cash Collateral for the purposes set forth in the Approved Budget pending the Final Hearing. I believe that interim relief requested in the DIP Financing Motion, pending the Final Hearing, is necessary, appropriate and fully warranted, and is essential to avoid immediate and irreparable harm to the Debtor and its creditors.

51.    I believe that the Debtor's goal of a successful sale can be achieved only if the Debtor is immediately authorized to use cash collateral and to borrow up to $5,493,000 under the DIP Term Sheet and to use such proceeds to operate its business.  The Debtor is unable to procure sufficient financing in the form of unsecured credit allowable under section 503(b)(1), as an administrative expense under section 364(a) or (b), or in exchange for the grant of a superpriority administrative expense claim pursuant to section 364(c)(1).

**E.**    **Motion for Order Under Sections 105, 345, 363, 364, 503, 1107 and 1108 of the Bankruptcy Code Authorizing (i) Maintenance of Existing Bank Accounts; (ii) Continuance of Existing Cash Management System, Bank Accounts, Checks and Related Forms; (iii) Continued Performance of Intercompany Transactions; (iv) Limited Waiver of Section 345(b) Deposit and Investment <u>Requirements and (v) Granting Related Relief ("Cash Management Motion")</u>**

52.    The Debtor seeks authority to (a) maintain its existing bank accounts and to pay any prepetition routine banking fees imposed by the financial institutions where the Debtor's bank accounts are maintained and to continue to use its existing business forms and check stock; (b) continue to use the existing Cash Management System, as provided in the Cash Management Motion; (c) continue to perform intercompany transactions; and (d) obtain a limited waiver of the requirements pursuant to section 345(b) of the Bankruptcy Code to the extent required.

53.    The Debtor's Cash Management System facilitates the timely and efficient collection, management, and disbursement of funds used in the Debtor's business.  The Cash Management System currently consists of nine (9) bank accounts.  The Cash Management System is designed to effectuate the collection of revenue from customers, pay operating expenses, and maintain payroll obligations.  Any disruption caused by requiring the Debtor to

close its existing bank accounts, open new bank accounts and establish a new cash management

system would jeopardize the Debtor's ability to satisfy postpetition obligations and maintain

their relationships with customers.

54.    All of the accounts are with SVB, which is approved as a depository for

funds of debtors in possession by the United States Trustee for Region 3. In addition, the

depository accounts are FDIC insured.  Thus, the funds maintained in the depository accounts are

not at risk.

55.    Consequently, I believe that maintaining the existing Cash Management

System and approval of the Cash Management Motion is not only essential, but is in the best

interests of the Debtor's estate, its creditors, and parties in interest.

**F.    Motion for Interim and Final Orders (a) Approving the Debtor's Proposed
    Adequate Assurance of Payment for Future Utility Services, (b) Prohibiting
    Utility Companies from Altering, Refusing, or Discontinuing Services, (c)
    Approving the Debtors' Proposed Procedures for Resolving Adequate
    Assurance Requests, and (d) Granting Related Relief (the "Utilities Motion")**

56.    The Debtor seeks entry of interim and final orders (a) approving the

Debtor's Proposed Adequate Assurance of payment for future utility services; (b) prohibiting

Utility Companies from altering, refusing, or discontinuing services; and (c) approving the

Debtor's proposed procedures for resolving Adequate Assurance Requests.

57.    In connection with the operation of their businesses and management of

their properties, the Debtor obtains electricity and natural gas and other similar services from a

number of utility companies or brokers.

58.    Uninterrupted Utility Services are essential to the Debtor's ongoing

business operations.  The Debtor's operations require electricity and gas for lighting, heating,

trash, sewer services, air conditioning, and telecommunications (including telephone and internet/data).  Should any Utility Provider refuse or discontinue service, even for a brief period, the Debtor's business operations could be severely disrupted, and such disruption would jeopardize the Debtor's ability to operate their business.  Accordingly, it is essential that the Utility Services continue uninterrupted during the chapter 11 case.

59.    The Debtor intends to pay postpetition obligations owed to the Utility Companies in a timely manner.  Cash held by the Debtor, cash generated in the ordinary course of business, and cash available to the Debtors through their debtor in possession financing facility, will provide sufficient liquidity to pay the Debtor's Utility Service obligations in accordance with prepetition practice.

60.    To provide additional assurance of payment, the Debtor proposes to deposit into a segregated account $20,000, which represents an amount equal to approximately one half of the Debtor's average monthly cost of Utility Services.  The Adequate Assurance Deposit will be held in the segregated account for the duration of this chapter 11 case.  The Debtor submits that the Adequate Assurance Deposit, in conjunction with the Debtor's ability to pay for future utility services in accordance with prepetition practice, constitutes sufficient adequate assurance to the Utility Companies in full satisfaction of section 366 of the Bankruptcy Code.

61.    Based on the foregoing, the relief requested in the Utilities Motion is not prejudicial to any party-in-interest and, in fact, only benefits the Debtor's estate and its creditors.  Accordingly, I submit that the proposed adequate assurance is sufficient and that the relief

requested in the Utilities Motion is in the best interests of the Debtor's estate, its creditors and parties-in-interest.

**G.      Motion Pursuant to Sections 105(a), 507(a)(8), and 541(d) of the Bankruptcy Code for an Order Authorizing Payment of Prepetition Sales, Use and Franchise Taxes and Similar Taxes and Fees (the "Prepetition Tax Motion")**

62.      The Debtor seeks entry of an order authorizing the Debtor to pay any Sales and Use Taxes, Personal Property Taxes and Business Fees in the ordinary course of the Debtor's business, including, without limitation, Sales and Use Taxes or Franchise Taxes subsequently determined on audit to be owed for periods prior to the Petition Date, authorizing banks and financial institutions to honor and process checks and transfers related thereto.

