IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| TINTRI, INC.,[1] | ) | Case No.: 18-11625 (___) |
| | ) | |
| Debtor. | ) | |
| | ) | |

## DEBTOR'S MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, AND 507 (I) AUTHORIZING DEBTOR TO OBTAIN SECURED SUPERPRIORITY POSTPETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (III) AUTHORIZING THE USE OF CASH COLLATERAL, (IV) GRANTING ADEQUATE PROTECTION, (V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF

The debtor and debtor in possession (the "Debtor") in the above-captioned

chapter 11 case hereby moves the Court (the "Motion") for entry of an interim order on an

expedited basis substantially in the form attached hereto as Exhibit A (the "Interim Order"), and

ultimately, at a final hearing to be set by the Court (the "Final Hearing"), a final order (the "Final

Order")[2]: (a) authorizing the Debtor to obtain secured postpetition superpriority financing (the

"DIP Credit Facility") pursuant to the terms and conditions of that certain *Superpriority Secured*

*Debtor-in-Possession Credit Facility Term Sheet* dated as of July 9, 2018 (as amended,

supplemented or otherwise modified from time to time, the "DIP Term Sheet")[3] by and between

---

[1] The Debtor and the last four digits of its taxpayer identification numbers are (6978). The headquarters and service address for the above-captioned Debtor is 303 Ravendale Dr., Mountain View, CA 94043.

[2] The Interim Order and the Final Order are referred to collectively as the "DIP Orders."

[3] The DIP Term Sheet is attached to this Motion at Exhibit B. Unless otherwise defined, capitalized terms used herein shall have the meanings ascribed to them in the DIP Term Sheet or the DIP Orders. To the extent there is any inconsistency between the terms of this Motion and the DIP Term Sheet or the DIP Orders, the DIP Term Sheet or the DIP Orders, as applicable, will control in all respects.

the Debtor and TriplePoint Capital LLC (the "DIP Lender");[4] (b) authorizing the Debtor to

execute and deliver additional documentation consistent with the terms of (or as may be required

by) the DIP Term Sheet and the other DIP Loan Documentation, or as may be reasonably

requested by the DIP Lender, and to perform such other and further acts as may be necessary or

appropriate under or in connection with the DIP Loan Documentation; (c) authorizing the Debtor

to use the DIP Loan Proceeds as permitted in the DIP Loan Documentation and in accordance

with the DIP Orders; (d) granting to the DIP Lender an allowed superpriority administrative

expense claim pursuant to section 364(c)(1) of the Bankruptcy Code; (e) granting to the DIP

Lender, pursuant to sections 364(c)(2), (c)(3) and (d) of the Bankruptcy Code, valid, enforceable,

non-avoidable, automatically and fully perfected (i) security interests in and liens on all of the

DIP Collateral (as defined below), including, without limitation, Cash Collateral (as defined

below), that prime certain pre-petition security interests on the terms set forth in the DIP Term

Sheet, (ii) senior security interests in and liens on all property that is not subject to a pre-petition

security interest, and (iii) non-priming security interests in and liens on the DIP Collateral in

which there are certain pre-existing permitted senior liens, in each case subject to the inter-

creditor priorities set forth in the DIP Loan Documentation, to secure the DIP Credit Facility and

all other obligations under the DIP Term Sheet and the DIP Orders, as applicable (collectively,

---

[4] This Motion also requests authorization for the Debtor to use the pre-petition collateral and cash collateral of Silicon Valley Bank ("SVB"), under the Prepetition SVB Documents (as defined in the DIP Term Sheet), in the manner, and according to the terms, conditions and limitations, set forth in the DIP Term Sheet and the DIP Orders. Under the DIP Term Sheet, certain rights, consents and deliverables applicable to the DIP Lender are also made applicable to SVB on account of its consent to the use of collateral and cash collateral to sustain the Debtor's post-petition operations.   For purposes of this Motion, (i) the foregoing post-petition arrangement with SVB is referred to as the "SVB Funding", and (ii) the DIP Facility and the SVB Funding are referred to collectively as the "Postpetition Financing Arrangement."

the "DIP Loan Obligations"); (f) authorizing the Debtor to use Cash Collateral according to the

DIP Order and the Approved Budget (as defined below); (g) authorizing the Debtor to grant

adequate protection to (i) TriplePoint Capital LLC in its capacity as pre-petition lender (the "Pre-

Petition Junior Secured Lender"), under that certain *Plain English Growth Capital Loan and*

*Security Agreement* dated as of February 6, 2015 (as it has been amended, restated and modified

from time to time prior to the Petition Date (as defined below) (the "Pre-Petition Junior Secured

Credit Facility" and together with all other agreements and documents delivered pursuant

thereto, the "Pre-Petition Junior Secured Loan Documents") by and between the Debtor, as

borrower, and the Pre-Petition Junior Secured Lender, and (ii) SVB in its capacity as pre-petition

lender (the "Pre-Petition Senior Secured Lender"),[5] under that certain *Amended and Restated*

*Loan and Security Agreement* dated as of April 30, 2018 (as it has been amended, restated and

modified from time to time prior to the Petition Date (the "Pre-Petition Senior Secured Credit

Facility" and together with all other agreements and documents delivered pursuant thereto, the

"Pre-Petition Senior Secured Loan Documents") by and between the Debtor, as borrower, and

the Pre-Petition Senior Secured Lender; (h) scheduling the Final Hearing pursuant to Rule

4001(c)(2) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to consider

entry of the Final Order, *inter alia*, approving and authorizing the Postpetition Financing

Arrangement (including, without limitation, the initial advance under the DIP Credit Facility

contemplated by the Interim Order) on a final basis pursuant to the DIP Loan Documentation;

(i) waiving any applicable stay with respect to the effectiveness and enforceability of the Interim

---

[5] The Pre-Petition Junior Secured Lender and the Pre-Petition Senior Secured Lender are referred to collectively
hereinafter as the "Pre-Petition Lenders."

Order (including under Bankruptcy Rule 6004); and (j) granting the Debtor such other and further relief as is just and proper.

This Motion is based on the facts and circumstances set forth below, the exhibits attached hereto and the First Day Declaration (as defined below), among other matters of record in this Chapter 11 case.

## Concise Summary of Key Financing Terms

1.    Pursuant to Bankruptcy Rule 4001(c) and Local Rule 4001-2,[6] following are the material provisions of the Postpetition Financing Arrangement:[7]

(a)    <u>Borrower</u>. Tintri, Inc., as debtor and debtor-in possession.

(b)    <u>Guarantors</u>. None.

(c)    <u>DIP Lender</u>. TriplePoint Capital LLC, subject to the satisfaction of all conditions set forth in the DIP Term Sheet and in the DIP Orders, is providing a commitment for 100% of the DIP Credit Facility.

