IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| TINTRI, INC.,[1] | ) | Case No.: 18-11625 (KJC) |
| | ) | |
| Debtor. | ) | |
| | ) | |

**Objection Deadline:  July 30, 2018 at 4:00 p.m. (ET)**
**Hearing Date:  August 6, 2018 at 2:00 p.m. (ET)**

**MOTION FOR ENTRY OF AN ORDER (I) (A) AUTHORIZING
ENTRY INTO ASSET PURCHASE AGREEMENT WITH RESPECT
TO THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS,
(B) APPROVING BID PROCEDURES FOR THE SALE OF SUBSTANTIALLY ALL
OF THE DEBTOR'S ASSETS, (C) SCHEDULING AN AUCTION AND HEARING TO
CONSIDER THE SALE AND APPROVE THE FORM AND MANNER OF
NOTICES RELATED THERETO, (D) ESTABLISHING PROCEDURES RELATING
TO THE ASSUMPTION AND ASSIGNMENT OF CERTAIN CONTRACTS AND
LEASES, INCLUDING NOTICE OF PROPOSED CURE AMOUNTS, (E) APPROVING
CERTAIN BREAKUP FEE AND EXPENSE REIMBURSEMENT PROVISIONS;
(II) AUTHORIZING AND APPROVING (A) THE SALE OF CERTAIN ASSETS FREE
AND CLEAR OF ALL LIENS,  CLAIMS AND ENCUMBRANCES, AND OTHER
INTERESTS, AND (B) THE ASSUMPTION AND ASSIGNMENT OF CERTAIN
CONTRACTS AND LEASES; AND (III) GRANTING RELATED RELIEF**

Tintri, Inc., the debtor and debtor-in-possession (the "Debtor" or "Tintri"), files

this motion (the "Motion") for the entry of an order pursuant to sections 105(a), 363, 365 and

503 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, 6006,

9007, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and

Rules 2002-1 and 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United

States Bankruptcy Court for the District of Delaware (the "Local Rules") for: (i) an order

---

[1]  The last four digits of the Debtor's taxpayer identification number are (6978):  The headquarters and service
address for the above-captioned Debtor is 303 Ravendale Dr., Mountain View, CA 94043.

substantially in the proposed form attached hereto as **Exhibit A** (the "Bid Procedures Order"):
(a) approving certain sale and bid procedures attached as **Exhibit 1** to the Bid Procedures Order
(the "Bid Procedures") in connection with the sale (the "Sale") of the Debtor's right, title and
interest in substantially all of the assets and properties used in connection with the operation of
the Debtor's business, as set forth in the Purchase Agreement (defined below); (b) scheduling
both an auction and hearing to consider approval of such Sale; (c) approving procedures related
to the assumption and assignment of certain executory contracts and unexpired leases related to
the Sale; (d) approving the form and manner of the notices of the Bid Procedures attached as
**Exhibit 2**, **Exhibit 3** and **Exhibit 4** to the Bid Procedures Order; and (e) approving the proposed
breakup fee and expense reimbursement in favor of the Stalking Horse Purchaser (defined
below); and (ii) an order, substantially in the proposed form attached hereto as **Exhibit B** (the
"Sale Order") (a) authorizing the Debtor's entry into an *Asset Purchase Agreement* with TI
Acquisition Corp., the wholly-owned subsidiary of DataDirect Networks, Inc. (the "Stalking
Horse Purchaser") substantially in the form attached as **Exhibit C** hereto (with schedules to be
completed in the future) (the "Purchase Agreement") with the Stalking Horse Purchaser or with
the successful bidder at the auction (if other than the Stalking Horse Purchaser); (b) authorizing
the Sale of such assets free and clear of, liens, claims, encumbrances ("Liens, Claims and
Encumbrances"), and other interests, except as provided in the Purchase Agreement; and (c)
approving the assumption and assignment of certain of the Debtor's executory contracts and
unexpired leases related to the Sale; and (iii) granting relief related.  In support of this Motion,
the Debtor respectfully states the following:

**Jurisdiction and Venue**

1.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

2.      Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory predicates for the relief sought herein are sections 105, 363, 365, 503, 1107 and 1108 of chapter 11 of the Bankruptcy Code, Bankruptcy Rules 2002(a)(2), 6004, 6006 and 9014 and Local Rules 2002-1(b), 6004-1 and 9006-1.

**Background**

4.      On July 10, 2018 (the "Petition Date"), the Debtor filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtor is operating its business as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.      The factual background regarding the Debtor, including its historical business operations and the events precipitating the chapter 11 filings, is set forth in detail in the *Declaration of Robert J. Duffy in Support of First Day Motions* (the "First Day Declaration") filed on the Petition Date and fully incorporated herein by reference.[2]

**The Debtor's Operations and Assets to Be Sold**

6.      The Debtor is an enterprise cloud storage company founded in 2008 to create storage products that are optimized for virtualization and cloud computing platforms.

---

[2]  Capitalized terms used but not defined herein shall have the meanings ascribed to them in the First Day Declaration.

Over time, the company expanded its focus to also address the cloud needs of enterprise customers.  Its customers include leading enterprises across a broad range of industry segments, including education, financial services and insurance, healthcare, manufacturing and automotive technology, as well as cloud service providers.

7.     The Debtor provides large organizations and cloud service providers with an enterprise cloud platform that offers public cloud capabilities inside its own data centers and that can also connect to public cloud services.  Its enterprise cloud platform delivers many of the benefits of public cloud infrastructure and also gives organizations the control and functionality to run both enterprise and cloud-native application in their own private cloud.

8.     The Debtor's customers use its enterprise cloud platform for a variety of workloads and uses, including virtualized desktop infrastructure (VDI), development and test environments, which are sometimes referred to as Continuous Integration Continuous Delivery, and other virtualized workloads, including virtualized servers, databases, and mixed workloads. The Debtor's software products are sold separately from its core enterprise cloud platform solution, enabling customers to tailor their infrastructure to their specific needs.

9.     The Debtor's revenues are generated from the sales of products and related support and maintenance offerings.  Product revenue, which is generally recognized upon shipment, is derived from sales of all-flash and hybrid storage systems and stand-alone software licenses for use in connection with the Debtor's systems. While purchasing support is not mandatory, substantially all products are purchased together with a support contract, which includes software patches, bug fixes, updates, upgrades, hardware repair and replacement parts,

and technical support. Support and maintenance revenue is recognized over the term of the support contracts. To date, substantially all customers either renew their support and maintenance subscriptions or purchase new support and maintenance subscriptions together with replacement products. The average length of the Debtor's support and maintenance contracts is approximately two years.

## **The Debtor's Marketing Process**

10.     Although the Debtor had previously worked with investment bankers at Bank of America in efforts to enhance the liquidity of the Debtor's operations, in April 2018 the Debtor's chief executive officer began an in-house merger and acquisition effort targeting potential strategic investors in the storage industry, as well as companies with complementary businesses. While this process did not immediately produce a stalking horse, it did establish that there were parties interested in participating in an auction conducted pursuant to Section 363 of the Bankruptcy Code.

11.     More recently, the Debtor agreed to retain Houlihan Lokey Capital, Inc. ("Houlihan Lokey") as its investment bankers effective as of July 10, 2018. Houlihan Lokey has begun a marketing process focused on both strategic and financial acquirers, and has created an electronic data room for prospective buyers containing information and documents relating to the Debtor and its business. As of the date of this Motion, Houlihan Lokey's efforts have included 32 approaches to potential acquirers, with 25 of those approaches leading to talks about the opportunity. Four new non-disclosure agreements have been signed in the past week. More are expected.

12.     Most importantly, the Debtor has sourced a potential "stalking horse" bidder, TI Acquisition Corp., a Delaware corporation, which is a wholly-owned subsidiary of DataDirect Networks, Inc.  Initially, the Stalking Horse Purchaser's interest in the Debtor's assets was the subject of a non-binding letter of intent.  More recently, the Debtor and the Stalking Horse Purchaser with input from the DIP lender (TriplePoint Capital, LLC ("TriplePoint")) and professionals have entered into the Purchase Agreement (Exhibit C).

13.     The Purchase Agreement contemplates the sale of substantially all of the Debtor's assets in exchange for cash consideration in the amount of $25,000,000, plus the assumption of $27,500,000 of secured debt owed to TriplePoint.  The Purchase Agreement further contains what amounts to an agreement between the Debtor, the Stalking Horse Purchaser and TriplePoint that the stipulated value of the combined cash and debt assumption for the purposes of the Auction is $40 million (the "Stipulated Value").  The Debtor hereby seeks Court approval to consummate the transaction, subject to overbid at an auction pursuant to certain proposed overbid procedures and protections.  Following entry by the Court of the Bidding Procedures Order providing for the Breakup Fee and the Expense Reimbursement for the Stalking Horse Purchaser, Houlihan Lokey will continue its marketing efforts with potential bidders, which will include "blast" electronic communications informing potentially interested parties of the Debtor's chapter 11 filing and its ongoing sales effort.  The Debtor believes that this marketing and sale process will preserve going concern value and maximize recoveries for all stakeholders.

14.     The Debtor now seeks to sell substantially all of its assets, which generally consist of its enterprise cloud platform products and service business (the "Assets").