63.      The Debtor further seeks authority to remit Prepetition Tax Obligations in an aggregate amount (excluding amounts paid prepetition by checks that have not yet cleared[5] and amounts that may be subsequently determined on sales tax audit or adjustment to be owed a particular Taxing Authority or party who ordinarily collects the Prepetition Tax Obligations) not to exceed $309,000, without prejudice to the Debtor's rights to contest the amounts of any Prepetition Tax Obligations on any grounds it deems appropriate.

64.      The Debtor estimates that, as of the Petition Date, it owes the approximate amount in Prepetition Tax Obligations:

| Type of Tax | Prepetition Amount |
|---|---|
| Sales & Use Tax | $70,000 |
| Personal Property Tax | $234,000 |
| Business Licenses, Permits & Other Fees | $5,000 |
| **Total** | **$309,000** |

---

[5] The Debtor requests authority to reissue any amounts paid by check prepetition that have not cleared as of the Petition Date and are dishonored.

65.     Accordingly, I believe payment of the Prepetition Tax Obligations is in the best interest of the Debtor's estate and therefore request that the Prepetition Tax Motion be granted.

**H.      Motion for Entry of an Order Authorizing the Debtor to (i) Pay and/or Honor Prepetition Wages, Salaries, Commissions, Incentive Payments, Employee Benefits, and Other Compensation and Pay Third Party and Contract Workers; (ii) Remit Withholding Obligations and Deductions; (iii) Maintain Employee Compensation and Benefits Programs and Pay Related Administrative Obligations; and (iv) Have Applicable Banks and Other Financial Institutions Receive, Process, Honor, and Pay Certain Checks Presented for Payment and Honor Certain Fund Transfer Requests (the "Wage and Benefits Motion")**

66.     The Debtor requests, in its sole discretion, the authority (a) to pay and honor, *inter alia*, certain prepetition claims of Employees for Wages and pay Third Party Labor Provider Costs, (b) pay and honor employee benefits and expense reimbursements  and honor and pay commissions and incentive payments owed to certain non-insider Employees (collectively, the "Benefits" and, together with Wages, the "Wages and Benefits");  (c) remit withholding obligations and employee deductions and withholdings, and (d) to continue to pay and honor such Wages and Benefits as they become due postpetition in the ordinary course of the Debtors' business.

67.     As of the Petition Date, the Debtor employed 55 Employees, who are all employed full time.  The Employees are not unionized.

68.     The Debtor's Employees are paid current. Employees are paid twice per month, on the fifteenth and last day of the month (each, a "Bi-Monthly Pay Date"). The latest Bi-Monthly Pay Date occurred on June 29, 2018, which compensated employees for services rendered during the period of June 16 through June 30, 2018. As of the Petition Date, employees

have accrued wages or salary for the period of July 1-9, 2018. For this period, the Debtor

estimates it owes approximately $236,800 on account of accrued, but unpaid wages, for

Employees (the "Unpaid Wages").

69.     As part of the relief requested in this Motion, the Debtor seeks authority to

permit One Source Virtual ("OSV") to continue to process the Debtor's payroll obligations in the

ordinary course of business. On a monthly basis, the Debtor pays OSV fees to process their

payroll. The Debtor is seeking authorization to pay OSV to the extent that any prepetition fees

are still outstanding not to exceed $300.00.

70.     *Gross Pay Deductions and Payroll Taxes.*  For each applicable pay period,

the Debtor routinely deducts certain amounts from each Employee's gross payroll, including,

without limitation, garnishments, child support, spousal support, and similar deductions and

other pre-tax and post-tax deductions payable pursuant to the employee benefit plans discussed

herein (including, for example, the Employee's share of health care benefits, contributions under

flexible spending plans, 401(k) contributions, legally ordered deductions, and miscellaneous

deductions) (collectively, the "Deductions").  As set forth below, the Deductions are not property

of the Debtor or its estate and are withheld from Employees' gross payroll and remitted to the

appropriate third parties.  On average, the Debtor's payroll Deductions total approximately

$54,750 each Bi-Monthly Pay Date.  As of the Petition Date, certain of the Deductions may not

yet have been transmitted to the appropriate third party recipients and the Debtor requests

authority to transfer any Deductions to the appropriate third party recipients or as may be

required under applicable nonbankruptcy law.

71.     In addition to the Deductions, federal and state laws require the Debtor to withhold amounts related to federal, state, and local income taxes, Social Security, and Medicare taxes for remittance to the appropriate federal, state, or local taxing authorities (collectively, the "Withholding Obligations"). The Debtor must also pay, from its own funds, for Social Security and Medicare taxes and pay, based on a percentage of gross payroll, additional amounts for federal and state unemployment insurance (collectively the "Employer Payroll Taxes," and, together with the Withholding Obligations, the "Payroll Taxes"). On average, the Payroll Taxes for each Bi-Monthly Pay Date, including both the Employee and employer portions, totaled approximately $30,900.

72.     To the extent any of the prepetition Deductions or Payroll Taxes have not yet been forwarded to the appropriate third-party recipients, the Debtor seeks authority to forward such amounts (and to continue to forward Deductions and Payroll Taxes on a postpetition basis whether or not related to the prepetition period) to the applicable third-party recipients in the ordinary course of business and consistent with past practice.