(d)    <u>DIP Credit Facility</u>. The DIP Credit Facility is a senior secured superpriority debtor-in-possession loan facility in an aggregate principal amount, before giving effect to the Roll-Up (as defined below), of $5,493,000 (the "<u>Maximum Commitment</u>") consisting of:

(i) A term loan commitment in a maximum principal amount of $2,952,000 (the "<u>Interim DIP Loan</u>"), which shall be made available on the Interim Closing Date. On the Interim Closing Date, the DIP Lender will make a single extension of credit to the Borrower in the amount of the Interim DIP Loan.

---

[6] The summaries and descriptions of the terms and conditions of the DIP Term Sheet and the Interim Order set forth in this Motion are intended solely for informational purposes to provide the Court and parties in interest with an overview of the significant terms thereof. The summaries and descriptions are qualified in their entirety by the DIP Term Sheet and the Interim Order.

[7] As noted, the Postpetition Financing Arrangement also contemplates the consensual use of the pre-petition collateral, including Cash Collateral, of SVB pursuant to the Approved Budget. Although most of the following summary of material terms reflects provisions of the DIP Term Sheet (with the principal exception of the budget, adequate protection and release provisions described below), SVB's consent to the use of Cash Collateral is subject to satisfaction of many of the same conditions applicable to the DIP Lender's extension of credit under the DIP Term Sheet.

(ii)  A term loan commitment in a maximum principal amount of $2,541,000 (the "Final DIP Draws"), which shall be made available on and following the Final Closing Date in two Advances to the Borrower, with the first Advance in the amount of up to $1,943,000 on the Final Closing Date and the second advance in an amount of up to $598,000 after the Final Closing Date and before the Maturity Date (defined below).  Each of the Interim DIP Loan and the Final DIP Draws are subject to the satisfaction by the Borrower of the Draw Conditions, among other conditions precedent specified in the DIP Term Sheet. The Draw Conditions are listed in the *Availability* section of the DIP Term Sheet and include the absence of an event of default and the delivery of an Approved Budget.  The second advance, moreover, is subject to the receipt by the DIP Lender of a draw request from the Debtor and to any legal and business due diligence deemed necessary by the DIP Lender and approval of the DIP Lender, in each case, in its sole discretion.

(e)    Roll-Up.  Subject to the entry of the Final Order, on the Final Closing Date, the indebtedness of Borrower to the Pre-Petition Junior Secured Lender under the Pre-Petition Junior Secured Loan Documents, whether for borrowed money, fees, expenses, or otherwise, but not to exceed $25 million (the "Roll-Up"), will be added to the DIP Credit Facility, subject to customary challenge rights in favor of other parties in interest and any statutory committee as provided by the DIP Orders.  For purposes of this Motion, the sum of the (i) Interim DIP Loan, (ii) the Final DIP Draws, and (iii) the Roll-Up is referred to as the "DIP Loans."

(f)    Interest Rates and Fees.  12.75% per annum payable monthly in cash in arrears on each monthly anniversary of the Petition Date, computed based on a 360-day year.  At all times while any Event of Default exists, unpaid principal, interest and other amounts shall bear interest at a rate per annum equal to 5% in excess of the foregoing interest rate.  With the exception of certain reimbursable expenses, there are no other fees payable by the Debtor to the DIP Lender under the DIP Term Sheet.  Under ¶ 4 of the Interim Order, the reimbursement of the DIP Lender's reasonable and documented professionals' fees and expenses will be made following certain notice and objection procedures.  Unlike interest on the Interim DIP Loan and the Final DIP Draws, interest on the Roll-Up from and after the Petition Date will be paid-in-kind absent an Event of Default, but such paid-in-kind interest shall be due and payable in cash upon the Maturity Date.

(g)    Termination Event.  The DIP Credit Facility shall mature, and all unpaid principal, interest, fees and expenses shall be immediately due and payable, on the earliest to occur of (i) September 21, 2018 (the "Maturity Date"), and (ii) the acceleration of the DIP Loans and the termination of the commitment to make the DIP Loans in accordance with the terms of the DIP Term Sheet or the DIP Orders, as applicable (including, without limitation, the non-satisfaction of any Chapter 11 Milestone (as defined in *Exhibit A* to the DIP Term Sheet) by the applicable specified deadline and the non-waiver of such non-satisfaction by the DIP Lender).

The date on which the earlier of clauses (i) and (ii) occurs is referred to as a "Termination Event." Upon a Termination Event, the DIP Credit Facility shall be deemed terminated and the DIP Lender shall have no further obligation to provide financing pursuant to the DIP Credit Facility or the DIP Orders, other than to fund any then outstanding Carve-Out. All unpaid principal, interest, fees and expenses under the DIP Credit Facility shall be due and payable in full upon a Termination Event, whether at maturity, upon acceleration or otherwise. Upon a Termination Event, the Debtor's authority to use Cash Collateral shall also lapse, subject to the rights and remedies set forth in the DIP Orders.

(h)    Purpose of Funding. The proceeds of the DIP Credit Facility and Cash Collateral will be used solely for (a) working capital and general corporate purposes of the Debtor, (b) bankruptcy-related costs and expenses (subject to the Carve-Out (as defined below)), (c) costs and expenses related to the Sale,[8] all in accordance with the Approved Budget and, (d) for any other purpose consented to in writing by the DIP Lender and the Pre-Petition Lenders.

(i)    Payroll Reserve. Upon the Interim Closing Date, the Debtor shall establish a reserve (the "Payroll Reserve") of $1,890,000 (to be adjusted from time to time pursuant to the Approved Budget) to pay wages, benefits, withholdings, and commissions owed to employees and independent contractors, along with related payroll management expenses (collectively, the "Payroll Expenses"), that have or will come due through the Final Closing Date as set forth in the Approved Budget. Upon the Final Closing Date, the Debtor shall make an additional deposit into the Payroll Reserve for Payroll Expenses that will come due for the period from such date through the Outside Date (defined below) as set forth in the Approved Budget. The funds contained in the Payroll Reserve shall be used only for Payroll Expenses and not for any other purpose. The DIP Lender and the Pre-Petition Lenders have agreed that, notwithstanding a default, the Debtor will be permitted to access and use funds contained in the Payroll Reserve and Cash Collateral to pay and satisfy Payroll Expenses accrued through the date of such default, as more particularly described in the DIP Term Sheet. The funds contained in the Payroll Reserve shall retain their characteristic as Cash Collateral and will remain subject to (a) the DIP Liens, (b) existing liens in favor of the Pre-Petition Lenders, and (c) the adequate protection liens granted by the Interim Order in the relative priorities among such liens set forth in the Interim Order.

(j)    Use of Cash Collateral. The Postpetition Financing Arrangement contemplates the Debtor's continued use of Cash Collateral,[9] according to an Approved Budget

---

[8]  For purposes of this Motion, a "Sale" refers to the sale of substantially all of the assets of the estate pursuant to section 363 of the Bankruptcy Code, which may be effectuated in more than one transaction.