## The Purchase Agreement

15.     The following are the material terms of the proposed Purchase Agreement:[3]

| Purchase Price | Not less than $52.5 million, consisting of: $25 million in cash (less the amount of any A/R billed between July 4 and the Closing Date, less $150,000 deposit), plus the assumption of $27.5 million of the Debtor's indebtedness to TriplePoint, to be paid by the Stalking Horse Purchaser at closing, as set forth in section 5.1 of the Purchase Agreement. |
|---|---|
| Purchased Assets | The Debtor's right, title and interest in substantially all of the assets heretofore used exclusively in connection with or arising out of the operation of the Debtor's business as further set forth in section 2.1 of the Purchase Agreement and schedules thereto, including certain personal property, intangible property, governmental permits and licenses to the extent transferrable, inventory, vendor related items and claims. |
| Excluded Assets | The Cash Consideration; any Permits that are not transferable pursuant to their terms and in accordance with applicable Laws; any Contracts that are not Assumed Contracts listed on Schedule 2.1(c); all accounts receivable and the proceeds therefrom; all cash and cash equivalents, bank accounts and securities of the Debtor; all claims and actions of the Debtor arising under chapter 5 of the Bankruptcy Code; certain books and records, corporate seals, organizational documents, minute books, stock books, tax returns, books of account or other records having to do with the corporate organization of the Debtor, all employee-related or employee benefit-related files or records (other than personnel files of Transferred Employees), and any other books and records which the Debtor is prohibited from disclosing or transferring under applicable law and is required by applicable law to retain; all insurance policies of the Debtor and all rights to applicable claims and proceeds thereunder; any asset, including any Contract, set forth in Schedule 2.2(h); the Debtor's tax refunds, rebates, credits, Tax assets and similar items relating to any period, or any portion of any period; income tax returns of the Debtor and related materials; equity securities or other ownership interest of the Debtor or its affiliates; prepayments |

---

[3] Capitalized terms in this section shall bear the definitions assigned to them in the Purchase Agreement.

| | |
|---|---|
| | and deposits other than those included in Section 2.1 and all claims, indemnities, warranties, guarantees, refunds, causes of action, rights of recovery, rights of set-off and rights of recoupment other than those included in Section 2.1; and any adequate assurance deposit under Sec. 366 of the Bankruptcy Code. |
| Assumed Liabilities | all Liabilities of Seller which first accrue and are to be performed from and after the Closing under the Assumed Contracts, the Personal Property Leases and the Real Property Leases, which relate to periods of time on or after the Closing Date, and (ii) liabilities and obligations relating to and arising from Purchaser's operation of the Purchased Assets after the Closing. |
| Breakup Fee and Expense Reimbursement | The Breakup Fee in the amount of $1.2 Million Dollars ($1,200,000) plus and expense reimbursement up to a maximum of Four Hundred Thousand Dollars ($400,000) is deemed approved and shall be paid to Purchaser from the proceeds of sale actually paid by a successful bidder only after a closing in the event that the Bankruptcy Court enters an order approving an offer to purchase the Purchased Assets submitted by a party other than Purchaser, or enters an order confirming a plan of reorganization of Seller (other than a plan under which Purchaser acquires the Purchased Assets) no later than the closing of the sale of the Purchased Assets to a third party. |
| Closing Deadline | Closing shall be held on the date which is not later than the first business day following the date on which all conditions to Closing set forth in Articles X and XI of the Purchase Agreement have been satisfied or waived, and in any event no later than September 7, 2018, subject to the parties' mutual agreement to extend. |
| | The deadline for the Sale Hearing to take place is the later of August 29, 2018, or two business days from the conclusion of the Auction. |
| Representations and Warranties | Customary for transactions of this kind. |
| Termination Rights | Customary for transactions of this kind. |

**Relief Requested**[4]

16.     Pursuant to this Motion, the Debtor requests that the Court enter the

proposed Bid Procedures Order:

---

[4]  In compliance with Local Rule 6004-1 and for the convenience of the reader, the salient terms of the Purchase Agreement have been summarized and are attached hereto as **Exhibit D**.

(a)     approving the proposed Bid Procedures annexed as <u>Exhibit 1</u> to the proposed Bid Procedures Order, including the overbid provisions, Breakup Fee and Expense Reimbursement provisions, subject to the terms of the Purchase Agreement and Bid Procedures Order;

(b)     approving the procedures set forth herein (the "<u>Cure Procedures</u>") for the assumption and assignment of certain executory contracts and unexpired leases in connection with the Sale (the "<u>Assumed Executory Contracts</u>");

(c)     establishing a date for holding the auction (the "<u>Auction</u>") to occur approximately two days prior to Sale Hearing and approving certain procedures in connection therewith;

(d)     scheduling the hearing (the "<u>Sale Hearing</u>") to approve any sale transaction(s) to either the Stalking Horse Bidder or the highest or best bidder for the Assets determined at the Auction (the "<u>Successful Bidder</u>") and establishing deadlines for objections and responses to the relief requested in the Motion with respect to the proposed Sale and Sale Hearing; and

(e)     approving the form and manner of notice to be served upon certain parties, including:  (i) the form of notice, substantially in the form attached to the Bid Procedures Order as <u>Exhibit 2</u> (the "<u>Sale and Bid Procedures Notice</u>"), to be served on the Bid Procedures Notice Parties (as defined below); (ii) the form of notice, substantially in the form attached to the Bid Procedures Order as <u>Exhibit 3</u>, to be served on all known creditors of the Debtor (the "<u>Creditor Notice</u>"); and (iii) the form of notice to parties holding Assumed Executory Contracts

in conjunction with the proposed sale, in substantially the form attached to the Bid Procedures

Order as Exhibit 4 (the "Cure Notice").

17. The Debtor further requests that the Court enter the Sale Order:

(a) approving the Sale of the Assets to the Stalking Horse Purchaser or

other Successful Bidder, free and clear of all Liens, Claims and Encumbrances, and other

interests, except as provided in the Purchase Agreement or competing purchase agreement (with

all Liens, Claims and Encumbrances, and other interests to attach to the Sale proceeds with the

same validity and in the same order of priority as they attached to the Assets prior to the Sale);

(b) authorizing the assumption and assignment to the Stalking Horse

Purchaser or other Successful Bidder of the Assumed Executory Contracts; and

(c) authorizing the Debtor to consummate the Sale and all documents,

agreements, and contracts executed in conjunction therewith.

## **Proposed Bid Procedures**[5]

18. The Bid Procedures are summarized as follows:

*Competing Agreement*

19. Prospective bidders should submit a proposed asset purchase agreement (a

"Competing Agreement"), similar in form and substance, as modified, to the Purchase

Agreement. Subject to the approval of the Court, the highest or best bidder at the auction will

purchase the Assets, and assume certain executory contracts and unexpired leases of the Debtor,

---

[5]  The following is a summary of the Bid Procedures.  In the event of any conflict between the procedures
summarized in this Motion and the Bid Procedures attached as **Exhibit 1** to the Bid Procedures Order, the latter
shall control.  Unless otherwise noted, capitalized terms used in this section describing the proposed Bid Procedures
shall have the meanings ascribed thereto in the Purchase Agreement.

free and clear of any Liens, Claims and Encumbrances, and other interests.  The transaction contemplated is subject to competitive bidding as set forth herein, and approval by the Bankruptcy Court pursuant to Bankruptcy Code sections 363 and 365.

*Assets for Sale*

20.     The Debtor is offering for sale the Assets, which generally consist of its enterprise cloud products and service business, together with substantially all of the Debtor's other business assets and property associated with that technology.  Except as otherwise provided in the Purchase Agreement, all of the Debtor's right, title and interest in and to the Assets subject thereto shall be sold free and clear of any Liens, Claims and Encumbrances, and other interests (other than Permitted Liens, Claims and Encumbrances and/or except as otherwise provided in the Competing Agreement) to the maximum extent permitted by section 363 of the Bankruptcy Code, with such Liens, Claims and Encumbrances, and other interests to attach to the net proceeds of the sale of the Assets with the same validity and priority as such Liens, Claims and Encumbrances, and other interests applied against the Assets.

*Participation Requirements*

21.     In order to participate in the bidding process and to otherwise be considered for any purpose hereunder, a person interested in all or portions of the Assets (a "Potential Bidder") must first deliver (unless previously delivered) to the Debtor and its counsel, not later than five (5) business days before the Bid Deadline (defined below), unless otherwise modified by the Debtor in its reasonable discretion (subject to the requirements of section 4.7(a) of the Purchase Agreement):

(a)  <u>Non-Disclosure Agreement</u>.  An executed non-disclosure agreement substantially in the form of the NDA included in Houlihan Lokey's electronic data room;

(b)  <u>Identification of Potential Bidder</u>.  Concurrently with its Bid (as defined herein), identification of the Potential Bidder, its principals, and the representatives thereof who are authorized to appear and act on their behalf for all purposes regarding the contemplated transaction;

(c)  <u>Corporate Authority</u>.  Concurrently with its Bid, written evidence satisfactory to Debtor of the Potential Bidder's chief executive officer or other appropriate senior executive's approval of the contemplated transaction;

(d)  <u>Disclosure</u>.  Written disclosure of any connections or agreements with the Debtor, the Stalking Horse Purchaser, any other known Potential Bidder or Qualified Bidder (as defined below), and/or any officer, director or direct or indirect equity security holder of the Debtor; and

(e)  <u>Proof of Financial Ability to Perform</u>.  Prior to or at the time of presentation of a Bid, written evidence that demonstrates the Potential Bidder has the necessary financial ability to close the contemplated transaction and provide adequate assurance of future performance under all contracts to be assumed in such contemplated transaction.  Such information should include, *inter alia*, the following:

(1)  the Potential Bidder's current financial statements (audited if they exist);

(2)  contact names and numbers for verification of financing sources;

(3)  evidence of the Potential Bidder's internal resources and proof of any debt or equity funding commitments that are needed to close the contemplated transaction; and

(4)  any such other form of financial disclosure of credit-quality support information or enhancement acceptable to the Debtor demonstrating that such Potential Bidder has the ability to close the contemplated transaction.

### Designation as Qualified Bidder

22.     A "<u>Qualified Bidder</u>" is a Potential Bidder (or combination of Potential Bidders whose bids for the Assets of the Debtor do not overlap and who shall also be referred to herein as a single Qualified Bidder) that delivers the documents described above and otherwise satisfies the requirements of the Bid Procedures Order and the procedures set forth herein, and that the Debtor, in its discretion (in consultation with any Official Committee of Unsecured Creditors that may be appointed (the "<u>Committee</u>") and TriplePoint Capital, LLC ("TriplePoint"), determines is reasonably likely to submit a *bona fide* offer for the Assets and to be able to consummate a sale if selected as a Successful Bidder.