73.     *Reimbursable Expenses.* Employees customarily incur business expenses in the ordinary course of performing their duties on behalf of the Debtor. Such expenses may include, but are not limited to, cell phone expenses, office supply purchases and business-related travel expenses, including air travel, car rental, lodging, meal charges, ground transportation, and miscellaneous other allowed travel expenses (the "Reimbursable Expenses"). In addition, certain Employees have corporate-issued American Express credit cards upon which Reimbursable Expenses are charged and for which the Employees are personally responsible, but which invoices are paid by the Debtor to the extent the charges are authorized.

74.    Generally, Employees pay for the Reimbursable Expenses personally and submit expense reports through a formal system to the Debtor for reimbursement. In some cases, Employees may not have submitted reimbursement requests in time to have been processed prior to the Petition Date. In addition, certain Employees have corporate-issued credit cards upon which Reimbursable Expenses are charged and for which the Employees are personally responsible, but which invoices are paid by the Debtor to the extent the charges are authorized. Historically, Employees incur, on average, approximately $36,000 per month in Reimbursable Expenses, including corporate credit card expenses, although these amounts can vary from month to month depending on the amount of expenses incurred at any given time. In light of the recent reduction in force, the Debtor expects an increase in valid Reimbursable Expenses and seeks authority to pay unpaid prepetition Reimbursable Expenses owed as of the Petition Date, not to exceed $83,000, and to continue to honor, reimburse, and pay postpetition Reimbursable Expenses in the ordinary course of business in its discretion.

75.    *Health Benefits*.  The Debtor provides health insurance to Employees, including, *inter alia*, medical, dental, vision, disability, COBRA, flexible spending accounts, health reimbursement accounts, and dependent care benefits (collectively, the "Health Plans"), as described in more detail below.  Each pay period, Employees make contributions toward the Health Plan premiums for medical, dental and vision coverage, and the Debtor deducts the Employees' portions of the premiums, if applicable, owing under the Health Plans from their Wages as Deductions.

**Medical Plans**

76.     The Debtor offers all Employees and legal dependents company-subsidized medical insurance (the "**Medical Plans**"). The Debtor offers medical benefits through Aetna (either a high or low deductible plan) and Kaiser, which provides an HMO based plan for California Employees only. For both providers, the Debtor remits a monthly premium on the first of each month for coverage during that month. The monthly premium paid to Aetna is approximately $53,000, which includes the portion that is paid by Employees. The monthly premium paid to Kaiser is approximately $11,750. The Debtor is invoiced at the beginning of each month for that month's coverage and the Debtor pays such invoice on net thirty terms (i.e., at the end of the month). Employees contribute their respective share through deductions from the wages twice a month when they are paid and the Debtor uses those deduction to make the full payment. For example, fifty percent of the Employees' share is deducted on the first Bi-Monthly Pay Date and the remainder on the second Bi-Monthly Pay Date.

77.     The Debtor seeks authority to continue to offer the Medical Plans, administer Employee withholdings, and pay to Aetna and Kaiser the amount owed under the Medical Plans postpetition in the ordinary course of business and in the Debtor's discretion.

78.     As of the Petition Date, the Debtor estimates only the premiums for July 2018 are outstanding on account of period prior to the Petition Date. The Debtor seeks authority to pay those premiums in the amounts described above to Aetna and Kaiser.

**Dental Plan**

79.     The Debtor offers all Employees and legal dependents company-subsidized dental insurance (the "**Dental Plan**"). The Debtor offers Dental benefits through Cigna. The Debtor remits a monthly premium on the first of each month for coverage during that

month. The monthly premium paid to Cigna is approximately $5,000, which includes the portion

that is paid by Employees. The Debtor is invoiced at the beginning of each month for that

month's coverage and the Debtor pays such invoice on net thirty terms (i.e., at the end of the

month). Employees contribute their respective share through deductions from the wages twice a

month when they are paid and the Debtor uses those deduction to make the full payment. For

example, fifty percent of the Employees' share is deducted on the first Bi-Monthly Pay Date and

the remainder on the second Bi-Monthly Pay Date.

80.     The Debtor seeks authority to continue to offer the Dental Plan, administer

Employee withholdings, and pay to Cigna amounts owed under the Dental Plan postpetition in

the ordinary course of business and in the Debtor's discretion.

81.     As of the Petition Date, the Debtor estimates only the premium for July

2018 is outstanding. The Debtor seeks authority to pay to Cigna any unpaid prepetition claims in

the amount described above.

**Vision Plan**

82.     The Debtor also provides Employees with vision insurance through a self-

insured, premium-based policy issued by VSP (the "**Vision Plan**"). The Vision Plan provides

several types of services, including eyeglass lenses, frames, and contact lenses. The Vision Plan

provides both in-network and out-of-network services. The Vision Plan is by the Debtor and by

Employees through withholdings from payroll.

83.     The monthly premium paid to VSP is approximately $6,000, which

includes the portion that is paid by Employees. The Debtor is invoiced at the beginning of each

month for that month's coverage and the Debtor pays such invoice on net thirty terms (i.e., at the end of the month). Employees contribute their respective share through deductions from the wages twice a month when they are paid and the Debtor uses those deduction to make the full payment. For example, fifty percent of the Employees' share is deducted on the first Bi-Monthly Pay Date and the remainder on the second Bi-Monthly Pay Date.

84.    The Debtor seeks authority to continue to offer the Vision Plan, administer Employee withholdings, and pay to VSP amounts owed under the Vision Plan postpetition in the ordinary course of business and in the Debtor's discretion.

85.    As of the Petition Date, the Debtor estimates only the premium for July 2018 is outstanding. The Debtor seeks authority to pay to Cigna any unpaid prepetition claims in the amount described above.