[9]  "Cash Collateral" means all "cash collateral" as defined in section 363 of the Bankruptcy Code, in or on which the DIP Lender and each Pre-Petition Lender holds a lien, security interest, or other interest (including, without limitation, any adequate protection liens or security interests) whether existing on the Petition Date or subsequently arising.

on the terms and conditions set forth in the Interim Order. *See* Interim Order at ¶ 29. The parties with an interest in Cash Collateral are the Pre-Petition Senior Secured Lender and the Pre-Petition Junior Secured Lender.

(k)     <u>Budget</u>. The Debtor's use of all cash (whether or not from advances under the DIP Credit Facility or pursuant to the SVB Funding, *i.e.,* collections of accounts receivable generated by the Debtor's operations) shall be subject to a weekly budget for the 13-week period commencing on the Petition Date and ending on the October 5, 2018 (*i.e.,* the "<u>Outside Date</u>"), in form and substance acceptable to, and approved in writing by, the DIP Lender and SVB, in their sole and absolute discretion (the "<u>Approved Budget</u>").[10] The Approved Budget is subject to amendment with the written consent of the DIP Lender and SVB. Moreover, the Debtor is allowed a 10% variance under certain reporting categories specified in the budget, as well as under its projected aggregate weekly cash receipts and cash disbursements. The Debtor is required, by the DIP Term Sheet, to periodically deliver certain reports to the DIP Lender and SVB showing results and variances under the Approved Budget to date as well as daily cash receipts and disbursements, among other information.

(l)     <u>Restrictions on Use of Funds</u>. None of the advances under the DIP Credit Facility and no Cash Collateral may be used in connection with the investigation (including discovery proceedings), initiation or prosecution of any claims, causes of action, adversary proceedings, contested matters or other litigation against the DIP Lender (in its capacity as such). None of the advances under the DIP Credit Facility and no Cash Collateral may be used in connection with the investigation (including discovery proceedings), initiation or prosecution of any claims, causes of action, adversary proceedings, contested matters or other litigation against the Pre-Petition Lenders (each in their capacity as such), except up to the amount of $15,000 for an investigation (including any related discovery proceedings) by a committee or other parties in interest (other than the Debtor) in connection with the validity and perfection of the liens granted under the Pre-Petition Junior Secured Credit Facility or the Pre-Petition Senior Secured Credit Facility, as set forth in the DIP Orders.

(m)     <u>Security and Superpriority</u>. The DIP Loans and all other obligations of the Debtor to the DIP Lender under or in connection with the DIP Loan Documentation (collectively, the "<u>DIP Obligations</u>"), shall (a) pursuant to section 364(c)(1) of the Bankruptcy Code, be entitled to superpriority administrative expense claim status in the Chapter 11 Case with priority over any and all administrative expenses, and (b) pursuant to sections 364(c)(2), (c)(3) and (d) of the Bankruptcy Code, be

---

[10] The Debtor has provided a budget to the DIP Lender and SVB setting forth in reasonable detail the projected receipts and disbursements of the Debtor on a weekly basis following the Petition Date. This budget has been approved by the DIP Lender and SVB as provided by the DIP Term Sheet. A summary of the Approved Budget is attached to the DIP Term Sheet as <u>Exhibit B</u>. The Debtor believes that the Approved Budget is achievable and will enable it to operate its business without the accrual of unpaid administrative expenses.

secured by liens on the DIP Collateral (as defined below), in all cases subject to the Carve-Out and the priorities set forth in the DIP Term Sheet.

(n)    DIP Collateral.  For purposes of this Motion, "DIP Collateral" means, collectively, all now owned or hereafter acquired assets and property of the Debtor and its chapter 11 estate, whether real or personal, tangible or intangible, or otherwise, and any and all proceeds therefrom, including, without limiting the generality of the foregoing, all Cash Collateral, accounts, accounts receivable, inventory, property, plant and equipment, real estate, leaseholds, vehicles, trailers, rolling stock, avoidance actions under chapter 5 of the Bankruptcy Code ("Avoidance Actions") (but, in the case of Avoidance Actions, only upon the Final Closing Date and subject to entry of the Final Order), all intercompany claims, any and all proceeds available to the Debtor arising from insurance policies (including, without limitation, policies for the benefit of directors and officers of the Borrower), all intellectual property, all claims and causes of action of the Debtor or its estate and any and all proceeds therefrom.  For the avoidance of doubt, the DIP Collateral shall include, without limiting the generality of the foregoing, all assets of the Borrower that are secured pursuant to the Prepetition TriplePoint Documents.

(o)    Adequate Protection.  The Pre-Petition Lenders are each entitled to and shall each receive adequate protection to protect (to the extent of any diminution in value of their respective interests in the value of their respective prepetition collateral, including any Cash Collateral) resulting from (a) the incurrence of the DIP Loan Obligations, (b) the use of Cash Collateral, (c) the granting of the liens and the superpriority claim under the DIP Term Sheet, (d) the acquiescence of the Pre-Petition Lenders in the Carve-Out, (e) any other diminution in the value of their respective prepetition collateral, and (f) the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code (collectively, the "Diminution"), by the granting of the following, all as more fully set forth in the DIP Orders: (a) a replacement lien in the DIP Collateral, (b) an adequate protection superpriority claim pursuant to section 507(b) of the Bankruptcy Code; and (c) the right to hereafter request additional or further adequate protection in the event that the protection granted by the DIP Orders proves to be inadequate.

The claim of SVB under section 507(b) of the Bankruptcy Code will be senior to the claim of the DIP Lender under section 364(c)(1) of the Bankruptcy Code and, hence, junior only to the Carve-Out.  In addition, SVB (in its capacity as the Pre-Petition Senior Secured Lender), will receive cash payments, as permitted by section 361 of the Bankruptcy Code, for (i) interest at the applicable non-default rate under their respective prepetition loan documents (although SVB will continue to accrue interest at the default rate for purposes of their respective claims in the Chapter 11 case), and (ii) reimbursement of reasonable and documented professionals' fees and expenses (payable in the manner and in accordance with the procedures set forth in the DIP Orders).

(p)     Sale Proceeds. The Debtor will not seek or support entry of any order that provides for a sale of the DIP Collateral unless SVB and the DIP Lender consent to such sale, and the excess sale proceeds shall be applied to repay the obligations under the SVB Credit Facility and the DIP Credit Facility in the priority set forth in the DIP Orders.