23.     The Debtor, in its sole discretion and in consultation with the Committee and TriplePoint, shall determine and notify the Potential Bidder with respect to whether such Potential Bidder is a Qualified Bidder.

24.     The Stalking Horse Purchaser is hereby deemed to be a Qualified Bidder.

### Access to Due Diligence Materials

25.     Only Potential Bidders that execute and deliver a confidentiality agreement satisfactory to the Debtor, in its sole discretion, are eligible to receive due diligence access or access to additional non-public information.  The Debtor shall not be required to provide confidential or proprietary information to a Potential Bidder if the Debtor believes that such disclosure would be detrimental to the interests of the Debtor. If the Debtor determines that a Potential Bidder that has satisfied all requirements to become a Qualified Bidder and yet does not constitute a Qualified Bidder, then such Potential Bidder's right to receive due diligence

access or access to additional non-public information shall terminate. The Debtor will designate an employee or other representative to coordinate all reasonable requests for additional information and due diligence access from Qualified Bidders. The Debtor shall not be obligated to furnish any due diligence information after the Bid Deadline. The Debtor is not responsible for, and will bear no liability with respect to, any information obtained by Qualified Bidders in connection with the sale of the Assets.

*Due Diligence From Bidders*

26.     Each Potential Bidder and Qualified Bidder (each, a "Bidder") (and, collectively, "Bidders") shall comply with all requests for additional information and due diligence access by the Debtor or its advisors regarding such Bidder and its contemplated transaction. Failure by a Potential Bidder to comply with requests for additional information and due diligence access will be a basis for the Debtor to determine that the Potential Bidder is not a Qualified Bidder. Failure by a Qualified Bidder to comply with such requests for additional information and due diligence access will be a basis for the Debtor to determine that a bid made by a Qualified Bidder is not a Qualified Bid (as defined herein).

## Bidding Process

27.     The Debtor and its advisors, shall (in consultation with Committee and TriplePoint): (i) determine whether a Potential Bidder is a Qualified Bidder; (ii) coordinate the efforts of Bidders in conducting their due diligence investigations, as permitted by the provisions hereof; (iii) receive offers from Qualified Bidders; and (iv) negotiate any offers made to purchase the Assets. The Debtor (in consultation with the Committee and TriplePoint) shall have the right

to adopt such other rules for the bidding process that are not inconsistent with the Bid Procedures Order that will better promote the goals of such process.

*Bid Deadline*

28.     On or before August 23, 2018 not later than 5:00 pm Eastern time, or such other date as set by the Bankruptcy Court (the "Bid Deadline"), a Qualified Bidder that desires to make an offer, solicitation or proposal (a "Bid") shall deliver written and electronic copies of its Bid to Tintri, Inc., 303 Ravendale Drive, Mountain View, California 94043, Attn: Kieran Harty, and kieran@tintri.com, with copies to Houlihan Lokey, 245 Park Avenue New York, NY 10167, Attn: Jay Weinberger, and JWeinberger@HL.com and counsel for the Debtor, Pachulski Stang Ziehl & Jones LLP, 919 N. Market St., 17th Floor, Wilmington, Delaware 19801, Attn: John D. Fiero, Esq. and Colin R. Robinson, Esq. The Debtor shall promptly provide copies of all Bids to counsel for the Stalking Horse Purchaser, the Committee and TriplePoint.

29.     A Bid received after the Bid Deadline shall not constitute a Qualified Bid, unless ordered otherwise by the Court.

*Bid Requirements*

30.     To be eligible to participate in the Auction, each Bid and each Qualified Bidder submitting such a Bid must be determined by the Debtor (in consultation with the Committee and TriplePoint) to satisfy each of the following, unless otherwise modified by the Debtor in its reasonable discretion (subject to the requirements of section 4.7(a) of the Purchase Agreement):

(i)     be submitted in writing to Seller and Purchaser and their respective counsel on or before 5:00 p.m. (Eastern Time) on August 23, 2018, or such other date as set by the Bankruptcy Court;

(ii)    provide for a purchase price to be paid to Seller that exceeds the Stipulated Value by at least the amount of the Bid Protections (as defined below) plus the initial Overbid Increment (as defined below);

(iii)   be accompanied by a signed asset purchase agreement in form and substance substantially similar to this Agreement, together with a redlined, marked copy showing all changes to this Agreement (the "Competing Agreement");

(iv)    must not be subject to due diligence contingencies or other conditions beyond those imposed by Purchaser;

(v)     remain open until the conclusion of the Sale Hearing (as defined below);

(vi)    contain terms and conditions no less favorable to Seller than the terms and conditions of this Agreement;

(vii)   be accompanied by evidence establishing that the bidder is capable and qualified, financially, legally, and otherwise, of unconditionally performing all obligations under the Competing Agreement;

(viii)  be accompanied by a cashier's check or other good funds made payable to the order of Seller in an amount of One Hundred Fifty Thousand U.S. Dollars ($150,000.00) (the "Overbidder's Deposit"), and further provide that (A) if the Bankruptcy Court approves a sale of the Purchased Assets to that bidder, Seller may retain the Overbidder's Deposit, and (B) if the Bankruptcy Court does not approve a sale of the Purchased Assets to that bidder, Seller will promptly return the Overbidder's Deposit to such overbidder;

(ix)    be for any of the Purchased Assets;

(x)     include a provision that any Cure Costs are final and binding upon the applicable counterparty and Seller is authorized to pay such Cure Costs directly from the sale proceeds; and

(xi)    include a provision that Purchaser shall be provided all Qualified Bids (as defined below) and the supporting documentation and evidence that each Qualified Bid satisfies the requirements of the Sale Procedures Order.

(xii)   No Fees Payable to Qualified Bidder.  A Bid may not request or entitle the Qualified Bidder to any breakup fee, termination fee, expense reimbursement or similar type of payment.  Moreover, by submitting a Bid, a Bidder shall be deemed to waive the right to pursue a substantial contribution claim under Bankruptcy Code § 503 related in any way to the submission of its Bid or the Bid Procedures.

(xiii)   Immediate Payment of the Breakup Fee.  A Bid must allow for the immediate payment of the Breakup Fee and Expense Reimbursement to the Stalking Horse Purchaser from the first proceeds of the cash portion of the purchase price of such Bid.

(xiv)   Non-Reliance.  A Bid must include an acknowledgement and representation of the Qualified Bidder that it has had an opportunity to conduct any and all due diligence regarding the Assets and Assumed Liabilities prior to making its bid, that it has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Assets in making its Bid, and that it did not rely upon any written or oral statements, representations, warranties, or guaranties, express, implied, statutory or otherwise, regarding the Assets, the financial performance of the Assets or the physical condition of the Assets, the Assumed Liabilities, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated.

31.     A Bid received from a Qualified Bidder before the Bid Deadline that meets the above requirements and that satisfies the Bid Deadline requirement above shall constitute a "Qualified Bid," if the Debtor believes, in its sole discretion (in consultation with the Committee and TriplePoint), that such Bid would be consummated if selected as the Successful Bid.  The Debtor shall have the right to reject any and all Bids that they believe, in its sole discretion (in consultation with the Committee and TriplePoint), do not comply with the Bid Procedures.  In the event that any Potential Bidder is determined by the Debtor not to be a Qualified Bidder, the Potential Bidder shall be refunded its Good Faith Deposit.

***Breakup Fee***

32.     Recognizing the Stalking Horse Purchaser's expenditure of time, energy and resources, and that the Stalking Horse Purchaser provides a floor bid with respect to the Assets that it offers to purchase, the Debtor is authorized (pursuant to the Bid Procedures Order) to provide the following bidding protections to the Stalking Horse Purchaser.

(a)     The Debtor has agreed to pay the Stalking Horse Purchaser (i) a Breakup Fee in the amount of $1.2 million as a breakup fee and (ii) Expense

Reimbursement of up to $400,000, in each case pursuant to and in accordance with terms of the Purchase Agreement and Bid Procedures Order.

(b)    Any Bid submitted prior to the Bid Deadline by a party or parties other than the Stalking Horse Purchaser must be in an amount that is sufficient to pay the Breakup Fee and Expense Reimbursement and result in additional consideration to the Debtor's estate in the amount of at least $100,000 (as compared to the Purchase Price offered by such Stalking Horse Purchaser), after payment of the Breakup Fee and Expense Reimbursement.

## Auction

33.    If the Debtor receives at least two Qualified Bids (inclusive of the Qualified Bid from the Stalking Horse Purchaser) prior to the Bid Deadline, then the Debtor shall notify the Stalking Horse Purchaser and each other Qualified Bidder that the Debtor intends to conduct an auction (the "Auction") to consider all Qualified Bids and to determine the highest or otherwise best bid with respect to the Assets.  The Debtor shall provide the Stalking Horse Purchaser, all Qualified Bidders and the Committee with copies of all Qualified Bids not less than forty-eight (48) hours in advance of the Auction, but may exclude any confidential financial information, as reasonably designated by the applicable Qualified Bidder.  Unless otherwise designated by the Debtor, the Debtor anticipates that the Auction will commence no later than August 27, 2018 at 10:00 a.m. (prevailing Pacific Time) at the offices of Pachulski, Stang Ziehl & Jones LLP, 150 California Street, 15th Floor, San Francisco, CA 94111, or such other place determined by the Debtor.

34.    Not less than forty-eight (48) hours in advance of the Auction, the Debtor will notify all Qualified Bidders in writing of (i) the highest or otherwise best Qualified Bid, as determined by the Debtor in its discretion (the "Baseline Bid") and (ii) the time and place of the Auction.