86.    *COBRA.*  The Consolidated Omnibus Budget Reconciliation Act ("COBRA") gives workers and their families who lose their health benefits the right to choose to continue the group health benefits provided by their group health plan for limited periods of time under certain circumstances, such as voluntary or involuntary job loss, reduction in the hours worked, transition between jobs, death, divorce, and other life events.  COBRA generally requires that group health plans sponsored by employers with 20 or more employees in the prior year offer employees and their families the opportunity for a temporary extension of health coverage (called continuation coverage) in certain instances where coverage under the plan would otherwise end.  Former Employees electing to receive COBRA benefits pay a fixed premium to Aetna, the Debtor's COBRA administrator, totaling approximately $28,500 per month.  As of the Petition Date, the Debtor believes there are approximately $2,800 outstanding

prepetition administrative COBRA fees that may be owed.  The Debtor seeks authority to pay

any unpaid prepetition COBRA administrative fees up to $2,800 to Aetna, and to continue to pay

postpetition COBRA administrative fees in the ordinary course of business and in the Debtor's

discretion.

        87.    *Flexible Spending Accounts and Dependent Care Spending Accounts.*  The

Debtor offers eligible Employees the ability to contribute a portion of their pre-tax compensation

to pay for certain health care and expenses or dependent care expenses through a program (the

"Flexible/Dependent Care Spending Account Program") managed by Bank of America.  Flexible

spending accounts and dependent care spending accounts are funded with Deductions from

participating Employees' pre-tax payroll, all pursuant to applicable IRS guidelines.  The Debtor

estimates that they withhold approximately $64,000 per month to fund participating Employees'

flexible spending accounts and dependent care spending accounts as Deductions.  In addition, the

Debtor pays Bank of America approximately $400.00 per month in fees to administer the

Flexible Spending Account Program.  The Debtor seeks authority to honor its obligations under

the Flexible Spending Account Program, and to continue to pay any amounts under the Flexible

Spending Account Program in the ordinary course of business and in their discretion.

        88.    *Life Insurance,* Accidental *Death & Dismemberment, and Disability*

*Plans.*  The Debtor provides basic life and accidental death and dismemberment coverage to full-

time Employees participating in the Debtor's medical plan (the "Basic Life and AD&D

Insurance Plan") through Life Insurance Company of North America (Cigna) at no cost to

eligible Employees.  The Debtor pays all premiums in connection with the Basic Life and

AD&D Insurance Plan, which is approximately $25,000 per month.

89.     Additionally, the Debtor offers supplemental life, short term and long term disability insurance to their eligible Employees with Life Insurance Company of North America (Cigna) (the "Disability and Supplemental Life Insurance Plan"). Employees may voluntarily elect supplemental life, short term and long term disability insurance under the Disability and Supplemental Life Insurance Plan. The Debtor pays Life Insurance Company of North America (Cigna) premiums in the approximate aggregate amount of $4,000 per month, and Employees reimburse the Debtor for the cost of the Disability and Supplemental Life Insurance Plan out of payroll deductions.

90.     The Debtor estimates that they remit approximately $29,000 per month on account of premiums and administrative fees under the Basic Life and AD&D Insurance Plan and Disability and Supplemental Life Insurance Plan. The Debtor seeks authority to pay unpaid prepetition amounts on account of the Basic Life and AD&D Insurance Plan and Disability and Supplemental Life Insurance Plan up to $29,000, and to continue to pay postpetition premium amounts on account of the Basic Life and AD&D Insurance Plan and Disability and Supplemental Life Insurance Plan in the ordinary course of business and in the Debtor's discretion.

91.     *Holidays, Vacation and Sick Time.* The Debtor provides holiday pay for full-time Employees. All Employees holding a title of vice president (or a more senior position) are not provided with a set amount of vacation time ("PTO"). All others earn fifteen days per year that accrues in proportion to the amount of time worked for any year. The Debtor also offer Employees paid sick time ("Sick Time"). The Debtor's Sick Time benefits consist of five days

per year based on the Employee's anniversary date.  Unused Sick Time is not paid at the time of

termination.

92.    By this Motion, the Debtor seeks authority to continue to honor their PTO

and Sick Time programs in the ordinary course of business by allowing Employees to use

accrued prepetition PTO and Sick Time postpetition in the Debtor's discretion.  The Debtor also

seeks authority, but not the obligation, in their sole discretion, to pay out any accrued and

prepetition PTO amounts that are owed to Employees solely to the extent their employment with

the Debtor is terminated postpetition, provided that no Employee shall be paid more than

$12,850 on account of all payments of accrued and prepetition amounts owing to such Employee

for wages and benefits including such PTO.

93.    *401(k) Plan.*  The Debtor provides full-time Employees with a 401(k)

retirement plan (the "401(k) Plan").  The Debtor does not match Employee contributions.

Employee contributions are withheld from paychecks as Deductions.  To the extent any

prepetition 401(k) Deductions have not yet been made, the Debtor seeks authority to process

those Deductions.  The Debtor also seeks authority, in their discretion, to continue to their 401(k)

Plan postpetition in the ordinary course of business, including continuing to match Employee

contributions to the 401(k) Plan consistent with their 401(k) Plan policy.

94.    The Debtor employs Fidelity and ABD Retirement to audit and administer

the 401(k) Plan (the "401(k) Plan Administration and Audit Fees").  The Debtor pays ABD

Retirement fees of approximately $6,250 per month to administer the 401(k) Plan.  The Debtor

seeks authority pursuant to this Motion to pay up to $6,250 on account of prepetition amounts

owed to ABD Retirement and to continue to pay postpetition amounts with respect to the 401(k)

Plan Audit in the ordinary course of business and in their discretion.