(q)     Carve-Out. The term "Carve-Out" means, collectively:  (i) fees payable to the United States Trustee pursuant to 28 U.S.C. § 1930(a)(6) ("US Trustee Fees"), (ii) fees payable to the Clerk of the Bankruptcy Court ("Case Administration Fees"), (iii) unpaid postpetition professional fees and expenses ("Debtor Professional Fees") payable to each legal or financial advisor retained by the Debtor, including the noticing agent (the "Debtor Professionals") that are incurred or accrued prior to the date of the occurrence of a Termination Event (as defined in the Interim Order or Final Order as in effect), but subject to the aggregate amount(s) set forth in the Approved Budget and ultimately allowed by the Court pursuant to sections 328, 330, 331 and 503 of the Bankruptcy Code or any order of the Court (whenever such fees may be actually incurred prior to the Termination Event), (iv) unpaid professional fees and expenses (together with the Debtor Professional Fees, the "Professional Fees") payable to each legal or financial advisor retained by the Committee that are incurred or accrued prior to the date of the occurrence of a Termination Event but subject to the aggregate amount(s) set forth in the Approved Budget and ultimately allowed by the Court pursuant to sections 328, 330, 331 and 503 of the Bankruptcy Code or any order of the Court (whenever such fees may be actually incurred prior to the Termination Event), (v) Case Administration Fees and Professional Fees paid on or after the date of the occurrence of a Termination Event in an aggregate amount not to exceed $25,000, and (vi) in the event this Chapter 11 Case is converted to a case under chapter 7 of the Bankruptcy Code, reasonable fees and expenses incurred by a duly-appointed trustee under section 726(b) of the Bankruptcy Code in an aggregate amount not to exceed $25,000. The Carve-Out shall be senior to all claims and liens, including DIP Liens, the SVB Liens and liens granted to each of the Prepetition Lenders, as well as any adequate protection liens and claims described herein, other than Existing Prepetition Liens (except for the SVB Liens insofar as they are defined as Permitted Liens under the Pre-Petition Junior Secured Loan Documents).

(r)     Reserves for Carve-Out. The Debtor shall establish segregated accounts for the purpose of periodically depositing funds on account of (a) US Trustee Fees that will accrue during the pendency of the Chapter 11 Case, and (b) 50% of the then-accrued Carve-Out for Professional Fees pending approval of the Bankruptcy Court to disburse such funds to the respective beneficiaries of the Carve-Out.

(s)     Events of Default. The DIP Term Sheet specifies the following events of default under the Postpetition Financing Arrangement (each an "Event of Default"): (i) occurrence of any deviation from the Approved Budget that is greater than the Permitted Variances; (ii) failure of any of the Chapter 11 Milestones to be satisfied or, following execution of the asset purchase agreement referenced in the

Chapter 11 Milestones, an express written statement indicating that the buyer does not intend to go forward with the sale; (iii) failure by the Debtor to be in compliance in all respects with any provision of the DIP Loan Documentation; (iv) reversal, modification, amendment, stay or vacation of the Interim Order or the Final Order, as entered by the Bankruptcy Court, without the prior written consent of the DIP Lender; (v) the filing with the Bankruptcy Court of a plan of reorganization or liquidation in this Case that does not provide for indefeasible payment in full in cash to SVB of amounts outstanding under the SVB Credit Facility and the DIP Lender of the DIP Loans (including the portion of the DIP Loans related to the Roll Up); (vi) the appointment in this Case of a trustee, receiver, examiner, or responsible officer with enlarged powers relating to the operation of the business of the Debtor (powers beyond those set forth in sections 1106(a)(3) and (a)(4) of the Bankruptcy Code); (vii) the filing of a motion by the Debtor seeking dismissal of this Case or the conversion of this Case to a case under chapter 7 of the Bankruptcy Code; (viii) the granting of relief from the automatic stay by the Bankruptcy Court as to any material assets of the Debtor to any other creditor or party in interest in this Case; (ix) failure of all amounts due and owing to the DIP Lender under, in respect of or in connection with the DIP Credit Facility to be paid in full in cash on the Maturity Date; (x) if any provision in the DIP Term Sheet shall cease to be binding on or enforceable against the parties thereto; and (xi) other Events of Default specified in the DIP Orders.

Although an Event of Default may be waived by the DIP Lender or SVB in their respective discretion, a waiver by the DIP Lender will not be binding on SVB or affect SVB's ability to declare an Event of Default under the DIP Orders.

(t)    <u>Indemnity</u>. The Borrower has agreed to indemnify, pay and hold harmless the DIP Lender (strictly in its capacity as such) (and its respective directors, officers, employees and agents) against any loss, liability, cost or expense incurred in respect of the financing contemplated by the DIP Credit Facility or the proposed use of proceeds thereof (except to the extent resulting from the gross negligence or willful misconduct of the indemnified party, as determined by a final, non-appealable judgment of a court of competent jurisdiction).

(u)    <u>Releases</u>. The Borrower has agreed to release and exculpate the Pre-Petition Lenders in respect of any matters arising prior to the Petition Date, subject to customary challenge rights in favor of creditors or any statutory committee. The release and challenge rights are set forth in greater detail in the Interim Order attached hereto. The Debtor's acknowledgments regarding the validity, enforceability and perfection of the claims and liens under Pre-Petition Senior Secured Loan Documents and the Pre-Petition Junior Secured Loan Documents (defined as the "Debtor's Stipulations" under the Interim Order), are set forth at ¶¶ E(i) through (viii) of the Interim Order. The Debtor's Stipulations are subject to the challenge rights and deadlines set forth at ¶ 36 of the Interim Order. The Interim Order does not grant standing on any party in interest, including any Statutory Committee, to bring a challenge on behalf of the Debtor's estate,

10

*provided that*, the challenge deadline is tolled for 30 days if a motion seeking standing to bring a challenge is filed before the expiration of the challenge period.

2.     The provisions described in Federal Rule of Bankruptcy Procedure 4001(c)(1)(B)(i)-(xi) and Local Bankruptcy Rule 4001-2, to the extent applicable, are set out at the following sections of the DIP Term Sheet and the Interim Order:

(i)     ***Grant of priority or a lien on property of the estate.*** DIP Term Sheet, *Priority*, p. 5, Interim Order ¶¶ 8-9.

(ii)    ***(A) Provisions that grant cross-collateralization protection to prepetition secured creditors, and (B) provisions that deem pre-petition secured debt to be postpetition debt.*** Subject to the entry of the Final Order, $25 million of the indebtedness of the Debtor to the Pre-Petition Junior Secured Lender under the Pre-Petition Junior Secured Loan Documents, will be added to the DIP Credit Facility subject to (a) the priorities set forth in the Interim Order and (b) the reservation of challenge rights under paragraph 36 of the Interim Order. *See* DIP Term Sheet, *Roll-Up of Prepetition TriplePoint Documents*, p. 7, Interim Order ¶ 11.

(iii)   ***Adequate protection or priority for a claim that arose before the commencement of the case.*** DIP Term Sheet, *Adequate Protection*, p. 7; Interim Order, ¶ 32.

(iv)    ***Determination of validity, enforceability, priority or amount of a claim that arose before the commencement of the case, or of any lien securing the claim.*** DIP Term Sheet, *Purpose*, p. 4 & *Other Bankruptcy Matters,* p. 13; Interim Order, ¶ (E)(iv)-(vii), but subject to challenge rights in ¶ 36 consistent with the time periods contemplated by Local Rule 4001-2(a)(i)(B).

(v)     ***Waiver or modification of the automatic stay.*** DIP Term Sheet, *Remedies Upon Default*, p. 13; Interim Order, ¶ 18.

(vi)    ***Waiver or modification of authority to file a plan, seek an extension of time in which the debtor has the exclusive right to file a plan, request use of cash collateral or request authority to obtain credit.*** DIP Term Sheet, *Events of Default*, p. 12.