35. If the Debtor does not receive at least two Qualified Bids from Qualified Bidders (inclusive of the Qualified Bid from the Stalking Horse Purchaser), then no Auction shall be scheduled or conducted, and the Court at the Sale Hearing shall proceed to solely consider the approval of the proposed sale to the Stalking Horse Purchaser as set forth in the Purchase Agreement and shall not consider any competing or alternative offers or proposals to purchase the Assets.

36. If the Auction is necessary, such Auction shall be conducted according to the following procedures:

(a) **Participation at the Auction**

37. Only the Stalking Horse Purchaser and Qualified Bidders that have submitted Qualified Bids are eligible to participate at the Auction. Only the authorized representatives and professional advisors of each of the Qualified Bidders, the Debtor, the Committee, TriplePoint, the U.S. Trustee and any party that provides notice to the Debtor twenty-four hours prior to the Auction, shall be permitted to attend the Auction.

38. Except as otherwise set forth herein, the Debtor (in consultation with the Committee and TriplePoint) may conduct the Auction in the manner it determines will result in the highest or best offer for the Assets in accordance with the Bid Procedures.

39. In the Debtor's sole discretion, after the conclusion of the Auction, the Debtor may resume an auction for the sale of discrete assets and/or discrete groups of assets, if any, which are not included in the Successful Bid, on such bidding procedures as may be implemented by the Debtor in its discretion.

**(b)** **The Debtor Shall Conduct the Auction**

40.     The Debtor and its professionals shall direct and preside over the Auction. At the start of the Auction, the Debtor shall describe the terms of the Baseline Bid. The determination of which Qualified Bid constitutes the Baseline Bid shall be made by the Debtor in its discretion (in consultation with the Committee and TriplePoint), and may take into account any factors the Debtor reasonably deems relevant to the value of the Qualified Bid to the estate (the "Bid Assessment Criteria"). All Bids made thereafter shall be Overbids (as defined below) and shall be made and received on an open basis, and all material terms of each Bid shall be fully disclosed to all other Qualified Bidders. The Debtor reserves the right to conduct the Auction in the manner designed to maximize value based upon the nature and extent of the Qualified Bids received in a manner not inconsistent with the Bid Procedures. The Debtor shall maintain a transcript of all Bids made and announced at the Auction, including the Baseline Bid, all Overbids and the Successful Bid. Pursuant to Local Rule 6004-1, each Qualified Bidder shall be required to confirm that it has not engaged in any collusion with respect to the Bid Procedures, the Auction or the proposed transaction.

**(c)** **Terms of Overbids**

41.     An "Overbid" is any bid made at the Auction subsequent to the Debtor's announcement of the Baseline Bid. To submit an Overbid for purposes of this Auction, a Qualified Bidder must comply with the following conditions:

**(d)**      <u>Minimum Overbid Increment</u>

42.      During the Auction, bidding shall begin initially with the Baseline Bid. Any Overbid after the Baseline Bid shall be made in increments of at least $100,000 in cash or other consideration acceptable to the Debtor; *provided, however*, that any Overbid by the Stalking Horse Purchaser thereafter shall only be required to be equal to the sum of (1) the then existing lead Bid <u>plus</u> (2) the $100,000 Overbid <u>less</u> (3) the amount of the Breakup Fee and Expense Reimbursement.

43.      Any Overbid made by a Qualified Bidder must remain open and binding on the Qualified Bidder until and unless the Debtor (in consultation with the Committee and TriplePoint) accepts a higher Qualified Bid as an Overbid.

**(e)**      <u>Consideration of Overbids</u>

44.      The Debtor reserves the right, in its reasonable business judgment, to make one or more adjournments in the Auction to, among other things: facilitate discussions between the Debtor and individual Qualified Bidders; allow individual Qualified Bidders to consider how they wish to proceed; and give Qualified Bidders the opportunity to provide the Debtor with such additional evidence as the Debtor, in its reasonable business judgment, may require, that the Qualified Bidder has sufficient internal resources, or has received sufficient non-contingent debt and/or equity funding commitments, to consummate the proposed transaction at the prevailing Overbid amount.

**(f)**     **Additional Procedures**

45.     The Debtor may adopt rules for the Auction at or prior to the Auction that, in its reasonable discretion (in consultation with the Committee and TriplePoint), will better promote the goals of the Auction and that are not inconsistent with any of the provisions of the Bid Procedures Order or the Bankruptcy Code.  All such rules will provide that all Bids shall be made and received in one room, on an open basis, and all other Qualified Bidders shall be entitled to be present for all bidding with the understanding that the true identity of each Qualified Bidder (*i.e.*, the principals submitting the Bid) shall be fully disclosed to all other Qualified Bidders and that all material terms of each Qualified Bid will be fully disclosed to all other Qualified Bidders throughout the entire Auction.

46.     The Debtor (in consultation with the Committee and TriplePoint may (a) determine which Qualified Bid, if any, is the highest and best offer and (b) reject at any time before entry of an order of the Bankruptcy Court approving the sale of the Assets pursuant to a Qualified Bid, any Bid that is (i) inadequate or insufficient; (ii) not in conformity with the requirements of the Bankruptcy Code or these Bid Procedures; or (iii) contrary to the best interest of the Debtor, its estate and its creditors.

**(g)**     **Consent to Jurisdiction as Condition to Bidding**

47.     All Qualified Bidders at the Auction shall be deemed to have consented to the core jurisdiction of the Bankruptcy Court and waived any right to a jury trial in connection with any disputes relating to the Auction, and the construction and enforcement of each Qualified Bidder's Contemplated Transaction Documents, as applicable.

### (h)      Closing the Auction

48.      Upon conclusion of the bidding, the Auction shall be closed, and the Debtor (in consultation with the Committee and TriplePoint) shall immediately identify the highest or best offer for the Assets (which may be an aggregate of bids for less than all of the Assets) (the "Successful Bid" or the "Successful Bidder APA") and the entity submitting such Successful Bid (the "Successful Bidder"), which highest or best offer will provide the greatest amount of net value to the Debtor, and the next highest or best offers after the Successful Bid (the "Back-up Bid") and the entity or entities submitting the Back-up Bid (the "Back-up Bidder"), and advise the Qualified Bidders of such determination.  Upon three (3) days' prior notice by the Debtor, the Back-up Bidder selected by the Debtor must immediately proceed with the closing of the transaction contemplated under the Back-up Bid in the event that the transaction with the Successful Bidder is not consummated for any reason.

49.      As stated above, the Bids of the Successful Bidder and the Back-up Bidder must be irrevocable until the Termination Date, *provided* that in the event that the Successful Bid is submitted by a party other than the Stalking Horse Purchaser, and the Stalking Horse Purchaser's Bid (or as amended by the Stalking Horse Purchaser at the Auction in response to competitive bidding) is declared to be the Back-Up Bid, then the Stalking Horse Purchaser's Bid must only be irrevocable for fifteen (15) calendar days from the conclusion of the Sale Hearing.

### Acceptance of Successful Bid

50.      The Debtor shall sell the Assets to the Successful Bidder upon the approval of the Successful Bid by the Bankruptcy Court after the Sale Hearing.  The Debtor's

presentation of a particular Qualified Bid to the Bankruptcy Court for approval does not

constitute the Debtor's acceptance of such Qualified Bid. The Debtor will be deemed to have

accepted a Qualified Bid only when the Qualified Bid has been approved by the Bankruptcy

Court at the Sale Hearing.

### "As Is, Where Is"

51.     The sale of the Assets shall be on an "as is, where is" basis and without

representations or warranties of any kind, nature, or description by the Debtor, its agents or its

estate except to the extent set forth in the Successful Bidder APA. Each Qualified Bidder shall

be deemed to acknowledge and represent that it has had an opportunity to conduct any and all

due diligence regarding the Assets prior to making its offer, that it has relied solely upon its own

independent review, investigation and/or inspection of any documents and/or the Assets in

making its bid, and that it did not rely upon any written or oral statements, representations,

promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or

otherwise, regarding the Assets, or the completeness of any information provided in connection

therewith or the Auction, except as expressly stated in these Bid Procedures or the Successful

Bidder APA.

### Free of Any and All Interests

52.     Except as otherwise provided in the Successful Bidder APA and subject to

the approval of the Bankruptcy Court, all of Debtor's right, title and interest in and to the Assets

subject thereto shall be sold free and clear of any Liens, Claims and Encumbrances, and other

interests to the maximum extent permitted by section 363 of the Bankruptcy Code, with such

Liens, Claims and Encumbrances, and other interests to attach to the net proceeds of the sale of the Assets with the same validity and priority as such Liens, Claims and Encumbrances, and other interests applied against the Assets.

## Sale Hearing

53.     The Debtor has requested that the Sale Hearing occur on or about August 28, 2018, or on such other date as may be established by the Bankruptcy Court.

54.     If the Successful Bidder fails to consummate an approved sale in accordance with the applicable asset purchase agreement or such agreement is terminated, the Debtor shall be authorized, but not required, to deem the Back-up Bid, as disclosed at the Sale Hearing, the Successful Bid, and the Debtor shall be authorized, but not required, to consummate the sale with the Qualified Bidder submitting the next highest such Bid without further order of the Bankruptcy Court.

## Return of Good Faith Deposit

55.     The Good Faith Deposit of the Successful Bidder (or the Back-up Bidder that becomes a Successful Bidder) shall be applied to the purchase price of such transaction at Closing. The Debtor will hold the Good Faith Deposits of the Successful Bidder and the next highest Qualified Bidder in a segregated account until the closing of the sale with the Successful Bidder; Good Faith Deposits of all other Qualified Bidders shall be held in a segregated account, and thereafter returned to the respective bidders following the conclusion of the Auction. If a Successful Bidder (including any Back-up Bidder that has become the Successful Bidder) fails to consummate an approved sale because of a breach or failure to perform on the part of such

Successful Bidder, the Debtor shall be entitled to retain the Successful Bidder's Good Faith Deposit as part of the Debtor's damages resulting from such Successful Bidder's breach or failure to perform.