95.    *Workers' Compensation Insurance.*  Under the laws of various states, the

Debtor are required to maintain workers' compensation insurance to provide Employees with

coverage for injury claims arising from or related to their employment with the Debtor (the "WC

Claims").  The Debtor workers' compensation program is fully insured ("WC Program").  For

the current coverage year, the Debtor will pay an estimated annual premium to Zurich in the

amount of $128,816 to be trued up based on actual wages after the coverage year ends.  Of the

$128,816 annual premium, $34,991 was paid at the commencement of the current coverage year

January 31, 2018 through January 30, 2019 with the balance payable in nine (9) equal monthly

installments of $10,425.  As of the Petition Date, the Debtor still owed three (3) monthly

installments for the months of August – October 2018.  The Debtor hereby seeks authorization to

pay the WC Program Installments to Zurich as they come due in the ordinary course.

96.    In addition, for the claims administration process to operate in an efficient

manner and to ensure that the Debtor complies with their contractual obligations, the Debtor

must continue to assess, determine, and adjudicate WC Claims during these chapter 11 cases.

Thus, the Debtor requests that the automatic stay be modified to allow it to continue to assess,

determine and adjudicate unpaid WC Claims in the ordinary course of the Debtor's business.  In

addition, to the extent any employees assert claims under the WC Program, the Debtor requests

that the Court modify the automatic stay under section 362 of the Bankruptcy Code to permit the

employees to proceed with their claims under the WC Program and to allow Zurich to

administer, handle, defend, settle and/or pay a claim covered by the WC Program and the costs

related thereto in accordance with the WC Program. For avoidance of doubt, this requested

modification of the automatic stay described in this paragraph pertains solely to claims under the

WC Program, and not to other claims made under different insurance policies.

97.    Accordingly, I believe payment of the Wages and Benefits is in the best

interest of the Debtor's estate and therefore request that the Wage and Benefits Motion be

granted.

**I.    Debtor's Motion Pursuant to 11 U.S.C. §§ 362 & 105(a) for Entry of Interim and Final Orders Establishing Notification and Hearing Procedures and <u>Approving Restrictions on Certain Transfers of Interests in the Debtor's Estate</u>**

98.    The Debtor seeks to enforce the automatic stay by implementing court-

ordered procedures (the "<u>Procedures</u>") intended to protect Debtor's estate against the possible

loss of valuable tax benefits that could flow from inadvertent violations of the automatic stay.

Pursuant to sections 105(a) and 362 of the Bankruptcy Code, Debtor requests an order (the

"<u>Interim Trading Order</u>") authorizing the Debtor (i) to establish and implement restrictions and

notification requirements regarding the tax ownership and certain transfers of the stock ("Stock")

in the Debtor. The Debtor also seeks approval of a form of notice, which will be used to notify

holders of Stock whose actions could adversely affect Debtor's tax assets that the Procedures

have been established by order of this Court.

99.    The Debtor has certain attributes for U.S. federal income tax purposes (the

"<u>Tax Attributes</u>"), which are expected to include approximately $400,000,000 in estimated,

consolidated net operating loss carryforwards ("NOLs") by the end of the Debtor's 2018 taxable

year. The Tax Attributes may be valuable assets. Internal Revenue Code of 1986, as amended

(the "Tax Code") generally permits corporations to carry forward its tax attributes to reduce future taxable income. *See* I.R.C. § 172. Accordingly, absent any intervening limitations and depending upon future operating results and the consummation of taxable asset dispositions by Debtor, the Tax Attributes could substantially reduce the Debtor's U.S. federal income tax liability, including during the pendency of the Chapter 11 Cases. The Tax Attributes are available to offset any income realized through the taxable year that includes the effective date of a chapter 11 plan, and potentially thereafter. The Tax Attributes could translate into future tax savings over time and the availability of these tax savings may prove crucial to the financial health of a reorganized Debtor.

100. For the reasons discussed below, and consistent with the automatic stay, the Debtor needs the ability to enforce the stay to preclude certain transfers and to monitor and possibly object to other changes in the ownership of Stock. Specifically, trading of Stock could adversely affect Debtor's future ability to utilize the Tax Attributes if too many five percent or greater blocks of equity securities are created through purchases, sales, or issuances, or too many shares are added to or sold from such blocks, such that, together with the previous trading by five percent shareholders during the preceding three year period, a section 382 Ownership Change (as defined below) is triggered prior to the consummation of a confirmed chapter 11 plan.

101. The Debtor's ability to use the Tax Attributes to reduce future tax liability is subject to certain statutory limitations. Sections 382 and 383 of the Tax Code limit a corporation's use of its tax attributes to offset future income or tax after that corporation has undergone an "ownership change" within the meaning of section 382 of the Tax Code ("section 382" and such ownership change, an "Ownership Change"). Pursuant to section 382,

an Ownership Change generally occurs when the percentage of a corporation's equity held by its "5 percent shareholders" (within the meaning of section 382 of the Tax Code) increases by more than 50 percentage points above the lowest percentage of ownership owned by such shareholder(s) at any time during the relevant testing period (usually three years). In addition, an Ownership Change can occur where a "50 percent shareholder" (within the meaning of section 382(g)(4)(D) of the Tax Code) claims a worthlessness deduction in respect of its direct or indirect ownership of the corporation.

102.    In the event a corporation experiences an Ownership Change, section 382 generally imposes a limitation on the amount of NOLs and certain other tax attributes that can be utilized in each subsequent year to offset income. Subject to a number of potentially applicable adjustments, this limitation is generally equal to the product of (1) the equity value of the debtor immediately before the change in ownership multiplied by (2) a long-term tax-exempt rate prescribed by the U.S. Treasury (2.32% for an Ownership Change occurring during the month of July 2018). If the Debtor was to undergo an Ownership Change at a time prior to consummation of a chapter 11 plan, the resulting annual limitation could result in a substantial portion of its NOLs expiring unused.