(vii)   ***Establishment of deadlines for filing a plan, for approval of a disclosure statement, for a hearing on confirmation, or for entry of a confirmation order.*** Not applicable,[11] although the Debtor has agreed that it shall be an

---

[11] The DIP Term Sheet does, however, prescribe certain Chapter 11 Milestones, which include specified deadlines with respect to a sale process. *See* DIP Term Sheet, *Exhibit A*.

Event of Default under the DIP Term Sheet for the Debtor to file a plan of reorganization or liquidation in the Chapter 11 Case that does not provide for indefeasible payment in full in cash to the DIP Lender of the DIP Loans (including the portion of the DIP Loans related to the Roll Up) on the effective date of such a plan.

(viii)   *Waiver or modification of the applicability of nonbankruptcy law relating to the perfection of a lien on property of the estate, or on the foreclosure or other enforcement of the lien.* The Interim Order will serve as evidence of the validity, perfection, and priority of the DIP Liens and Adequate Protection Liens without the necessity of filing or recording any financing statement or other document otherwise required under applicable nonbankrutpcy law. Interim Order, ¶¶ 24, 34.

(ix)    *Release, waiver or limitation on any claim or other cause of action belonging to the estate or the trustee.* The Interim Order contains releases and exculpations for TriplePoint and SVB in respect of any matters arising prior to the Petition Date, subject to customary challenge rights in favor of creditors or any statutory committee consistent with the time periods contemplated by Local Rule 4001-2(a)(i)(B). DIP Term Sheet, *Purpose*, p. 4 & *Other Bankruptcy Matters,* p. 13; Interim Order, ¶ (E)(i) - (viii) (the Debtors' Stipulations), ¶ 36 (challenge rights).

(x)     *Indemnification of any entity.* The Debtor has agreed to indemnify the DIP Lender (strictly in its capacity as such) and its directors, officers, employees and agents against any loss or liability incurred in connection with the DIP Facility or the use of the proceeds thereof, except to the extent resulting from the gross negligence or willful misconduct of the indemnified party, as determined by a final, non-appealable judgment of a court of competent jurisdiction. DIP Term Sheet, *Other Bankruptcy Matters,* p. 13; Interim Order, ¶ 41.

(xi)    *Release, waiver or limitation on rights under Sections 506(c) and 552(b) and the equitable doctrine of marshaling.* Upon entry of the Final Order, in light of the DIP Credit Facility, the Pre-Petition Lenders' consent to use of Cash Collateral, and the agreements of the DIP Lender and the Pre-Petition Lenders to subordinate their respective rights of payment, liens and superpriority/priority claims to the Carve-Out, the DIP Lender and Pre-Petition Lenders will receive (a) a waiver of any *"equities of the case"* claims under section 552(b) of the Bankruptcy Code, (b) a waiver of the provisions of section 506(c) of the Bankruptcy Code, and (c) a waiver of the equitable doctrine of marshaling. Interim Order, ¶¶ 38-39.

(xii)   *Liens granted on claims arising under Chapter 5.* Upon entry of a Final Order, the DIP Collateral will include all avoidance actions and claims arising under chapter 5 of the Bankruptcy Code. DIP Term Sheet, *Collateral*, p. 8; Interim Order, ¶ 8.

**Jurisdiction and Venue**

3.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Debtor confirms its consent pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

4.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

5.      The statutory bases for the relief requested herein are sections 105(a) and 361, 362, 363 and 364 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rules 2002-1 and 4001-2.

## Background

6.     On the date hereof (the "Petition Date"), the Debtor commenced this case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtor has continued in the possession of its property and has continued to operate and manage its business as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner or committee has been appointed in the Debtor's chapter 11 case.

7.     The factual background regarding the Debtor, including its current and historical business operations, an overview of the Debtor's pre-petition capital structure and the events precipitating the chapter 11 filing, is set forth in further detail in the *Declaration of Robert J. Duffy in Support of First Day Pleadings* (the "First Day Declaration") filed concurrently herewith and fully incorporated herein by reference.[12]

## Proposed Postpetition Financing Arrangement

**A.     Need for Postpetition Financing**

8.     The Debtor's business does not generate the cash necessary to finance its operations and has consumed substantial amounts of cash to date.

9.     The company's revenue increased from $86 million in fiscal 2016 to $125.1 million in fiscal 2017, and to $125.9 million in fiscal 2018, representing year-over-year growth of 45% and 1%, respectively. The company's net loss was $101.0 million, $105.8 million, and $157.7 million in fiscal years 2016, 2017, and 2018, respectively. Total assets decreased from $158.1 million as of the end of fiscal 2016 to $104.9 million as of the end of

---

[12] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the First Day Declaration.

fiscal 2017, and to $76.2 million as of the end of fiscal 2018, representing year-over-year change

of 34% and 27%, respectively.  The company attributed flat revenue growth in fiscal 2018 in part

due to delayed and reduced purchases of products as a result of customer concerns about Tintri's

financial condition, as well as a shift in its product mix toward lower-priced products, offset

somewhat by increased support and maintenance revenue from its growing installed customer

base.  Ultimately, the company's sales levels have not experienced a level of growth sufficient to

address its cash burn rate and sustain its business.

10.    Following the company's initial public offering in July 2017, four class

action lawsuits were filed against it.  The company's IPO raised less capital than anticipated.

Tintri's orders for new products declined, it lost a few key customers and, consequently, its

declining revenues led to the company's difficulties in meeting day-to-day expenses, as well as

long-term debt obligations.  A few months after its IPO, in December 2017, the Debtor

announced that it was in the process of considering strategic options and had retained investment

bank advisors to assist it in this process.

11.    The Debtor's financial condition led existing and potential customers and

suppliers to express concerns regarding its financial condition, which negatively impacted the

Debtor's ability to sell products and services.  The Debtor's financial condition also adversely

affected its ability to continue to attract and retain key personnel and other employees.

12.    Due to continued deterioration in the Debtor's cash flow, the Debtor,

following consultation with its advisors and other professionals, determined that the best course

of action under the present circumstances would be to file a Chapter 11 petition and to seek the

Court's approval for the prompt sale of substantially all its assets.  In connection with that decision, the Debtor negotiated a debtor-in-financing package with the DIP Lender, as well as the terms for the continued use of cash collateral with the Pre-Petition Lenders.  The proposed DIP Credit Facility, coupled with the Debtor's continued access to Cash Collateral, will fund the Debtor's operations for approximately 90 days during which time the Debtor will vigorously market and sell its business, intellectual property and tangible assets in a sale (or sales) under section 363 of the Bankruptcy Code.  The funding will enable the Debtor to conduct a thorough and orderly marketing process so that the value of its estate, principally its skilled engineering talent and patent portfolio, will be maximized.