## Notice of Sale Hearing

56.    As noted above, the Debtor requests that the Court: (1) schedule the Sale Hearing on or about August 28, 2018; (2) fix on or about August 23, 2018, 5:00 p.m., prevailing Eastern Time as the Bid Deadline; and (2) fix no later than August 27, 2018, at 10:00 a.m. prevailing Pacific Time for the commencement of the Auction, if necessary.  The Debtor proposes that objections, if any, to the Sale be filed and properly served on the Sale and Bid Procedures Notice Parties (as defined herein) by 4:00 p.m. prevailing Pacific Time on the date seven (7) days prior to the Sale Hearing or such other date as set by the Bankruptcy Court.

57.    The Debtor requests that the Court approve the manner of notice of this Motion, the Bid Procedures, the Auction, and the Sale Hearing, substantially in the form attached to the Sale and Bid Procedures Notice, which the Debtor will serve on the following parties:

(a)    the U.S. Trustee;

(b)    the Debtor's top 20 unsecured creditors;

(c)    all parties who have timely filed requests for notice under Rule 2002 of the Federal Rules of Bankruptcy Procedure;

(d)    all parties who assert Liens, Claims and Encumbrances, and other interests  with respect to the Assets, including, but not limited to, Silicon Valley Bank and TriplePoint;

(e)     all entities known to have expressed an interest in bidding on the Assets, including the Stalking Horse Purchaser;

(f)     the United States Attorney's office;

(g)     the attorney general of California, which is the state where the Assets are located;

(h)     the Internal Revenue Service; and

(i)     for each state in which the Assets are located, the applicable taxing authorities.  The parties listed in (a)-(i) above are collectively referred to as the "<u>Sale and Bid Procedures Notice Parties</u>").

58.     Additionally, the Debtor proposes to serve the Creditor Notice substantially in the form attached to the Bid Procedures Order as **<u>Exhibit 3</u>** on all known creditors of the Debtor.

59.     The Debtor proposes to serve the Sale and Bid Procedures Notice and the Creditor Notice within two (2) business days from the date of entry of the Bid Procedures Order, by first-class mail, postage prepaid, on the appropriate parties as described above.  Both the Sale and Bid Procedures Notice and the Creditor Notice will provide that any party that has not received a copy of the Bid Procedures Order that wishes to obtain a copy of such document may make such a request, in writing, to Pachulski Stang Ziehl & Jones LLP, 919 North Market Street, 17th Floor, P.O. Box, 8705, Wilmington, Delaware, 19899-8705 (Courier 19801), Attn: John D. Fiero, Esq. and Colin R. Robinson, Esq., crobinson@pszjlaw.com and jfiero@pszjlaw.com.

60.     The Debtor submits that the foregoing notices comply fully with Bankruptcy Rule 2002 and are reasonably calculated to provide timely and adequate notice of the Bid Procedures, Auction, and Sale Hearing to the Debtor's creditors and other parties in interest as well as to those who have expressed an interest or are likely to express an interest in bidding on the Assets.  Based on the foregoing, the Debtor respectfully requests that this Court approve these proposed notice procedures.

## Sale Hearing

61.     At the Sale Hearing, the Debtor will seek Bankruptcy Court approval of the sale of the Assets to the Stalking Horse Purchaser or other Successful Bidder, free and clear of all Liens, Claims and Encumbrances, and other interests pursuant to section 363(f) of the Bankruptcy Code with all such Liens, Claims and Encumbrances, and other interests to attach to the proceeds of the sale, except as otherwise provided with the same validity and in the same order of priority as they attached to the Assets prior to the sale, including the assumption by the Debtor and assignment to the Successful Bidder of the Assumed Executory Contracts pursuant to section 365 of the Bankruptcy Code.  The Debtor will submit and present additional evidence, as necessary, at the Sale Hearing demonstrating that the Sale is fair, reasonable, and in the best interest of the Debtor's estate and all interested parties, and satisfies the standards necessary to approve a sale of substantially all of a debtor's assets articulated by the Court of Appeals for the Third Circuit in *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir. 1986).

## Closing

62.     The closing shall take place in accordance with the terms of the Successful

Bidder APA, approved by the Bankruptcy Court at the Sale Hearing.

## Procedures for the Assumption and Assignment of Assumed Executory Contracts

63.     As noted above, the Debtor will seek to assume and assign the Assumed

Executory Contracts to be identified on schedules to the Purchase Agreement, or alternatively,

identified pursuant the Successful Bidder's asset purchase agreement

64.     The Assumed Executory Contracts will be those Contracts and Leases

pursuant to which the Debtor serves a Cure Notice.  However, the Stalking Horse Purchaser may

choose to add or delete certain Assumed Executory Contracts.  If the Stalking Horse Purchaser

chooses to add or delete an Assumed Executory Contract, then notice of that addition or deletion

shall be provided to the affected counterparty by the Debtor approximately five (5) days prior to

the Auction or, if no Auction is required, five (5) days prior to the Sale Hearing.  Only those

Assumed Executory Contracts assumed as of the closing of the Sale will be required to be cured.

65.     The Debtor will file with the Court and serve the form of the Cure Notice,

substantially in the form of **Exhibit 4** to the Bid Procedures Order, (along with a copy of this

Motion) upon each Counterparty to the Assumed Executory Contracts by no later than two

business days after the entry of the Bid Procedures Order.  The Cure Notice will state the date,

time and place of the Sale Hearing as well as the date by which any objection to the assumption

and assignment of Assumed Executory Contracts (including the Cure Amount (defined below))

must be filed and served.  The Cure Notice also will identify the amounts, if any, that the Debtor

believes are owed to each Counterparty to an Assumed Executory Contract in order to cure any defaults that exist under such contract (the "Cure Amounts"). This Motion constitutes a separate motion to assume and assign the Assumed Executory Contracts pursuant to section 365 of the Bankruptcy Code.

66. The inclusion of a contract, lease, or other agreement on the Cure Notice shall not constitute or be deemed a determination or admission by the Debtor and its estate or any other party in interest that such contract, lease, or other agreement is, in fact, an executory contract or unexpired lease within the meaning of the Bankruptcy Code, and any and all rights with respect thereto are hereby reserved.

67. If an Assumed Executory Contract is assumed and assigned pursuant to Court Order, then unless the applicable counterparties to the Assumed Executory Contract (each a "Counterparty" and collectively, the "Counterparties") properly files and serves an objection to the Cure Amount contained in the Cure Notice by the Assumption Objection Deadline (defined below), subject to the assumption and assignment of its contract at the Closing, the Counterparty will receive, at the time of the closing of the Sale (or as soon as reasonably practicable thereafter), the Cure Amount as set forth in the Cure Notice, if any. If an objection is filed by a Counterparty to an Assumed Executory Contract, the Debtor proposes that such objection must set forth a specific default in the executory contract or unexpired lease, claim a specific monetary amount that differs from the Cure Amount, if any, specified by the Debtor in the Cure Notice, along with such documentation supporting this amount, and set forth any reason why the

Counterparty believes the executory contract or unexpired lease cannot be assumed and assigned to the Successful Bidder.

68.     If any Counterparty objects for any reason to the assumption and assignment of an Assumed Executory Contract (including an objection to a proposed Cure Amount) (an "Assumption Objection"), the Debtor proposes that the Counterparty must file the objection and serve it so as to be actually received on or before the Assumption Objection Deadline (defined below), upon the Debtor and the other notice parties identified in the Cure Notice by no later than (i) 4:00 p.m. (prevailing Pacific Time) on the date that is seven days prior to the Sale Hearing; or (ii) the date otherwise specified in the Cure Notice (or, alternatively, the date set forth in the motion to assume such Assumed Executory Contract if such contract is to be assumed and assigned after the Auction) (the "Assumption Objection Deadline"), provided, however, as to any Successful Bidder who is not the Stalking Horse Purchaser, any Counterparty may raise at the Sale Hearing an objection to the assumption and assignment of the Assumed Executory Contract solely with respect to the Successful Bidder's ability to provide adequate assurance of future performance under the Assumed Executory Contract. After receipt of an Assumption Objection, the Debtor will attempt to reconcile any differences in the Cure Amount or otherwise resolve the objection with the objecting Counterparty. In the event that the Debtor and the Counterparty cannot resolve an Assumption Objection, and the Court does not otherwise make a determination at the Sale Hearing regarding an Assumption Objection related to a Cure Amount, the Successful Bidder must either (i) fund the amount in escrow or similar arrangement to pay any disputed Cure Amounts pending the resolution of any such Cure Amount disputes by

the Court or mutual agreement of the parties, (ii) remove the Assumed Executory Contract from assumption and assignment to it pursuant to the Purchase Agreement.

69.     The Successful Bidder(s) shall be responsible for satisfying any requirements regarding adequate assurance of future performance that may be imposed under section 365(b) of the Bankruptcy Code in connection with the proposed assignment of any Assumed Executory Contract, and the failure to provide adequate assurance of future performance to any Counterparty to any Assumed Executory Contracts shall not excuse the Successful Bidder(s) from performance of any and all of its obligations pursuant to the Successful Bidder APA. The Debtor proposes that the Court make its determinations concerning adequate assurance of future performance under the Assumed Executory Contracts pursuant to section 365(b) of the Bankruptcy Code at the Sale Hearing if the Successful Bidder is the Stalking Horse Purchaser or, at such time as ordered by the Court if the Successful Bidder is a party other than the Stalking Horse Purchaser. Disputed Cure Amounts will be resolved by the Court at the Sale Hearing or such later date as may be agreed to or ordered by the Court.

70.     The Debtor and the Debtor's estate shall be relieved of all liability accruing or arising after the assumption and assignment of the Assumed Executory Contracts, pursuant to Section 365(k) of the Bankruptcy Code.