103.    By contrast, in the context of an Ownership Change that occurs pursuant to a confirmed chapter 11 plan, the rules relating to the limitations on the use of tax attributes are more relaxed, particularly where the plan involves the retention or receipt of at least 50 percent of the stock of the reorganized debtor by shareholders or "qualified creditors." *See* I.R.C. § 382(l)(5), (6). Paragraphs 11 and 12 below discuss the special rule under section 382(l)(5) of the Internal Revenue Code ("section 382(l)(5)") that would apply if Debtor's shareholders and

"qualified creditors" receive stock pursuant to the chapter 11 plan of reorganization constituting at least 50% of the total value and voting power of Debtor's stock immediately after the ownership change.  Paragraph 106 below discusses the special rule under section 382(l)(6) of the Internal Revenue Code ("section 382(l)(6)") that would apply if the Debtor does not satisfy the eligibility requirements of section 382(l)(5) or elect out of that provision.

104.    Under section 382(l)(5), the limitations imposed by section 382 do not apply to a debtor that undergoes an Ownership Change as a result of the consummation of a chapter 11 plan if the plan provides that the persons or entities who owned the debtor's stock immediately before the relevant Ownership Change and/or "qualified creditors" emerge from the reorganization owning (as a result of its prior ownership of stock or claims that are "qualified indebtedness") at least 50% of the total value and voting power of the debtor's stock immediately after the Ownership Change.  *See* I.R.C. § 382(l)(5)(A).  Qualified creditors are, in general, creditors who (i) held its claims continuously for at least 18 months at the time the bankruptcy petition is filed or (ii) hold claims incurred in the ordinary course of the debtor's business and held those claims continuously since they were incurred.  Claims described in the preceding sentence are "qualified indebtedness."  *See* I.R.C. § 382(l)(5)(E); Treas. Reg. § 1.382-9(d)(2).

105.    The Debtor has 33,920,522 shares outstanding, with 86 registered holders as of June 25, 2018, and 4,047 beneficial holders as of May 18, 2018.[6]  It is expected that Debtor will undergo an Ownership Change for purposes of section 382 in the event it emerges from chapter 11.  In that event, the Debtor seeks to avail itself of the special relief afforded by section

---

[6] These are the most recent quantities reported to the Debtor and represent the best information available.

382(l)(5) for changes in ownership under a confirmed chapter 11 plan. However, if the relief requested herein is not granted, there is a significant risk that, as a result of pre-consummation trading, this special relief would not be available to Debtor and the use of Debtor's Tax Attributes could be permanently impaired. Even if the Debtor is ultimately unable to satisfy the requirements of section 382(l)(5) or determine that it is more advantageous to elect not to accept its benefits, it is still in the best interest of Debtor and its estate to restrict Stock trading that could result in a change of ownership of the Debtor before the confirmation of a chapter 11 plan.[7]

106.    In order for Debtor to qualify for the favorable valuation rule of section 382(l)(6), an Ownership Change must occur pursuant to the consummation of a chapter 11 plan. Under section 382(l)(6), if Debtor experiences an Ownership Change pursuant to a confirmed chapter 11 plan and section 382(l)(5) does not apply (either because Debtor elects out of that provision or because its requirements are not satisfied), the value of the reorganized Debtor's equity for the purposes of calculating the limitation under section 382 would reflect the increase in value of the reorganized Debtor's equity resulting from the restructuring of creditor claims in the plan. Thus, to the extent the value of the reorganized Debtor's equity increases as a result of the reorganization (compared to the distressed value of Debtor's equity prior to the reorganization), section 382(l)(6) will provide for a higher annual limitation than would

---

[7] As discussed above, if a change of ownership occurred before the confirmation of a chapter 11 plan, the limitation under section 382 would be determined based on the equity value of Debtors immediately before the ownership change. Consequently, Debtor's ability to use its NOLs could be severely limited. Accordingly, this Motion proposes restrictions on Stock trading in order to guard against an ownership change and thereby to protect a valuable asset of Debtor's estate.

otherwise be obtained under section 382 for an Ownership Change occurring during the time

Debtor is operating under chapter 11.

107.    I believe that the Debtor has significant Tax Attributes that would be

adversely affected (and could be effectively eliminated) by an Ownership Change during the

pendency of these cases.  If such an Ownership Change occurs, the valuation for determining the

annual amount of useable Tax Attributes would be at or close to zero, which may effectively

eliminate the availability of such Tax Attributes.  It is therefore in the best interests of the Debtor

and its stakeholders to restrict trading that could result in an Ownership Change *before* the

effective date of a chapter 11 plan or applicable bankruptcy court order.  Accordingly, the Debtor

respectfully requests that the Court approve the procedures proposed herein to protect Debtor's

ability to use the Tax Attributes during the pendency of these Chapter 11 Cases and potentially

thereafter.

**J.    Debtor's Motion for Entry of an Order
       (a) Authorizing Debtor to Pay Prepetition Claim of
       Critical Vendors and (b) Granting Related Relief (the "Critical Vendor Motion")**

108.    The Debtors seek the entry of an order, (a) authorizing, but not directing,

the Debtor to pay the prepetition claim (the "Critical Vendor Claim") of a single essential vendor

and service provider, Flash Global Logistics, Inc. ("FGL" or the "Critical Vendor"), in an

amount not to exceed $113,620.00 (the "Critical Vendor Cap").