13.    The Debtor requires the financing under the DIP Credit Facility and the continued use of Cash Collateral (i) to preserve the value of its assets, (ii) to satisfy payroll obligations and other working capital and general corporate purposes consistent with the terms set forth in the DIP Loan Documentation and the Approved Budget, (iii) to pay fees and expenses related to the DIP Loan Documentation and the Chapter 11 Case, and (iv) for such other purposes as are set forth in the DIP Term Sheet.  If the Debtor does not obtain authorization to borrow and spend according to the DIP Loan Documentation, it will suffer immediate and irreparable harm and will be required to immediately cease operations.

14.    The First Day Declaration describes the Debtor's efforts to obtain working capital financing in order to fund its Chapter 11 case.  The Debtor is unable to obtain adequate unsecured credit allowable as an administrative expense under section 503 of the Bankruptcy Code, or other sufficient financing under section 364(c) or (d) of the Bankruptcy Code, on equal

or more favorable terms than those set forth in the DIP Loan Documentation. A loan facility in the amount provided by the DIP Credit Facility is not available to the Debtor without granting the DIP Lender the superpriority claims, and liens pursuant to sections 364(c)(1), 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, as provided in the Interim Order and the DIP Loan Documentation. After considering all alternatives, the Debtor has concluded, in the exercise of its business judgment, that the Postpetition Financing Arrangement represents the best financing option available at this time.

**B.      Negotiation of DIP Credit Facility and Use of Cash Collateral**

15.      The Debtor, the DIP Lender and SVB engaged in extensive, arm's length negotiations with respect to the terms and conditions of the proposed DIP Credit Facility and the use of Cash Collateral. These negotiations culminated in agreement upon the proposed financing pursuant to the DIP Term Sheet attached to this Motion as Exhibit A. The DIP Term Sheet permits the Debtor to request the advance of the Interim DIP Loan from the DIP Lender and use Cash Collateral of the Pre-Petition Lenders pending this Court's entry of the Final Order. This interim commitment will ensure that the Debtor will be able to meet its administrative obligations during the early stages of the Chapter 11 Case as well as provide adequate liquidity to operate its business.

16.      Upon entry of the Final Order, and subject to the terms and conditions set forth in the DIP Term Sheet, the Debtor will be permitted to request the final two advances under the DIP Credit Facility up to an aggregate amount not to exceed the Maximum Commitment, less the amount of the Interim DIP Loan. The Debtor, the DIP Lender and SVB have agreed upon

the Approved Budget, projecting cash flow for the expected duration of this case. This budget contemplates that the Debtor will have use of Cash Collateral during that time. The Debtor believes that the Approved Budget is achievable and will allow the Debtor to operate without the accrual of unpaid administrative expenses.

17.    Importantly, the DIP Term Sheet also provides critical assurances to the Debtor's employees that the company's aggregate payroll expenses (for the period commencing on the Petition Date through the Final Closing Date, *i.e.,* the first month of the Chapter 11 Case) will be *reserved in advance* (upon entry of the Interim Order), by a deposit to the Payroll Reserve.[13] This funding will provide a key incentive to the Debtor's workforce to remain with the company during the sale process. On the Final Closing Date, and subject to the terms and conditions set forth in the DIP Term Sheet, the Debtor will make a similar deposit to the Payroll Reserve to provide assurances that the Debtor's additional projected Payroll Expenses (as that term is used in the DIP Term Sheet), will be met for the period from such date through the Outside Date. Absent these pre-funding assurances, the Debtor believes it will suffer further attrition over the course of the Chapter 11 Case that will be extremely deleterious to its sale efforts. The DIP Lender and SVB are each willing to make this significant accommodation in order to allay any concerns among the Debtor's workforce that the company's payroll obligations will not be satisfied.

---

[13] The funds contained in the Payroll Reserve will remain as Cash Collateral subject to the DIP Liens, existing liens in favor of the Pre-Petition Lenders and the adequate protection liens granted to the Pre-Petition Lenders pursuant to the Interim Order

18.     Moreover, notwithstanding the occurrence of an Event of Default under the DIP Term Sheet, the Debtor will be able to access and use funds contained in the Payroll Reserve to satisfy its Payroll Expenses accrued through the effective date of a termination of the Debtor's entitlement to use Cash Collateral and/or receive DIP Loans under the DIP Loan Documentation. In addition, notwithstanding the conversion of the Chapter 11 case to a case under chapter 7, or the appointment of a Chapter 11 trustee or examiner (defined as a Specified Event of Default under the DIP Term Sheet), the Debtor will be able to use the Payroll Reserve to satisfy Payroll Expenses accrued through the date on which such Specified Event of Default shall have occurred.

**C.      Adequate Protection for Pre-Petition Lenders**

19.     The Pre-Petition Lenders are each entitled, pursuant to sections 361 and 363(e) of the Bankruptcy Code, to adequate protection of their respective interests in their pre-petition collateral, including Cash Collateral, to the extent that there is a diminution in the value of such collateral from and after the Petition Date.

20.     The Debtor seeks to grant liens and claims, as more fully described and set forth in the proposed Interim Order, to be made to the Pre-Petition Lenders for the purpose of, among other things, protecting each of their claims, obligations, and collateral interests from the potential depreciation and deterioration of such collateral.

21.     In addition to the foregoing liens and claims, SVB shall receive additional adequate protection as follows: (i) accrual of interest at the Default Rate (as provided in Section 2.5 of the SVB Secured Loan Agreement); *provided*, that the Borrower shall be required to only

make current payment of interest at the applicable non-default rate, and (ii) reimbursement of

SVB's reasonable and documented professionals' fees and expenses (to be made in the manner

and in accordance with the procedures set forth in the DIP Orders)

## **Relief Requested**

22.     The Debtor requests that the Court set an emergency interim hearing on

the Motion for the Court to consider entry of the Interim Order authorizing the Debtor to:  (a) use

the collateral and Cash Collateral of the Pre-Petition Lenders on an interim basis under the

Approved Budget, (b) obtain senior secured, superpriority, postpetition financing from the DIP

Lender up to an aggregate principal amount of $2,952,000, to avoid immediate and irreparable

harm to the estate pursuant to the terms and conditions of the DIP Term Sheet, (c) grant to the

DIP Lender the liens and superpriority claims described herein and in the DIP Term Sheet, and

(d) provide to the Pre-Petition Lenders the adequate protection described herein and in the

Interim Order.

23.     The Debtor further requests that the Court schedule the Final Hearing on

the Motion within thirty (30) days of the commencement of the case to consider entry of the

Final Order authorizing the Debtor to (a) continue to use the collateral and Cash Collateral of the

Pre-Petition Lenders on a final basis under the Approved Budget, (b) obtain the balance of the

borrowings permitted under the DIP Credit Facility, and (c) approve notice procedures with

respect to the Motion as well as approve the proposed notice of the Final Hearing and the

adequacy of the proposed service thereof.