## Basis for Relief Requested

### A.     The Sale of the Assets is Authorized by Section 363 as a Sound Exercise of the Debtor's Business Judgment

71.     In accordance with Bankruptcy Rule 6004, sales of property rights outside the ordinary course of business may be by private sale or public auction. The Debtor has

determined that the Sale of the Assets by public auction will enable it to obtain the highest and best offer for these Assets (thereby maximizing the value of the estate) and is in the best interests of the Debtor's creditors. In particular, a sale pursuant to the terms of the Purchase Agreement, subject to higher or otherwise better offers at the Auction, will provide a greater recovery for the Debtor's creditors than would be provided by any other existing alternative.

72.     Section 363 of the Bankruptcy Code provides that a trustee, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b). Although section 363 of the Bankruptcy Code does not specify a standard for determining when it is appropriate for a court to authorize the use, sale or lease of property of the estate, a sale of a debtor's assets should be authorized if a sound business purpose exists for doing so. *See, e.g.*, *Meyers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996); *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (2d Cir. 1986); *In re Titusville Country Club*, 128 B.R. 396 (W.D. Pa. 1991); *In re Delaware & Hudson Ry. Co.*, 124 BR. 169, 176 D. Del. 1991); *see also Official Committee of Unsecured Creditors v. The LTV Corp. (In re Chateaugay Corp.)*, 973 F.2d 141, 143 (2d Cir. 1992); *Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983); *Committee of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).

73.     The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate. *See, e.g., In re Food Barn Stores, Inc.*, 107 F.3d 558, 564-65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to

enhance the value of the estate at hand"); *Integrated Resources*, 147 B.R. at 659 ("It is a well-established principle of bankruptcy law that the. . . [trustee's] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (quoting *In re Atlanta Packaging Prods*., Inc., 99 BR. 124, 130 (Bankr. N.D. Ga. 1988)).  As long as the sale appears to enhance a debtor's estate, court approval of a trustee's decision to sell should only be withheld if the trustee's judgment is clearly erroneous, too speculative, or contrary to the provisions of the Bankruptcy Code.  *GBL Holding Co., Inc. v. Blackburn/Travis/Cole, Ltd.*, 331 B.R. 251, 255 (N.D. Tex. 2005); *In re Lajijani*, 325 B.R. 282, 289 (9th Cir. B.A.P. 2005); *In re WPRV-TV, Inc.*, 143 B.R. 315, 319 (D.P.R. 1991) ("The trustee has ample discretion to administer the estate, including authority to conduct public or private sales of estate property.  Courts have much discretion on whether to approve proposed sales, but the trustee's business judgment is subject to great judicial deference.").

74.     Applying section 363 of the Bankruptcy Code, the proposed Sale of the Assets should be approved.  As set forth above, the Debtor has determined that the best method of maximizing the recovery of the Debtor's creditors would be through the Sale of the Assets.  Further, the Debtor believes that the value its estate (and, thus, the value for the Debtor's creditors) will receive from the Sale of the Assets exceeds any value the Debtor's estate could obtain for the Assets if the Debtor is required to liquidate its assets piecemeal.  As assurance of value, bids will be tested through the Auction consistent with the requirements of the Bankruptcy Code, the Bankruptcy Rules, and pursuant to the Bid Procedures approved by the Court.  Consequently, the fairness and reasonableness of the consideration to be paid by the Successful

Bidder ultimately will be demonstrated by adequate "market exposure" and an open and fair auction process—the best means, under the circumstances, for establishing whether a fair and reasonable price is being paid.

**B.      The Bid Procedures Are Appropriate and
Will Maximize the Value Received for the Assets.**

75.      As noted above, the paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate.  To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy sales.  *See, e.g., In re Financial News Network, Inc.*, 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991) ("court-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estate").

76.      Procedures to dispose of assets, similar to the proposed Bid Procedures, have been approved in other bankruptcy cases.  *See, e.g.*, *In re IMRIS, Inc.*, Case No. 15-11133 (CSS) (Bankr. D. Del. June 16, 2015); *In re Velti Inc.*, Case No. 13-12878(PJW) (Bankr. D. Del. Nov. 20, 2013); *In re Orchard Supply Hardware Stores Corp.*, Case No.  13-11565 (CSS) (Bankr. D. Del. Jul. 8, 2013); *In re Conex Holdings LLC*, Case No. 11-10501(CSS) (Bankr. D. Del. Sept. 14, 2011); *In re Barnes Bay Dev. Ltd.*, Case No. 11-10792 (PJW) (Bankr. D. Del. May 19, 2011); *In re East West Resort Dev. V, L.P., L.L.L.P.*, Case No. 10-10452 (BLS) (Bankr. D. Del. March 31, 2010); *In re Dana Corp.*, Case No. 06-10354 (Bankr. S.D.N.Y. Oct. 19, 2006); *In re Delphi Corp.*, Case No. 05-44481 (Bankr. S.D.N.Y. June 22, 2006); *In re Oxford Automotive,*

*Inc.*, Case No. 04-74377 (Bankr. E.D. Mich. Jan. 24, 2005); *see also In re Calpine Corp.*, Case No. 05-60200 (Bankr. S.D.N.Y. Dec. 6, 2006).

77.     The Debtor believes that the Bid Procedures will establish the parameters under which the value of the Assets may be tested at an auction and through the ensuing Sale Hearing.  Such procedures will increase the likelihood that the Debtor's creditors will receive the greatest possible consideration for the Debtor's Assets because they will ensure a competitive and fair bidding process.  They also allow the Debtor to undertake an auction in as expeditious and efficient manner as possible, which the Debtor believes is essential to maximizing the value of the Debtor's estate for its creditors.

78.     The Debtor also believes that the proposed Bid Procedures will promote active bidding from seriously interested parties and will dispel any doubt as to the best and highest offer reasonably available for the Debtor's Assets.  In particular, the proposed Bid Procedures will allow the Debtor to conduct an auction in a controlled, fair, and open fashion that will encourage participation by financially capable bidders who demonstrate the ability to close a transaction.  Further, the Bid Procedures provide the Debtor with the opportunity to consider all Qualified Bids and to select, in its reasonable business judgment, and after consultation with its professionals and the Committee, the highest and best offer(s) for the Assets.

79.     In sum, the Debtor believes that the Bid Procedures will encourage bidding for the Assets and are consistent with the relevant standards governing auction

proceedings and bidding incentives in bankruptcy proceedings. Accordingly, the proposed Bid

Procedures are reasonable, appropriate, and within the Debtor's sound business judgment.

**C.**   **The Sale of the Assets Free and Clear of Liens, Claims and Encumbrances and Other Interests is Authorized by Section 363(f) of the Bankruptcy Code**

80.    The Debtor further submits that it is appropriate to sell the Assets free and

clear of Liens, Claims and Encumbrances, and other interests  pursuant to section 363(f) of the

Bankruptcy Code, with any such Liens, Claims and Encumbrances, and other interests  attaching

to the Sale Proceeds of the Assets to the extent applicable.  Section 363(f) of the Bankruptcy

Code authorizes a trustee to sell assets free and clear of Liens, Claims and Encumbrances, and

other interests if:

(1)    applicable nonbankruptcy law permits the sale of such property free and clear of such interests;

(2)    such entity consents;

(3)    such interest is a lien and the price at which such property is to be sold is greater than the value of all Liens, Claims and Encumbrances, and other interests  on such property;

(4)    such interest is in bona fide dispute; or

(5)    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.  11 U.S.C. § 363(f).

81.    This provision is supplemented by Section 105(a) of the Bankruptcy Code,

which provides that "[t]he Court may issue any order, process or judgment that is necessary or

appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a).

82.    Because Section 363(f) of the Bankruptcy Code is drafted in the

disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the

Assets "free and clear" of Liens, Claims and Encumbrances, and other interests.  *In re Dundee*

*Equity Corp.*, 1992 Bankr. LEXIS 436, at *12 (Bankr. S.D.N.Y. March 6, 1992) ("Section 363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if any one of the conditions of § 363(f) have been met."); *In re Bygaph, Inc.*, 56 B.R. 596, 606 n.8 (Bankr. S.D.N.Y. 1986) (same); *Michigan Employment Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.)*, 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (stating that Bankruptcy Code section 363(f) is written in the disjunctive; holding that the court may approve the sale "free and clear" provided at least one of the subsections of Bankruptcy Code section 363(f) is met).

83.     The Debtor believes that at least one of the tests of Section 363(f) is satisfied with respect to the transfer of the Assets pursuant to the Purchase Agreement. In particular, the Debtor believes that at least section 363(f)(2) will be met in connection with the transactions proposed under the Purchase Agreement because each of the parties holding Liens, Claims and Encumbrances, and other interests on the Assets will consent or, absent any objection to this Motion, will be deemed to have consented to the Sale. Any lienholder also will be adequately protected by having their Liens, Claims and Encumbrances, and other interests, if any, in each instance against the Debtor or its estate, attach to the Sale proceeds ultimately attributable to the Assets in which such creditor alleges an interest, in the same order of priority, with the same validity, force and effect that such creditor had prior to the Sale, subject to any claims and defenses the Debtor may possess with respect thereto. Accordingly, Section 363(f) authorizes the transfer and conveyance of the Debtor's Assets free and clear of any such claims, interests, liabilities, or Liens, Claims and Encumbrances, and other interests.

84.     Although Section 363(f) of the Bankruptcy Code provides for the sale of assets "free and clear of any interests," the term "any interest" is not defined anywhere in the Bankruptcy Code. *Folger Adam Security v. DeMatteis/MacGregor JV*, 209 F.3d 252, 257 (3d Cir. 2000). In the case of *In re Trans World Airlines, Inc.*, 322 F.3d 283, 288-89 (3d Cir. 2003), the Third Circuit specifically addressed the scope of the term "any interest." The Third Circuit observed that while some courts have "narrowly interpreted that phrase to mean only in rem interests in property," the trend in modern cases is towards "a more expansive reading of 'interests in property' which 'encompasses other obligations that may flow from ownership of the property.'" *Id.* at 289 (citing 3 *Collier on Bankruptcy* 15th Ed. Rev., ¶ 363.06[1] (L. King, 15th rev. ed. 1988)). As determined by the Fourth Circuit in *In re Leckie Smokeless Coal Co.*, 99 F.3d 573, 581-582 (4th Cir. 1996), a case cited with approval and extensively by the Third Circuit in *Folger*, *supra*, the scope of Section 363(f) is not limited to in rem interests. Thus, the Third Circuit in *Folger* stated that *Leckie* held that the debtor "could sell their assets under § 363(f) free and clear of successor liability that otherwise would have arisen under federal statute." *Folger*, 209 F.3d at 258 (citing *Leckie*, 99 F.3d at 582).