109.    While the Debtor's business relies on its access to and relationship with a

network of vendors and suppliers, at this time in the Debtor's operations with a view to a

potential sale as going concern, there is no relationship more important to maintaining the value

of the Debtor's business than the Debtor's relationship with FGL. The Debtor and FGL are

parties to a Master Services Agreement and Statement of Work, both dated December 2, 2014

(collectively, the "FGL Agreement"), pursuant to which FGL provides the Debtor with global

transportation and warehousing services for the Debtor's replacement parts. Specifically,

through the FGL Agreement, FGL receives and manages orders from the Debtor's customers

requiring replacement parts for mission critical equipment furnished by the Debtor to its

customers. As part of its agreements with its customers, depending on the level of support

purchased, the Debtor commits to providing needed replacement parts *within a four-hour to one*

*business day timeframe* after a customer's request. FGL maintained a network of 120

distribution centers and forward stocking locations worldwide in order to meet that commitment

to the Debtor's customers.

110.    The Debtor's income is dependent entirely on its ability to meet its

obligations to its customers. The Debtor's customers include large enterprises throughout the

world that require uninterrupted access to the cloud infrastructure provided by the Debtor's

products. Central to the Debtor's commitment to its customers is its obligation to provide

needed replacement parts within four hours of a customer's request. The Debtor is entirely

reliant on FGL's services to meet this commitment.

111.    Prior to the Petition Date, due to the Debtor's non-payment, FGL

suspended its services to the Debtor's customers, even though the FGL Agreement does not

permit FGL to terminate such services unilaterally. The Debtor had a choice either to undertake

the time and expense of seeking judicial recourse and obtain an injunction against FGL or make

at least a partial payment against its outstanding debt to FGL, which it did, to restore needed services immediately.

112.    I believe that it is essential to the success of the Debtor's restructuring and sales efforts that it is able to maintain its most critical services to its customers and that it is able to continue to rely on FGL to deliver such services to operate its business. Failure to continue emergency replacement part delivery through FGL could have catastrophic consequences for the Debtor and its customers. I do not believe that the Debtor would be able to identify an alternative service provider, transition needed services to the new provider, and create acceptable inventory levels of parts at a new warehouse network within a reasonable timeframe and the Debtor cannot continue to operate in the ordinary course while a replacement service provider is secured.

113.    Absent assurance of immediate payment, FGL again could refuse to continue providing services to the Debtor's customers. The Debtor believes that it would be extremely difficult, if not impossible, to replace FGL within a reasonable time without severe disruption to the Debtor's business, particularly since FGL's services must be completed within a very short time frame after a customer's request. Such harm would likely far outweigh the cost of payment of FGL's claim. Indeed, by the time it would take the Debtor to prepare the necessary papers and appear at a hearing to obtain a Court order compelling FGL's performance, irreparable harm could occur to customers' operations, as well as the Debtor's reputation for dependability and the perceived value of the Debtor's business.

114.    Given the importance of the services provided by FGL, I believe that it is imperative that the Debtor be granted, on an emergency basis, the flexibility and authority to satisfy its modest prepetition claim, up to the Critical Vendor Cap, as any disruption in the

Debtor's ability to adequately stock its inventory and provide merchandise directly to its customers would cause immediate and irreparable damage to the Debtor's business.

115.    The Debtor requires a continuing system and network in place to meet customers' emergency requests for replacement parts in order for the Debtor to meet its obligations to support hundreds of customer relationships.  The Debtor is dependent entirely on FGL for this critical function. Without uncompromised, uninterrupted and 100% assured access to FGL's services, the Debtor's reputation as a reliable products and services provider could suffer, the Debtor's numerous customer relationships could be jeopardized and the value of Debtor's business significantly impaired.  The Debtor cannot afford any risk of disruption whatsoever at this critical juncture in its sale process.

**K.    Debtor's Motion for Entry of an Order (i) Authorizing and Approving the Debtor's Key Employee Retention Program for Certain Non-Insider Employees and (ii) Granting Related Relief**

116.    By this motion, the Debtor is seeking entry of an order:  (i) authorizing and approving the Debtor's Key Employee Retention Program (the "KERP"), substantially in the form attached to the motion as Exhibit 2, for twenty-one (21) key non-insider employees (collectively, the "Eligible Employees"), providing for a total award pool of $348,000 in the aggregate and (ii) granting related relief.

117.    Operating in the Silicon Valley in Northern California, which has close to no unemployment in the highly competitive tech sector, the Debtor has been able to hire and retain personnel such as the Eligible Employees using competitive salaries and commission structures, benefits, and a stock appreciation rights program.  However, I believe that the recent

reductions in force, the bankruptcy filing, and the marketing of the sale of the business will negatively impact its ability to retain the Eligible Employees.

118.    First, the Debtor recently laid-off approximately 74% employees so that it could better position itself to address short and long-term operating expenditures in the face of declining revenues. Now with a skeletal staff, I believe that its remaining work-force will be forced to look for alternative employment unless the Debtor can assure them they will be compensated for their services as the Debtor markets its assets for sale.

119.    Second, the bankruptcy filing is likely to compound the atmosphere of uncertainty to employees generally following the reduction in force that took place prior to the Petition Date. The Eligible Employees specifically may be concerned that workforce reductions are not complete and inevitable as the Debtor seeks to sell its assets and liquidate its remaining affairs after the conclusion of any sale.

120.    Third, the bankruptcy filing will render the stock appreciation rights held by the Eligible Employees worthless, and reduces compensation that such employees were otherwise counting on.