### Basis For Requested Relief

**A.    The DIP Term Sheet and Use of Cash Collateral Should Be Authorized**

24.    Approval of the DIP Term Sheet and authorization for the use of Cash

Collateral will provide the Debtor with immediate and ongoing access to cash to ensure payment

of its operating expenses for the anticipated duration of the Chapter 11 case.  Without

authorization to enter into the DIP Term Sheet and to use Cash Collateral, the Debtor will suffer

material deterioration in employee, vendor and customer confidence as such constituencies may

harbor doubt with respect to the Debtor's liquidity and ability to sustain operations until the

consummation of a Sale.

25.    The credit provided under the DIP Term Sheet will help enable the Debtor

to continue to operate its business in an orderly and reasonable manner to preserve and enhance

the value of the estate for the benefit of all parties in interest.  Without the proposed financing

and use of cash collateral, the Debtor would be immediately forced to shut down operations and

liquidate its assets.  Thus, the implementation of the DIP Term Sheet and authorization to use

cash collateral will promote a successful Sale and maximize value for the Debtor's estate.

Accordingly, the timely approval of the relief requested herein is imperative.

26.    Section 364(c) of the Bankruptcy Code provides, among other things, that

if a debtor is unable to obtain unsecured credit allowable as an administrative expense under

section 503(b)(1) of the Bankruptcy Code, the court may authorize the debtor to obtain credit or

incur debt (a)  with priority over any and all administrative expenses as specified in

section 503(b) or 507(b) of the Bankruptcy Code, (b) secured by a lien on property of the estate

that is not otherwise subject to a lien, or (c) secured by a junior lien on property of the estate that

is subject to a lien. 11 U.S.C. § 364. The Debtor proposes to provide to the DIP Lender

superpriority claims and liens pursuant to sections 364(c)(1), (2), (3) and (d) of the Bankruptcy

Code as set forth in the DIP Term Sheet, subject in each case to the Carve-Out.[14]

27.    The Debtor's goal of a successful sale can be achieved only if the Debtor

is immediately authorized to use cash collateral and to borrow up to $5,493,000 under the DIP

Term Sheet and to use such proceeds to operate its business. The Debtor is unable to procure

sufficient financing in the form of unsecured credit allowable under section 503(b)(1), as an

administrative expense under section 364(a) or (b), or in exchange for the grant of a superpriority

administrative expense claim pursuant to section 364(c)(1). As set forth in the First Day

Declaration, the Debtor made reasonable inquiries with potential lenders and has not been able to

obtain postpetition financing or other financial accommodations from any alternative prospective

lender or group of lenders on more favorable terms and conditions than those for which approval

is sought herein.

28.    The Debtor negotiated with the DIP Lender extensively and at arm's

length. Provided that a debtor's business judgment does not run afoul of the provisions of, and

policies underlying, the Bankruptcy Code, courts grant a debtor considerable deference in acting

in accordance therewith. *See, e.g., Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe

Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986); *In re Ames Dep't Stores. Inc.*, 115 B.R. 34, 40

---

[14] The relative priority of the superpriority claims and liens granted to the DIP Lender among the DIP Lender, the
Pre-Petition Lenders, the beneficiaries of the Carve-Out and the holders of certain Existing Prepetition Liens (as
defined in the DIP Term Sheet), is set forth in the DIP Term Sheet, *Priority*, at pages 4-5.

(Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest"); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513-14 (Bankr. D. Utah 1981); *In re Simasko Prod. Co.*, 47 B.R. 444,449 (D. Colo. 1985).

29.    Furthermore, section 364(d) does not require that a debtor seek alternative financing from every possible lender; rather, the debtor simply must demonstrate sufficient efforts to obtain financing without the need to grant a senior lien. *In re Snowshoe Co.*, 789 F.2d at 1088 (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re 495 Central Park Ave Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (debtor testified to numerous failed attempts to procure financing from various sources, explaining that "most lend money only in return for a senior secured position").

30.    As set forth in the First Day Declaration, the terms and conditions of the DIP Term Sheet are fair and reasonable, and were negotiated extensively by well-represented, independent parties in good faith and at arm's length. Accordingly, the DIP Lender and all obligations incurred under the DIP Term Sheet should be accorded the benefits of section 364(e) of the Bankruptcy Code.

**B.    The Proposed Adequate Protection Should Be Authorized**

31.    Section 363(e) of the Bankruptcy Code provides that, "on request of an entity that has an interest in property used . . . or proposed to be used by a debtor-in-possession, the court . . . shall prohibit or condition such use . . . as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e). Section 361 of the Bankruptcy Code delineates the forms of adequate protection, which include periodic cash payments, additional liens, replacement liens and other forms of relief. 11 U.S.C. § 361. What constitutes adequate protection must be decided on a case-by-case basis. *See In re O'Connor*, 808 F.2d 1393, 1396 (10th Cir. 1987); *In re Martin*, 761 F.2d 472 (8th Cir. 1985). The focus of the requirement is to protect a secured creditor from diminution in the value of its interest in the particular collateral during the period of use. *See In re Kain*, 86 B.R. 506, 513 (Bankr. W.D. Mich. 1988); *Delbridee v. Production Credit Assoc. and Federal Land Bank*, 104 B.R. 824 (E.D. Mich. 1989); *In re Leduemere Land Corp.*, 116 B.R. 338, 343 (Bankr. D. Mass. 1990).

32.    The Pre-Petition Lenders have each agreed to the Debtor's entry into the DIP Term Sheet in consideration for the adequate protection provided to it under the DIP Term Sheet. Moreover, the replacement lien and other protections offered to the Pre-Petition Lenders will sufficiently protect their respective interests in any collateral, including Cash Collateral, taken as security under the Pre-Petition Junior Secured Credit Facility or the Pre-Petition Senior Secured Credit Facility. Accordingly, the adequate protection proposed here is fair and reasonable and sufficient to satisfy the requirements of Bankruptcy Code sections 363(c)(2) and (e).

33.    As with the protections granted to the DIP Lender pursuant to sections 364(c)(1), (2), (3) and (d) of the Bankruptcy Code, the Carve-Out shall also be senior to all adequate protection liens and claims granted to the Pre-Petition Lenders as provided under the DIP Orders.

**C.    The Automatic Stay Should Be Modified on a Limited Basis**

34.    The DIP Term Sheet and the proposed Interim Order also contemplates a modification of the automatic stay (to the extent applicable) to permit the Debtor to (i) grant the liens and superpriority claims described above to the DIP Lender and to perform such acts as may be requested to assure the perfection and priority of such liens; (ii) permit the DIP Lender to exercise, upon the occurrence and during the continuance of an Event of Default (as defined in the DIP Term Sheet) and after three business days' notice thereof,[15] its rights and remedies under the DIP Term Sheet; and (iii) to otherwise implement the terms of the proposed DIP Orders.

35.    Stay modifications of this kind are ordinary and standard features of postpetition debtor financing facilities and, in the Debtor's business judgment, are reasonable and fair under the present circumstances.