85.     Courts have consistently held that a buyer of a debtor's assets pursuant to section 363 of the Bankruptcy Code takes such assets free from successor liability resulting from pre-existing claims. *See The Ninth Avenue Remedial Group v. Allis-Chalmers Corp.*, 195 B.R. 716, 732 (Bankr. N.D. Ind. 1996) (stating that a bankruptcy court has the power to sell assets free and clear of any interest that could be brought against the bankruptcy estate during the bankruptcy); *MacArthur Company v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 837

F.2d 89, 93-94 (2d Cir. 1988) (channeling of claims to proceeds consistent with intent of sale free and clear under section 363(f) of the Bankruptcy Code); *In re New England Fish Co.*, 19 B.R. 323, 329 (Bankr. W.D. Wash. 1982) (transfer of property in free and clear sale included free and clear of Title VII employment discrimination and civil rights claims of debtor's employees); *In re Hoffman*, 53 B.R. 874, 876 (Bankr. D.R.I. 1985) (transfer of liquor license free and clear of any interest permissible even though the estate had unpaid taxes); *American Living Systems v. Bonapfel (In re All Am. of Ashburn, Inc.)*, 56 B.R. 186, 190 (Bankr. N.D. Ga. 1986) (product liability claims based on successor doctrine precluded after sale of assets free and clear); *WBO P'ship v. Virginia Dept. of Medical Assistance Servs. (In re WBO P'ship)*, 189 B.R. 97, 104-05 (Bankr. E.D. Va. 1995) (Commonwealth of Virginia's right to recapture depreciation is an "interest" as used in section 363(f)).[6] The purpose of an order purporting to authorize the transfer of assets free and clear of all "interests" would be frustrated if claimants could thereafter use the transfer as a basis to assert claims against the purchaser arising from the Debtor's pre-sale conduct. Under section 363(f) of the Bankruptcy Code, the purchaser is entitled to know that the Debtor's assets are not infected with latent claims that will be asserted against the purchaser after the proposed transaction is completed. Accordingly, consistent with the above-cited case law, the order approving the Sale should state that the Successful Bidder is not liable

---

[6] Some courts, concluding that Section 363(f) of the Bankruptcy Code does not empower them to convey assets free and clear of claims, have nevertheless found that Section 105(a) of the Bankruptcy Code provides such authority. *See, e.g., Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.)*, 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) (stating that the absence of specific authority to sell assets free and clear of claims poses no impediment to such a sale, as such authority is implicit in the court's equitable powers when necessary to carry out the provisions of title 11).

as a successor under any theory of successor liability, for claims that encumber or relate to the Assets.

**D.      The Proposed Notice of Bid Procedures, Auction, and Sale Is Appropriate**

86.      The Debtor believes that it will obtain the maximum recovery for creditors of the Debtor's estate if the Assets are sold through the proposed Bid Procedures.  As explained in detail above, the Debtor has already taken significant steps to identify and solicit interest from potential purchasers, including in-house efforts, and the efforts of Houlihan Lokey.

87.      Under Bankruptcy Rules 2002(a) and (c), the Debtor is required to notify creditors of the proposed sale of the Debtor's Assets, including a disclosure of the time and place of an auction, the terms and conditions of a sale, and the deadline for filing any objections.  The Debtor submits that the notice procedures herein comply fully with Bankruptcy Rule 2002 and are reasonably calculated to provide timely and adequate notice of the sale by auction to the Debtor's creditors and other interested parties, as well as to those parties who have expressed an interest, or may express an interest, in bidding on the Assets.  The proposed time frame between the filing of this Motion, the commencement of the bidding process and the Auction will provide interested purchasers sufficient time to participate in the Auction.

**E.      The Breakup Fee and Expense Reimbursement are Appropriate Under the Circumstances**

88.      The Debtor submits that the Breakup Fee and Expense Reimbursement are a normal and oftentimes necessary component of sales outside the ordinary course of business under Section 363 of the Bankruptcy Code.  In particular, such protections encourage a potential purchaser to invest the requisite time, money, and effort to conduct due diligence and sale

negotiations with a debtor despite the inherent risks and uncertainties of the chapter 11 process. *See, e.g., In re Comdisco, Inc.*, Case No. 01 24795 (RB) (Bankr. N.D. Ill. Aug. 9, 2002) (approving a termination fee as, inter alia, an actual and necessary cost and expense of preserving the debtor's estate, of substantial benefit to the debtor's estate and a necessary inducement for, and a condition to, the proposed purchaser's entry into the purchase agreement); *Integrated Resources*, 147 B.R. at 660 (noting that fees may be legitimately necessary to convince a "white knight" to offer an initial bid by providing some form of compensation for the expenses such bidder incurs and the risks such bidder faces by having its offer held open, subject to higher and better offers); *In re Hupp Indus.*, 140 B.R. 191, 194 (Bankr. N.D. Ohio 1997) (without any reimbursement, "bidders would be reluctant to make an initial bid for fear that their first bid will be shopped around for a higher bid from another bidder who would capitalize on the initial bidder's. . . due diligence"); *In re Marrose Corp.*, 1992 WL 33848, at *5 (Bankr. S.D.N.Y. 1992) (stating that "agreements to provide reimbursement of fees and expenses are meant to compensate the potential acquirer who serves as a catalyst or 'stalking horse' which attracts more favorable offers"); *In re 995 Fifth Ave. Assocs.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (finding that bidding incentives may be "legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking") (citations omitted).

89.     A proposed bidding incentive, such as the Breakup Fee and Expense Reimbursement, should be approved when it is in the best interests of the estate. *See In re S.N.A. Nut Co.*, 186 B.R. 98, 104 (Bankr. N.D. Ill. 1995); *see also In re America West Airlines, Inc.*,

166 B.R. 908 (Bankr. D. Ariz. 1994); *In re Hupp Indus., Inc.*, 140 B.R. 191 (Bankr. N.D. Ohio 1992).  Typically, this requires that the bidding incentive provide some benefit to the debtor's estate.  *Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 533 (3d Cir. 1999) (holding even though bidding incentives are measured against a business judgment standard in non-bankruptcy transactions the administrative expense provisions of Bankruptcy Code section 503(b) govern in the bankruptcy context).

90.     In *O'Brien Environmental Energy*, the Third Circuit found that whether breakup fees and expenses could be paid to Calpine Corp. as a "stalking horse" depended on whether such fees were necessary to preserve the value of the estate.  *See* 181 F.3d at 536.  The court determined that Calpine's right to breakup fees and expenses depended on whether it provided a benefit to the debtor's estate by promoting competitive bidding or researching the value of the assets at issue to increase the likelihood that the selling price reflected the true value of the company.  *Id.* at 537.  The Debtor believes that approval of the Breakup Fee and Expense Reimbursement will create such a competitive bidding process.

91.     The Debtor believes that the proposed Breakup Fee and Expense Reimbursement are fair and reasonably compensate the Stalking Horse Purchaser for taking actions that will benefit the Debtor's estate.  The Breakup Fee and Expense Reimbursement compensate the Stalking Horse Purchaser for diligence and professional fees incurred in negotiating the terms of the Purchase Agreement on an expedited timeline.

92.     The Debtor does not believe that the Breakup Fee and Expense Reimbursement will have a chilling effect on the sale process, as the reflect a Stipulated Value of

$40 million, which amount was the product of an arms' length negotiation among the Debtor, the Stalking Horse Purchaser, and TriplePoint. Rather, the Stalking Horse Purchaser will increase the likelihood that the best possible price for the Assets will be received, by permitting other qualified bidders to rely on the diligence performed by the Stalking Horse Purchaser, and moreover, by allowing qualified bidders to utilize the Purchase Agreement as a platform for negotiations and modifications in the context of a competitive bidding process.

93.     Payment of the Breakup Fee and Expense Reimbursement, if any, shall be made in accordance with the terms of the Purchase Agreement. Section 3.1(d) of the Purchase Agreement provides that the Stalking Horse Purchaser shall be entitled to (i) reimbursement of all reasonable out-of-pocket third party costs and expenses actually incurred in connection with and relating to the execution of the Purchase Agreement and consummation of the transactions contemplated thereby, including, without limitation, reasonable attorney's fees and expenses, diligence fees and costs and expenses incurred in connection with the capital structure of Purchaser, in an aggregate amount not to exceed $400,000 (the "Expense Reimbursement") and (ii) a break-up fee in consideration of the Stalking Horse Purchaser's time, effort and expenses incurred in conducting its due diligence and benefit to the Debtor's estate from the submission of the Purchase Agreement, in an amount equal to $1.2 million (the "Breakup Fee") in the event another bidder succeeds at the auction, which shall be paid solely from the proceeds of that closed transaction.

94.     Furthermore, the Breakup Fee, in an amount of $1.2 million and Expense Reimbursement of up to $400,000 are not inconsistent with termination fees approved by

bankruptcy courts in chapter 11 cases with a value such as the Stipulated Value here. *See, e.g.,*

*In re FoxMeyer Corp. et al.*, Case No. 96-1329 (HSB) through 96-1334 (HSB) (Bankr. D. Del.,

Oct. 9, 1996) (Court approved termination fee of 7.47%, or $6,500,000, in connection with

$87,000,000 sale of substantially all of Debtor's assets); *In re Global Motorsport Group, Inc., et*

*al.*, (Case No. 08-10192 (KJC) (Bankr. D. Del. February 14, 2008) (Court approved a breakup

fee of approximately 4%, or $500,000 in connection with sale); *In re Global Home Products*,

Case No. 06-10340 (KG) (Bankr. D. Del. July 14, 2006) (Court approved a breakup fee of 3.3%,

or $700,000, in connection with sale); *In re Ameriserve*, Case No. 00-0358 (PJW) (Bankr. D.