121.    Fourth, with a skeletal staff, many of the Eligible Employees are expected to assume significant additional duties and responsibilities following the bankruptcy filing. These factors have greatly increased the risk that other companies in a highly competitive employment market may successfully recruit the Eligible Employees, who are the Debtor's most talented and experienced operating personnel.  To maintain the consistency that is crucial to providing the platform to market the Debtor's assets as a going concern or a stand-alone sale of the key assets, the Debtor has developed the KERP.

44

122.    The Debtor's proposed KERP is attached as Exhibit 2 to the Motion and can be summarized as follows:

| Max. Participants | Average Individual Award | Max. Individual Award | Total Cost |
|---|---|---|---|
| 20 employees | $16,571 | $30,000 | $348,000 |

123.    The Debtor proposed awards for each Eligible Employee are identified on **Exhibit 2** attached hereto.  The individual amounts have been determined through management's analysis of the appropriate amount for each Eligible Employee taking into account all relevant factors.

124.    Each Eligible Employee shall earn and be entitled to receive the full amount of his or her retention payment on the KERP Payment Date (as defined below), so long as he or she is employed by the Debtors through the closing or completion date of the sale of substantially all of the Debtor's assets (the "Effective Date" or "KERP Payment Date").

125.    Notwithstanding the foregoing, if an Eligible Employee's employment with the Company is terminated prior to the Effective Date without Cause (as defined below), or due to death or disability, then such Eligible Employee shall earn and be entitled to receive the retention payment on the KERP Payment Date.

126.    As used in the KERP, the term "Cause" means any of the following reasons: (a) the commission of any act of fraud, dishonesty, embezzlement or similar act against the Debtor; (b) unauthorized use or disclosure of any proprietary information or trade secrets of the Debtor or any other party to whom an Eligible Employee owes an obligation of nondisclosure as a result of a relationship with the Debtor; (c) material breach of any obligations

under any written agreement or covenant with (or made for the benefit of) the Debtor, provided that an Eligible Employee will have seven (7) calendar days to cure such material breach to the extent that it is curable; (d) conviction (including any plea of no contest) of a felony or a crime involving moral turpitude; (e) failure or inability to perform any assigned duties after written notice from the Debtor of, and a 7-day opportunity to cure, such failure or inability; or (f) gross negligence or willful misconduct in the performance of any duties to the Debtor that has resulted or is likely to result in damage to the Debtor.

127.    Payments under the KERP are subject to and conditioned upon approval of the KERP by the Bankruptcy Court presiding over the Debtor's chapter 11 case.  If Bankruptcy Court approval is not obtained, the KERP shall be null and void and the Debtor will have no obligation to make the payments under the KERP.

128.    Except as provided in the KERP, payments under the KERP will be in lieu of any other performance bonus, retention, or severance compensation otherwise payable to the Eligible Employees by the Debtor pursuant to any prepetition bonus plan or employment agreement between the Eligible Employee and the Debtor. However, any Eligible Employee that accrued "paid time off" ("PTO") prior to the Petition Date will still receive compensation for such PTO upon termination to the extent permitted under any wage/benefit motion that is approved by the Bankruptcy Court.

129.    Except as otherwise provided in the KERP, upon approval of the KERP by this Court, the Eligible Employees, in consideration of the benefits offered hereunder, shall release the Debtor and all of the Debtor's present or former managers, equity holders, officers, agents, financial advisors, attorneys, employees, partners, affiliates, representatives and their

respective property from any and all claims and causes of action which the Eligible Employees may have in connection with their employment by the Debtor in any capacity whatsoever, including as managers and/or officers of the Debtor, and including, but not limited, to any claim or cause of action the Eligible Employees may have for unpaid salary, commissions and any claims arising under any employment agreement by and between any Eligible Employee and the Company (the "Claims"), *provided, however,* that the foregoing shall not operate as a waiver of or release of any Claims that an Eligible Employee may have for claims against the Company for (a) payment of wages earned by the employee but which remain unpaid, (b) retention payments earned and due under the KERP, or (c) indemnification that arises from such employee's status, to the extent applicable, as an officer or representative of the Company pursuant to applicable law and/or pursuant to an indemnification agreement between such employee and the Company.

130.    As noted above, the Eligible Employees are 21 key non-insider employees identified by the Debtor, as listed on Exhibit 2 attached to the motion.  These individuals hold various titles with the Debtor, including:  vice president, director, and senior manager of various departments, among others.

131.    Notwithstanding the foregoing titles, the Eligible Employees do not include any employee that:  (a) reports directly to the Company's board of directors; (b) is appointed directly by the Company's board; (c) exercises managerial control over the Debtors' operations as a whole; (d) controls Company policy generally; or (e) directs the Debtors' overall corporate governance.

132.    The Debtor is a moderately-sized enterprise whose activities are directed primarily by the Chief Technology Officer (Kieran Harty) and Mr. Duffy as CRO (collectively,

"Senior Management"), who are not Eligible Employees.  While certain employees junior to Senior Management may have the title of vice president, director, senior supervisor, or senior manager, these employees do not exercise material levels of control over the Debtor's governance, budgeting, operations, or strategic direction, as to warrant "insider" status.

133.    Thus, none of the Eligible Employees, although important to the Debtor's businesses, qualify as an "insider" in terms of wielding executive power over the Debtor's business and/or corporate affairs.

134.    I believe the award opportunities provided under the KERP are consistent with market practice for similarly situated employers and are, both individually and in the aggregate, reasonable under the circumstances of this chapter 11 case.

*[Remainder of page intentionally left blank]*

I declare under penalty of perjury under the United States of America that the foregoing is true and correct.

Executed this 10ᵗʰ day of July, 2018 at Boston , MA .

_____
Robert J. Duffy