**D.    Carve-Out**

36.    The professional fees and expenses incurred by professional persons employed by the Debtor or a statutory committee in the chapter 11 case (including, any expenses of the members of such statutory committee) (collectively, "Professional Fees") may be paid to

---

[15] Under the DIP Term Sheet, this notice period will allow the Debtor an opportunity to either seek to cure the Event of Default or seek an expedited hearing before the Bankruptcy Court or dispute whether or not an Event of Default has occurred.

the extent authorized in the Approved Budget and subject to entry of a customary order of the

Bankruptcy Court allowing for the interim payment of such amounts, and subject further to final

Bankruptcy Court approval of any such Professional Fees.

37.    The liens and superpriority claim granted to the DIP Lender (and the liens

and claims held by the Pre-Petition Lenders, including the adequate protection liens and claims

granted to the Pre-Petition Lenders) will be subject to a Carve-Out, for the purpose of, and in an

amount not to exceed: (A) accrued but unpaid Professional Fees incurred prior to a Termination

Event under the DIP Term Sheet, *provided*, such portion of the Carve-Out shall not exceed the

amounts set forth in the Approved Budget for such items through such date (including any

unused amounts for Professional Fees that are rolled forward under such Approved Budget), plus

(B) fees payable to the clerk of the Bankruptcy Court ("Case Administration Fees") incurred

prior to a Termination Event under the DIP Term Sheet, plus (C) fees incurred pursuant to 28

U.S.C. § 1930, plus (D) $25,000 for the payment of Professional Fees and Case Administration

Fees arising after a Termination Event under the DIP Term Sheet, plus (E) in the event this

Chapter 11 Case is converted to a case under chapter 7 of the Bankruptcy Code, $25,000 for the

payment of reasonable fees and expenses incurred by a duly-appointed trustee under section

726(b) of the Bankruptcy Code.

38.    The Interim Order includes provisions providing that the Debtor may fund

a segregated account for the weekly deposit of 50% of the then-accrued Carve-Out.  If and to the

extent the Carve-Out has not been funded by such periodic deposits.  The balance of the Carve-

Out would be payable (or funded into the segregated account, if not then allowed) from Cash

Collateral on hand or upon a Sale. Amounts on deposit in the segregated account for the benefit

of the holders of the Carve-Out shall be used to satisfy Professional Fees that are allowed and

authorized to be paid as provided under the interim compensation procedures authorized by, or

allowance orders entered by, the Bankruptcy Court.

**E.    Waivers of Rights**

           39.    In addition to the certain limitations on the right to challenge the claims

and liens of the Pre-Petition Lenders set forth in the Interim Order, the Debtor has also agreed

under the DIP Term Sheet to waive and release all claims arising from or related to the Pre-

Petition Junior Secured Credit Facility or the Pre-Petition Senior Secured Loan Facility,

including without limitation, waiving any right to challenge the validity, perfection, priority,

extent or enforceability of the liens on or security interests in the assets of the Debtors securing

the such facilities, including without limitation seeking to equitably subordinate or avoid the

liens securing such facilities.

           40.    The foregoing waivers, however, will be subject to the right of the

statutory committee of unsecured creditors (or other party in interest) to investigate and bring

any such claims against, and, with respect to the claims held by, the Pre-Petition Lenders within

the periods allowed by Local Rule 4001-2(a)(i)(B).

**F.    Interim Authorization Should Be Granted**

           41.    Bankruptcy Rules 4001(b) and (c) and Local Rule 4001-2(b) provide that

a final hearing on a motion to obtain credit may not be commenced earlier than fourteen (14)

days after the service of such motion. Upon request, however, the Court is empowered to

conduct a preliminary expedited hearing on the motion and authorize the obtaining of credit to

the extent necessary to avoid immediate and irreparable harm to a debtor's estate pending a final

hearing.

42.    The Debtor hereby requests that the Court conduct an expedited

preliminary hearing on this Motion and authorize the Debtor to use the Cash Collateral of the

Pre-Petition Lenders and to borrow up to $2,952,000 from the DIP Lender under the DIP Term

Sheet on an interim basis, pending entry of a Final Order, in order to (i) maintain, finance and

ensure the ongoing operations of the Debtor, (ii) assure the satisfaction of the Payroll Expenses

incurred by the Debtor pending a Final Hearing, and (iii) avoid immediate and irreparable harm

and prejudice to the Debtor's estate and all parties in interest.  In addition, the Debtor requests

the Court to schedule a hearing to consider entry of the Final Order.

43.    The availability of Interim DIP Loan under the DIP Term Sheet will

provide the Debtor with the ability to meet its near-term obligations.  Failure to meet these

obligations, especially the company's employee obligations, will have an immediate and material

negative impact on the value of the estate, and the Debtor's ability to attract the highest and best

offer for tis assets, to the detriment of all stakeholders.  Accordingly, the interim relief requested

is critical to preserving and maintaining the value of the Debtor's estate.

**Notice**

44.    No trustee, examiner or creditors' committee has been appointed in this

Chapter 11 Case. Notice of the interim hearing on this Motion shall be given to the following

parties or, in lieu thereof, to their counsel, if known: (a) the Office of the United States Trustee

28

for the District of Delaware ("U.S. Trustee"); (B) counsel for the DIP Lender, (c) counsel for the Pre-Petition Lenders; (d) other parties with liens of record on assets of the Debtor as of the Petition Date, and (e) the Debtor's twenty largest unsecured creditors.  The Debtor submits that, in light of the urgent nature of the relief requested, no other or further notice need be given.

45.     Upon entry of the Interim Order, the Debtor shall give notice of the request for entry of a Final Order under the Motion to:  (a) the U.S. Trustee; (b) counsel for the DIP Lender, (c) counsel for the Pre-Petition Lenders; (d) other parties with liens of record on assets of the Debtor as of the Petition Date, (e) the Debtor's twenty largest unsecured creditors, and (f) all other parties requesting special notice pursuant to Bankruptcy Rule 2002.

46.     No prior request for the relief sought in this Motion has been made by the Debtor to this or any other court.

WHEREFORE, the Debtor respectfully requests that the Court: (i) enter the Interim Order, substantially in the form attached hereto as <u>Exhibit A</u>, approving the DIP Term Sheet and the use of Cash Collateral on an interim basis pending the Final Hearing, (ii) schedule a Final Hearing on this Motion for approval of the DIP Term Sheet and the continued use of Cash Collateral on a final basis; (iii) enter a Final Order approving the DIP Term Sheet and the use of Cash Collateral after the Final Hearing, and (iv) grant further relief as may be just and proper.

Dated:    July 10, 2018

PACHULSKI STANG ZIEHL & JONES LLP

Henry C. Kevane (CA Bar No. 125757)
John D. Fiero (CA Bar No. 136557)
John W. Lucas (CA Bar No. 271038)
Colin R. Robinson (DE Bar No. 5524)
919 N. Market Street, 17th Floor
Wilmington, DE 91899
Tel:  (302) 652-4100
Fax: (302) 652-4400
E-mail:  hkevane@pszjlaw.com
            jfiero@pszjlaw.com
            jlucas@pszjlaw.com
            crobinson@pszjlaw.com

Proposed Attorneys for Debtor and Debtor in Possession