Del., September 27, 2000) (Court approved a breakup fee of 3.64%, or $4,000,000, in connection

with $110,000,000 sale); *In re Montgomery Ward Holding Corp., et al.*, Case No. 97-1409

(PJW) (Bankr. D. Del., June 15, 1998) (Court approved termination fee of 2.7%, or $3,000,000,

in connection with $110,000,000 sale of real estate assets); *In re Medlab, Inc.*, Case No, 97-1893

(PJW) (Bankr. D. Del. April 28, 1998) (Court approved termination fee of 3.12%, or $250,000,

in connection with $8,000,000 sale transaction); *In re Edison Bros. Stores. Inc., et al.*, Case No.

95-1354 (PJW) (Bankr. D. Del., Dec. 29, 1995) (Court approved termination fee of 3.5%, or

$600,000, in connection with $17,000,000 sale of Debtor's entertainment division); *In re*

*NetEffect, Inc.*, Case No. 08-12008 (KJC) (Bankr. D. Del., Sept. 11, 2008) (Court approved

breakup fee of 3%, or $240,000.00 in connection with sale of debtor's assets for purchase price

of $8,000,000); *In re Champion Enterprises, et al.*, Case No. 09-14019 (KG) (Bankr. D. Del.,

Feb. 8, 2010) (Court approved breakup fee of less than credit bid or $3,000,000.00 in connection

with sale of debtor's assets for purchase price of approximately $80,000,000); *In re Filene's*

*Basement, Inc., et al.*, Case No. 09-11525 (MFW) (Bankr. D. Del., May 15, 2009) (Court approved breakup fee and expense reimbursement of 3.68%, or $810,000 in connection with sale of debtor's assets for purchase price for $22,000,000); *In re Western Nonwovens, Inc., et al.*, Case No. 08-11435 (PJW) (Bankr. D. Del., July 28, 2009) (Court approved breakup fee and expense reimbursement of $250,000 in connection with sale of debtor's assets for purchase price of $4,000,000 to $6,500,000 purchase price); and *In re Point Blank Solutions, Inc., et al.*, Case No. 10-11255 (PJW) (Bankr. D. Del, Oct. 5, 2011) (Court approved breakup and expense reimbursement of 3.75% or $750,000 in connection with sale of debtor's assets for purchase price of $20,000,000).

95.     In sum, the Breakup Fee and Expense Reimbursement are reasonable under the circumstances and will enable the Debtor to maximize the value for the Assets while limiting any chilling effect in the sale process.

## F.     Assumption and Assignment of Certain Executory Contracts and Unexpired Leases

96.     Section 365(a) of the Bankruptcy Code provides that, subject to the court's approval, a trustee "may assume or reject any executory contracts or unexpired leases of the debtor."  11 U.S.C. § 365(a).  Upon finding that a trustee has exercised its sound business judgment in determining to assume an executory contract or unexpired lease, courts will approve the assumption under section 365(a) of the Bankruptcy Code.  *See Nostas Assocs. v. Costich (In re Klein Sleep Prods., Inc.)*, 78 F.3d 18, 25 (2d Cir. 1996); *see also Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1099 (2d Cir. 1993).

97. Pursuant to section 365(f)(2) of the Bankruptcy Code, a trustee may assign an executory contract or unexpired lease of nonresidential real property if:

      (A) the trustee assumes such contract or lease in accordance with the provisions of this section; and

      (B) adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2).

98. The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *See Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1989); *see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent); *In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) ("Although no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance.").

99. Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *In re Bygaph, Inc.*, 56 B.R. 596, 605-6 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease has financial resources and expressed willingness to devote sufficient funding to business to give it strong likelihood of succeeding; chief determinant of adequate assurance is whether rent will be paid).

100. The Debtor and the Successful Bidder(s) will present evidence at the Sale Hearing to prove the financial credibility, willingness, and ability of the Successful Bidder(s) to perform under the Assumed Executory Contracts. The Court and other interested parties therefore will have the opportunity to evaluate the ability of any Successful Bidder(s) to provide adequate assurance of future performance under the Assumed Executory Contracts, as required by section 365(b)(1)(C) of the Bankruptcy Code.

101. In addition, the Debtor submits that the cure procedures set forth herein are appropriate, reasonably calculated to provide notice to any affected party, and afford the affected party to opportunity to exercise any rights affected by the Motion, and consistent with Section 365 of the Bankruptcy Code. To the extent that any defaults exist under any Assumed Executory Contracts, any such defaults will be cured pursuant to the Purchase Agreement or the Successful Bidder's APA. Except as otherwise limited by Section 365 of the Bankruptcy Code, any provision in the Assumed Executory Contracts that would restrict, condition, or prohibit an assignment of such contracts will be deemed unenforceable pursuant to Section 365(f)(1) of the Bankruptcy Code.

102. Accordingly, the Debtor submits that the cure procedures for effectuating the assumption and assignment of the Assumed Executory Contracts as set forth herein are appropriate and should be approved.

## G. The Successful Bidder Should be Afforded All Protections Under Section 363(m) as A Good Faith Purchaser

103. Section 363(m) of the Bankruptcy Code protects a good-faith purchaser's interest in property purchased from the debtor's estate notwithstanding that the sale conducted

under section 363(b) is later reversed or modified on appeal. Specifically, Section 363(m) states that:

> The reversal or modification on appeal of an authorization under [section 363(b)] . . . does not affect the validity of a sale . . . to an entity that purchased . . . such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale were stayed pending appeal.

11 U.S.C. § 363(m). Section 363(m) "fosters the 'policy of not only affording finality to the judgment of the bankruptcy court, but particularly to give finality to those orders and judgments upon which third parties rely.'" *In re Chateaugay Corp.*, 1993 U.S. Dist. Lexis 6130, *9 (S.D.N.Y. 1993) (quoting *In re Abbotts Dairies of Penn., Inc.*, 788 F.2d 143, 147 (3d Cir. 1986)); *see Allstate Ins. Co. v. Hughes*, 174 BR. 884, 888 (S.D.N.Y. 1994) ("Section 363(m) . . . provides that good faith transfers of property will not be affected by the reversal or modification on appeal of an unstayed order, whether or not the transferee knew of the pendency of the appeal"); *In re Stein & Day, Inc.*, 113 B.R. 157, 162 (Bankr. S.D.N.Y. 1990) ("pursuant to 11 U.S.C. § 363(m), good faith purchasers are protected from the reversal of a sale on appeal unless there is a stay pending appeal").

104. The selection of the Successful Bidder will be the product of arms' length, good-faith negotiations in an anticipated competitive purchasing process. The Debtor intends to request at the Sale Hearing a finding that the Successful Bidder is a good faith purchaser entitled to the protections of section 363(m) of the Bankruptcy Code.

**H.** **Relief from the 14-Day Waiting Period Under**
**Bankruptcy Rules 6004(h) and 6006(d) is Appropriate**

105. Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Similarly, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." The Debtor requests that the Sale Order be effective immediately by providing that the 14-day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

106. The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented. *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d). Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the 14-day stay period, *Collier* suggests that the 14-day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." *Collier on Bankruptcy* P 6004.11 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.). Furthermore, *Collier* provides that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. *Id*.

107. The Debtor hereby requests that the Court waive the 14-day stay periods under Bankruptcy Rules 6004(h) and 6006(d) or, in the alternative, if an objection to the Sale is

filed, reduce the stay period to the minimum amount of time needed by the objecting party to file its appeal.

## No Prior Request

108.     No prior request for the relief sought in this Motion has been made to this or any other court.

## Notice

109.     Concurrently with this filing, copies of this Motion will be provided to (a) the Office of the United States Trustee; (b) the Debtor's top 20 unsecured creditors; (c) all parties who have timely filed requests for notice under Rule 2002 of the Federal Rules of Bankruptcy Procedure; (d) all parties who assert Liens, Claims and Encumbrances, and other interests  with respect to the Assets, including, but not limited to, the SVB and TriplePoint; (e) all entities known to have expressed an interest in bidding on the Assets, including the Stalking Horse Purchaser; (f) the United States Attorney's office; (g) the attorney general of California, which is the state where the Assets are located; (h) the Internal Revenue Service; and (i) for each state in which the Assets are located, the applicable taxing authorities.  In addition, within two (2) business days following entry of the Bid Procedures Order, the Debtor will serve the Sale and Bid Procedures Notice and the Creditor Notice as provided herein.  The Debtor respectfully submit that such notice is sufficient, and request that the Court find that no further notice of the relief requested herein is required.

**WHEREFORE**, the Debtor respectfully requests that the Court enter orders,

substantially in the forms attached hereto as **<u>Exhibit A</u>** and **<u>Exhibit B</u>**, granting the relief requested herein and such other and further relief as this Court deems appropriate.

Dated:   July 18, 2018           PACHULSKI STANG ZIEHL & JONES LLP

*/s/ Colin R. Robinson*

John D. Fiero (CA Bar No. 136557)
Henry C. Kevane (CA Bar No. 125757)
John W. Lucas (CA Bar No. 271038)
Colin R. Robinson (DE Bar No. 5524)
919 N. Market Street, 17th Floor
Wilmington, DE 91899
Tel:  (302) 652-4100
Fax: (302) 652-4400
E-mail:  jfiero@pszjlaw.com
       hkevane@pszjlaw.com
       jlucas@pszjlaw.com
       crobinson@pszjlaw.com

Proposed Attorneys for Debtor and Debtor in Possession