# Exhibit C

**Stalking Horse Purchase Agreement**

**(Without Schedules)**

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (the "Agreement") is made and entered into as of July 18, 2018 (the "Execution Date") by and among (i) DATADIRECT NETWORKS, INC., a Delaware corporation ("Parent") solely for purposes of Section 13.14 hereof, (ii) TI ACQUISITION CORP. a Delaware corporation and wholly owned subsidiary of Parent ("Purchaser"), and (iii) TINTRI, INC., a Delaware corporation, as Debtor and Debtor-in-Possession ("Seller") under Case No. 18-11625-KJC (the "Bankruptcy Case") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). Capitalized terms used herein but not otherwise defined shall have the meanings set forth in Section 13.13 of this Agreement.

## R E C I T A L S

WHEREAS, on July 10, 2018 (the "Petition Date"), Seller commenced the Bankruptcy Case by filing a voluntary petition for relief under Chapter 11 of the Bankruptcy Code with the Bankruptcy Court;

WHEREAS, Seller is a provider of an enterprise cloud platform that offers public cloud capabilities to large organization and cloud service providers inside their own data centers, which can also connect to public cloud services (such businesses, as presently conducted by Seller, shall be collectively referred to herein as the "Business"), as Debtor and Debtor-in-Possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, Seller wishes to sell, transfer, convey, assign and deliver to Purchaser, in accordance with Sections 363 and 365 and the other applicable provisions of the Bankruptcy Code, all of the Purchased Assets (defined below), together with the Assumed Liabilities of Seller (defined below) upon the terms and subject to the conditions set forth in this Agreement (hereinafter collectively referred to as the "Transaction");

WHEREAS, Purchaser wishes to purchase and take delivery of such Purchased Assets and Assumed Liabilities upon such terms and subject to such conditions;

WHEREAS, the Purchased Assets will be sold pursuant to a Sale Order of the Bankruptcy Court approving such sale under Section 363 of the Bankruptcy Code and such Sale Order will include the assumption and assignment of certain executory contracts and service agreements, unexpired leases of equipment and liabilities thereunder, under Section 365 of the Bankruptcy Code and pursuant to the terms and conditions of this Agreement;

WHEREAS, all of the obligations of the parties under this Agreement are conditioned upon the approval of the Bankruptcy Court in accordance with Article III hereof; and

WHEREAS, Purchaser has executed, contemporaneously with this Agreement, a debt financing commitment letter from TriplePoint Capital LLC ("TPC") in the form attached hereto as Exhibit A (the "Debt Commitment Letter").

NOW, THEREFORE, in consideration of the premises and mutual covenants and agreements herein set forth and for other good and valuable consideration, the receipt and

adequacy of which are hereby acknowledged, the parties hereto hereby agree as follows:

# ARTICLE I
# PURCHASE AND SALE

Except as otherwise provided and subject to the terms and conditions set forth in this Agreement and subject to Bankruptcy Court approval, Seller agrees to sell, convey, assign, transfer and deliver to Purchaser, and Purchaser agrees to purchase from Seller at the Closing, all of Seller's right, title and interest in and to the Purchased Assets, free and clear of all Liens, claims or interests of any type or nature, whether known or unknown, of Seller or any other party.

# ARTICLE II
# DESCRIPTION OF PURCHASED ASSETS; EXCLUDED ASSETS; ASSUMPTION OF LIABILITIES

Section 2.1    Purchased Assets.  Upon the terms and subject to the conditions set forth in this Agreement, at the Closing, Seller shall sell, convey, transfer, assign and deliver to Purchaser, and Purchaser shall purchase, acquire and take assignment and delivery from Seller, all of Seller's right and title to and interest in and to the assets, properties, and rights (contractual or otherwise) owned by Seller, excluding only the Excluded Assets (defined below) (the assets so included, the "Purchased Assets"). The Purchased Assets shall include, without limitation, all of Seller's right, title and interest in and to the following:

(a)    all equipment, machinery or other tangible personal property, including the items listed on Schedule 2.1(a) hereto and any warranty rights or claims associated therewith;

(b)    all leases of equipment, machinery or other tangible personal property, to the extent listed on Schedule 2.1(b) hereto (the "Personal Property Leases");

(c)    all contracts, agreements, contract rights, license agreements, customer contracts, purchase and sales orders (if any), instruments, royalty agreements, third party guaranties, indemnifications, arrangements and understandings, whether oral or written, to which Seller is a party (whether or not legally bound thereby) and which relate to the Purchased Assets and the operation of the Business, to the extent listed on Schedule 2.1(c) hereto (the "Assumed Contracts");

(d)    all leases of real property, to the extent listed on Schedule 2.1(d) hereto (the "Real Property Leases");

(e)    all Permits transferable to Purchaser pursuant to their terms and in accordance with applicable Laws;

(f)    all intellectual property owned by Seller, including but not limited to all domestic and foreign patents, patent applications (regardless of the applicant), trademarks, service marks and other indicia of origin, trademark and service mark registrations and applications for registrations thereof, copyrights, copyright registrations and applications for registration thereof, Internet domain names and universal resource locators (URLs), trade secrets,

inventions (whether or not patentable), invention disclosures, moral and economic rights of authors and inventors (however denominated), technical data, customer lists, vendor lists, corporate and business names, trade names, trade dress, brand names, know-how, show-how, formulae, methods (whether or not patentable), designs, processes, procedures, technology, source codes, object codes, computer software programs, databases, data collectors and other proprietary information or material of any type, whether written or unwritten (and all goodwill associated with, and all derivatives, improvements and refinements of, any of the foregoing), including the registered intellectual property listed on Schedule 2.1(f) hereto;

        (g)     all prepaid items and or expenses;

        (h)     all books and records related to the Purchased Assets or the Business, including customer or client lists, files, documentation, records and the related documentation;

        (i)     all of Seller's right, title and interest in and to all other assets, whether real or personal, tangible or intangible, used by Seller or useful in the operation of the Business;

        (j)     all claims, indemnities, warranties, guarantees, refunds, causes of action, rights of recovery, rights of set-off and rights of recoupment of every kind and nature (whether or not known or unknown or contingent or non-contingent) related to the Purchased Assets or the Business (other than those related to the Excluded Assets or the Excluded Liabilities, or claims on insurance policies of Seller); and

        (k)     all deposits and prepayments held by third parties pursuant to any Assumed Contract.

    Section 2.2    Excluded Assets.  The Purchased Assets shall include all assets, properties and/or rights of Seller except for those set forth in this Section 2.2 (collectively, the "Excluded Assets"):

        (a)     the Cash Consideration;

        (b)     any Permits that are not transferable pursuant to their terms and in accordance with applicable Laws;

        (c)     any Contracts that are not Assumed Contracts listed on Schedule 2.1(c) hereto (the "Excluded Contracts");

        (d)     all accounts receivable and the proceeds therefrom;

        (e)     all cash and cash equivalents, bank accounts and securities of Seller;

        (f)     all claims and actions of the Seller arising under sections 544, 547, 548, 549, and 550 of the Bankruptcy Code;

        (g)     any of the following books and records: corporate seals, organizational documents, minute books, stock books, tax returns, books of account or other records having to do with the corporate organization of Seller, all employee-related or employee benefit-related

files or records (other than personnel files of Transferred Employees), and any other books and records which Seller is prohibited from disclosing or transferring to Purchaser under applicable Law and is required by applicable Law to retain;

(h)      all insurance policies of Seller and all rights to applicable claims and proceeds thereunder;

(i)      any asset, including any Contract, set forth in <u>Schedule 2.2(h)</u> attached hereto;

(j)      all of Seller's Tax refunds, rebates, credits, Tax assets and similar items relating to any period, or any portion of any period;

(k)      income Tax Returns of Seller and related materials;

(l)      equity securities or other ownership interest of Seller;

(m)      equity securities or other ownership interest of any of Seller's Affiliates;

(n)      prepayments and deposits other than those included in Section 2.1 and all claims, indemnities, warranties, guarantees, refunds, causes of action, rights of recovery, rights of set-off and rights of recoupment other than those included in Section 2.1; and

(o)      any adequate assurance deposit under Sec. 366 of the Bankruptcy Code.

Section 2.3      <u>Assumed Liabilities; Excluded Liabilities</u>.

(a)      At the Closing, Purchaser shall assume and agree to perform and discharge only the following Liabilities of Seller to the extent not previously performed or discharged, and no others: (i) all Liabilities of Seller which first accrue and are to be performed from and after the Closing under the Assumed Contracts, the Personal Property Leases and the Real Property Leases, which relate to periods of time on or after the Closing Date, (ii) liabilities and obligations relating to and arising from Purchaser's operation of the Purchased Assets after the Closing Date, and (iii) Twenty-Seven Million Five Hundred Thousand U.S. Dollars ($27,500,000) of Seller's indebtedness to TPC under the Prepetition TPC Loan Documents (items (i), (ii), and (iii) are collectively referred to herein as the "<u>Assumed Liabilities</u>").

(b)      Other than the Assumed Liabilities, Purchaser shall not assume or be bound by or be obligated or responsible for any duties, responsibilities, commitments, expenses, obligations or liabilities of Seller or relating to the Purchased Assets (or which may be asserted against or imposed upon Purchaser as a successor or transferee of Seller as an acquirer of the Purchased Assets as a matter of law) of any kind or nature, fixed or contingent, known or unknown, including, without limitation, the following (collectively, the "<u>Excluded Liabilities</u>"):

(i)      any Liability of Seller in respect of any Taxes;

(ii)      any Liability of Seller under any contract or lease that is not an Assumed Contract or Assumed Personal Property Lease;

(iii)     any Liability of Seller which first accrued and was to be performed prior to the Closing under the Assumed Contracts, the Personal Property Leases or the Real Property Leases or which otherwise relate to periods of time prior to the Closing Date;

(iv)     any Liability of Seller relating to and arising from Seller's operation of the Purchased Assets prior to the Closing;

(v)     any Liability of Seller arising out of or resulting from its compliance or noncompliance with any Law;

(vi)     any Liability of Seller arising out of or related to any Legal Proceeding against it or any Legal Proceeding which could reasonably be expected to have an adverse effect on the Purchased Assets and which was or could have been asserted on or prior to the Closing Date or to the extent the basis of which arose or accrued on or prior to the Closing Date;

(vii)     any Liabilities of Seller arising under or in connection with any Employee Plans of, or maintained or required to be maintained by, Seller;

(viii)     any Liability of Seller to pay any fees or commissions to any broker or finder in connection with the transactions contemplated by this Agreement; and

(ix)     any Liability of Seller that is not an Assumed Liability.

(c)     Purchaser may amend the Schedules setting forth the Purchased Assets and the Excluded Assets attached hereto at any time on or before five (5) business days prior to the Bid Deadline in order to exclude from the definition of Purchased Asset, and include in the definition of Excluded Asset, any other asset, lease or Contract not otherwise excluded from the definition of Purchased Asset; *provided*, that such exclusion shall not serve to reduce or otherwise affect the Cash Consideration.  The Assumed Contracts, Personal Property Leases and Real Property Leases shall be assumed by Seller and assigned to Purchaser in accordance with the requirements of Section 365 of the Bankruptcy Code, and Seller shall be obligated to pay, on the Closing Date, all amounts needed to cure any defaults to the extent such defaults are required to be cured and such cure amounts are required to be paid as a condition to assumption and assignment of any such Assumed Contracts, Personal Property Leases and Real Property Leases ("Cure Costs"); *provided* that Seller shall not be obligated to pay Cure Costs in excess of $2,000,000 in the aggregate without the affirmative consent of the Seller and TPC, which, in each case, shall not be unreasonably withheld.

(d)     Purchaser acknowledges that the Sale Order will authorize the assumption and assignment of the Assumed Contracts without the requirement of any consent of the parties thereto. To the extent any Assumed Contract is not assumable and assignable by Seller to Purchaser under Section 365 of the Bankruptcy Code without the consent of the applicable counterparty thereto, Seller and Purchaser shall use their commercially reasonable efforts (which shall not require Seller to pay any amounts for such consent) prior to Closing to obtain all such required consents of third parties which are necessary for the consummation of the transactions contemplated hereby (without conditions that are materially adverse to Purchaser) (the "Required Consents"). All such Required Consents shall be in writing and executed counterparts thereof

shall be delivered to Purchaser on or before the Closing Date. If a Required Consent is not obtained, or if an attempted assignment thereof would be ineffective or would affect the rights thereunder so that Purchaser would not receive all such rights, Seller shall use its commercially reasonable efforts (which shall not require Seller to pay any amounts for such consent) after Closing to provide to Purchaser the benefits under any such Contract or any claim or right, including, without limitation, enforcement for the benefit of Purchaser of any and all rights of Seller against a third party thereto arising out of the default or cancellation by such third party or otherwise. Notwithstanding the foregoing, if Seller does not obtain a Required Consent, Purchaser shall not be required to assume (or deemed to have assumed) such Contract.

## ARTICLE III
## BANKRUPTCY COURT APPROVAL

Section 3.1    Entry of Sale Procedures Order.  No later than one (1) business day after execution of this Agreement by the parties hereto, Seller shall file a motion in form and substance reasonably satisfactory to Purchaser (the "Sale Procedures Motion") with the Bankruptcy Court seeking, entry of an order in form and substance reasonably satisfactory to Purchaser by no later than July 18, 2018 which shall include all of the following provisions (the "Sale Procedures Order"):

(a)    Competing offers to acquire the Purchased Assets shall:

(i)    be submitted in writing to Seller and Purchaser and their respective counsel on or before 5:00 p.m. (Eastern Time) on August 23, 2018, or such other date as set by the Bankruptcy Court (the "Bid Deadline");

(ii)    provide for a purchase price to be paid to Seller that exceeds the Stipulated Value by at least the amount of the Bid Protections (as defined below) plus the initial Overbid Increment (as defined below);

(iii)    be accompanied by a signed asset purchase agreement in form and substance substantially similar to this Agreement, together with a redlined, marked copy showing all changes to this Agreement (the "Competing Agreement");

(iv)    must not be subject to due diligence contingencies or other conditions beyond those imposed by Purchaser;

(v)    remain open until the conclusion of the Sale Hearing (as defined below);

(vi)    contain terms and conditions no less favorable to Seller than the terms and conditions of this Agreement;

(vii)    be accompanied by evidence establishing that the bidder is capable and qualified, financially, legally, and otherwise, of unconditionally performing all obligations under the Competing Agreement;

(viii)    be accompanied by a cashier's check or other good funds made payable to the order of Seller in an amount of One Hundred Fifty Thousand U.S. Dollars ($150,000.00) (the "Overbidder's Deposit"), and further provide that (A) if the Bankruptcy Court approves a sale of the Purchased Assets to that bidder, Seller may retain the Overbidder's Deposit, and (B) if the Bankruptcy Court does not approve a sale of the Purchased Assets to that bidder, Seller will promptly return the Overbidder's Deposit to such overbidder;

(ix)    be for any of the Purchased Assets;

(x)    include a provision that any Cure Costs are final and binding upon the applicable counterparty and Seller is authorized to pay such Cure Costs directly from the sale proceeds; and

(xi)    include a provision that Purchaser shall be provided all Qualified Bids (as defined below) and the supporting documentation and evidence that each Qualified Bid satisfies the requirements of the Sale Procedures Order.

(b)    If any bidders have submitted a qualifying competing bid in accordance with the Sale Procedures Order hereof (each such bid, a "Qualified Bid"), then a public auction of the Purchased Assets (the "Auction") shall be held at 9:00 a.m. (Eastern Time) on August 27, 2018 (or such other date as set by the Bankruptcy Court) at the offices of Debtor's counsel, Pachulski, Stang, Ziehl & Jones, LLP, 150 California Street, 15th Floor, San Francisco, CA 94111.  The Auction shall be governed by the following procedures:

(i)    all bidders shall be deemed to have consented to the core jurisdiction of the Bankruptcy Court and to have waived any right to jury trial in connection with any disputes relating to the Auction or the sale of the Purchased Assets;

(ii)    bidding will commence at the amount of the highest Qualified Bid as determined by the Seller in its sole and absolute discretion; and

(iii)    each subsequent bid shall be in increments of no less than One Hundred Thousand U.S. Dollars ($100,000) (the "Overbid Increment"); and

(iv)    for the Purchaser, the amount of the Bid Protections shall be taken into account and added to the Purchaser's bid.

(c)    A hearing to approve the successful bid at the Auction, or, if no auction is held, to approve this Agreement, shall be scheduled immediately following the Auction, within two (2) business days of the date on which the Auction concludes, or if there is no Auction, within two (2) business days of the date on which the Auction was originally scheduled (the "Sale Hearing");

(d)    The Breakup Fee in an amount of One Million Two Hundred Thousand U.S. Dollars ($1,200,000) (the "Breakup Fee") plus an expense reimbursement up to a maximum of Four Hundred Thousand U.S. Dollars ($400,000) (the "Expense Reimbursement" and, together with the Breakup Fee, the "Bid Protections") is deemed approved and shall be paid to Purchaser from the proceeds of sale actually paid by a successful bidder only after a closing in

the event that the Bankruptcy Court enters an order approving an offer to purchase any Purchased Assets submitted by a party other than Purchaser or enters an order confirming a plan of reorganization of Seller (other than a plan under which Purchaser acquires the Purchased Assets) no later than the closing of the sale of any Purchased Assets to a third party or the date an order confirming a plan of reorganization of Seller (other than a plan under which Purchaser acquires the Purchased Assets) is entered, as applicable;

       (e)    No other bidder for the Purchased Assets shall be entitled to payment of any breakup fee;

       (f)    Any entity that fails to submit a timely, conforming Qualified Bid, as set forth above, shall be disqualified from bidding for the Purchased Assets at the Auction or the Sale Hearing, unless the Bankruptcy Court orders otherwise; and

       (g)    If no timely, conforming Qualified Bid is submitted, Seller shall request at the Sale Hearing that the Court approve the proposed sale of the Purchased Assets to Purchaser under this Agreement.

      Section 3.2    <u>Entry of Order Approving Sale</u>.

       (a)    In the event there is no Auction, or that Purchaser presents the winning bid at the Auction, then Seller shall use its reasonable best efforts to obtain entry of an order of the Bankruptcy Court approving the sale on the terms of this Agreement on the date previously set for the Sale Hearing, or such other date set by the Bankruptcy Court. The Sale Order shall be in accordance with the terms of this Agreement, shall be in a form reasonably satisfactory to Purchaser and Seller, and shall, among other things:

       (i)    approve and direct the sale and assignment of the Purchased Assets to Purchaser and approve and direct the assumption and assignment of the Assumed Contracts to Purchaser free and clear of all Liens, claims or interests, based on appropriate findings and rulings pursuant to, inter alia, Sections 363(b), (f) and (m) and 365 of the Bankruptcy Code, including but not limited to Sections 365(h), (i), (l) and (n) and the release of Purchaser of any rights otherwise associated with, and which may otherwise be to the benefit of, any third parties; <u>provided</u> that notwithstanding anything to the contrary in this Agreement, Purchaser shall not be entitled to disapprove the Sale Order by reason of, and Purchaser's (or a successful overbidder's) obligation to consummate the transactions provided for herein shall not be conditioned upon the assumption and assignment of, any Assumed Contracts with respect to which the Bankruptcy Court determines that Purchaser (or a successful overbidder) has failed to provided adequate assurance of future performance pursuant to Section 365 of the Bankruptcy Code;

       (ii)    include a finding that Purchaser is a good faith purchaser pursuant to Section 363(m) of the Bankruptcy Code;

       (iii)    include a finding that Purchaser is not deemed to be a successor to Seller, to have, de facto or otherwise, merged with or into Seller or to be a mere continuation of Seller;

(iv)     include a finding that the Consideration is a fair and reasonable price for the Purchased Assets;

(v)     include a finding confirming the adequacy of notice to all creditors and parties in interest and parties to any executory contract, unexpired lease or right of entry; and

(vi)     include provisions for the retention of jurisdiction in the Bankruptcy Court over matters relating to the transactions contemplated in this Agreement including matters relating to title to the Purchased Assets and claims against the Purchased Assets which arose or were based on facts or occurrences prior to the Closing. Furthermore, the Sale Order shall not have been reversed, stayed, modified or amended.

(b)     Seller shall provide notice of any hearing on the motion to approve the Sale Order or any other matter before the Bankruptcy Court relating to this Agreement or the Transaction Documents, in each case as required by the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules for the District of Delaware or as otherwise ordered by the Bankruptcy Court.

(c)     Notwithstanding anything to the contrary in this Section 3.2 or any other provision of this Agreement, in the event that a Qualified Bid of a third party (an "Alternative Purchaser," and the underlying agreement between the Alternative Purchaser and Seller, the "Alternative APA") is approved by the Bankruptcy Court at the hearing on the Sale Motion, this Agreement, may become an approved "back-up bid" in Purchaser's sole discretion and pursuant to the Sale Procedures Order, unless at the Auction, other higher and better bids are received and the Seller elects to make a different Alternative Purchaser the "back-up bidder."

Section 3.3     Certain Bankruptcy Undertakings by Seller.

(a)     On the Execution Date, Seller shall file the Sale Motion.  Except as ordered by the Bankruptcy Court, Seller shall neither take any action, nor fail to take any action, which action or failure to act would reasonably be expected to prevent or impede the consummation of the transactions contemplated by this Agreement in accordance with the terms of this Agreement; or (ii) result in (A) the reversal, avoidance, revocation, vacating or modification (in any manner that would reasonably be expected to materially and adversely affect Purchaser's rights hereunder), or (B) the entry of a stay pending appeal.

(b)     If the Sale Procedures Order, the Sale Order or any other order of the Bankruptcy Court relating to this Agreement shall be appealed by any Person (or a petition for certiorari or motion for rehearing or reargument shall be filed with respect thereto), Seller, with the cooperation and support of Purchaser, shall take all steps as may be reasonable and appropriate to defend against such appeal, petition or motion, and shall endeavor to obtain an expedited resolution of such appeal.

**ARTICLE IV**
**INSTRUMENTS OF TRANSFER AND ASSUMPTION**

Section 4.1     Transfer Documents.  At the Closing, Seller will deliver to Purchaser (a) one or more Bills of Sale in substantially the form attached hereto as Exhibit B (the "Bill of

Sale"), and (b) all such other good and sufficient instruments of sale, transfer and conveyance consistent with the terms and provisions of this Agreement, including, without limitation, the Purchased Assets, and any other assignments as shall be reasonably necessary to vest in Purchaser all of Seller's right and title to, and interest in, the Purchased Assets.

Section 4.2    Assignment and Assumption Documents.  At the Closing, Purchaser and Seller will execute and deliver an Assignment and Assumption Agreement in substantially the form attached hereto as Exhibit C (the "Assumption Agreement") in order to effect the assignment and assumption of the Assumed Liabilities.

## ARTICLE V
## CONSIDERATION; ALLOCATION

Section 5.1    Consideration.

(a)    In exchange for the sale, assignment, transfer, conveyance and delivery from Seller of the Purchased Assets, Purchaser shall provide no less than Fifty Million U.S. Dollars ($52,500,000) of consideration (the "Consideration"), consisting of:

(i)    The assumption of the Assumed Liabilities pursuant to this Agreement, which are valued at no less than Twenty-Seven Million Five Hundred Thousand U.S. Dollars ($27,500,000); and

(ii)    Cash in the amount of Twenty-Five Million Dollars ($25,000,000) (the "Cash Consideration"), payable upon Closing by wire transfer to an account designated by Seller.

(b)    Deposit. On or about July 7, 2018, Purchaser deposited One Hundred Fifty Thousand U.S. Dollars ($150,000) with Seller (the "Deposit").  The parties agree that Seller may, at the Closing, retain the Deposit and apply it to the Cash Consideration.  In the event this Agreement is terminated, the Deposit shall be returned to Purchaser, unless this Agreement is terminated by Seller pursuant to Section 12.2(d).

Section 5.2    Allocation of Consideration.  Within ninety (90) days following the Closing, Purchaser shall deliver to Seller a statement allocating the Consideration among the Purchased Assets in accordance with Section 1060 of the Code (the "Allocation Statement").

## ARTICLE VI
## CLOSING

Section 6.1    Closing Date.  Subject to the terms and conditions hereof, the closing of the transactions contemplated by this Agreement (the "Closing") shall take place at the offices of Wilson Sonsini Goodrich & Rosati, P.C. One Market Street, Spear Tower, San Francisco CA 94105, or such other location as may be mutually agreed upon between the Parties on the date which is not later than the first (1st) business day following the date on which all conditions to Closing set forth in Articles X and XI hereof have been satisfied or waived (the "Closing Date"). The Closing shall be effective as of 12:01 a.m. Eastern Time on the Closing Date.

# ARTICLE VII
## SELLER'S REPRESENTATIONS AND WARRANTIES

Seller represents and warrants to Purchaser that the statements contained in this Article VII are true and correct as of the date of this Agreement, subject to the disclosures and exceptions set forth in the Disclosure Schedules attached hereto:

Section 7.1 <u>Organization, Qualification and Corporate Power</u>. Seller is a corporation duly organized, validly existing and in good standing under the Laws of the state of Delaware and is in good standing under the Laws of each jurisdiction where such qualification is required, except where the lack of such qualification would not reasonably be expected to have a Material Adverse Effect. Seller has all necessary power and authority to own and operate its properties and to carry on its business as it is now being conducted. Seller has the power and authority to execute and deliver and, subject to order of the Bankruptcy Court, perform its obligations under this Agreement and the other Transaction Documents, and to undertake the transactions contemplated hereby and thereby. As used herein, the term "<u>Transaction Documents</u>" means this Agreement and all other agreements, documents and instruments executed in connection herewith or required to be executed and/or delivered by Seller in accordance with the provisions of this Agreement.

Section 7.2 <u>Authorization, Execution and Delivery of Agreement and Transaction Documents</u>. The execution, delivery and performance of this Agreement and the other Transaction Documents by Seller and the transfer or assignment of the Purchased Assets to Purchaser have been duly and validly authorized and approved by all necessary corporate action. Subject to order of the Bankruptcy Court and pursuant thereto, Seller will have full power, right and authority to sell and convey to Purchaser the Purchased Assets owned by Seller, subject to any necessary authorization from the Bankruptcy Court.

Section 7.3 <u>Title to and Condition of Assets</u>. Except as set forth in <u>Schedule 7.3</u> hereto, Seller has title to, or a valid leasehold interest in, all of the properties and assets included in the Purchased Assets, and upon the consummation of the transactions contemplated hereby and by the Transaction Documents, Purchaser will acquire title to all of the Purchased Assets, free and clear of all Liens. Without making any representations regarding the intellectual property of third parties, the Purchased Assets include, without limitation, all material tangible and intangible assets necessary for the conduct of the Business as it is currently conducted and such assets are sufficient for the continued conduct of the Business after the Closing in all material respects in substantially the same manner as currently conducted.

Section 7.4 <u>Legal Proceedings</u>. Except as set forth on <u>Schedule 7.4</u> hereto, there is no Legal Proceeding pending or, to the Knowledge of Seller, threatened in writing against or affecting Seller or the Purchased Assets (or to the Knowledge of Seller, pending or threatened, against any of the officers, directors or employees of Seller with respect to their business activities related to or affecting the Purchased Assets) (a) that challenges or that is reasonably expected to have the effect of preventing, making illegal, delaying or otherwise interfering with any of the transactions contemplated by this Agreement; or (b) that is related to the Purchased Assets to which Seller is otherwise a party.

Section 7.5    Real Property.  Except as set forth in Schedule 7.5 hereto, Seller does not own any real property.  Schedule 7.5 sets forth the street addresses of all real property used or held for use in the Business which Seller leases, operates, occupies, or subleases in connection with the Business or upon which any tangible Purchased Assets are located and all instruments, easements, leases, subleases, options and other material agreements (including all amendments thereto) creating any interest or right in Seller or any other party in any of the real property specifying the name of the lessor or sublessor (as applicable).

Section 7.6    No Violation of Laws or Agreements.  Subject to order of the Bankruptcy Court, the execution and delivery by Seller of this Agreement and the Transaction Documents contemplated hereby, the performance by Seller of its obligations hereunder and thereunder and the consummation by Seller of the transactions contemplated herein and therein will not violate, (i) any Laws or any judgment, decree, order, regulation or rule of any court or Governmental Authority to which Seller is subject; (ii) result in any breach of, or constitute a default (or event which with the giving of notice or lapse of time, or both, would become a default) under, or give to any Person any rights of termination, amendment, acceleration or cancellation of, or result in the creation of any Lien on any of the Purchased Assets, any note, bond, mortgage, indenture, contract, agreement, lease, license, Permit, franchise or other instrument to which Seller is a party and which relates to any of the Purchased Assets; and (iii) contravene, conflict with or result in a violation of any provision of any organizational documents of Seller, except in the cases of clauses (i) and (ii) above, for such violations which would not be reasonably expected to be material to the Purchased Assets, after the Closing, taken as a whole.

Section 7.7    Employee Benefits; ERISA Matters.  Seller has made available to Purchaser summaries of all material Employee Plans covering employees, directors or consultants or former employees, directors or consultants in, or related to, the Business. Seller has made available to Purchaser true and complete summaries of all such material Employee Plans, including summaries of written descriptions thereof which have been distributed to Seller's employees and for which Seller has copies, all annuity contracts or other funding instruments relating thereto, and a summary description of all Employee Plans which are not in writing.  Neither Seller nor any ERISA Affiliate has incurred any liability with respect to any Employee Plan, which may create, or result in any liability to Purchaser.

Section 7.8    Labor Matters.  Except as set forth on Schedule 7.8 hereto, there are no employment, consulting, severance or indemnification contracts between Seller and any of its employees.  Seller (i) is not party to or bound by any collective bargaining or similar agreement with any labor organization; (ii) has no employees that are represented by any labor organization; and (iii) has no Knowledge of any union organizing activities among the employees of Seller.

Section 7.9    Brokers.  Except for those set forth in Schedule 7.9, for whom Seller shall be solely responsible for any fees or commissions owing, Seller has not engaged any agent, broker or other Person acting pursuant to the express or implied authority of Seller which is or may be entitled to a commission or broker or finder's fee in connection with the transactions contemplated by this Agreement or otherwise with respect to the sale of the Purchased Assets.

Section 7.10   Permits. Seller is and at all times has been in compliance in all respects with all Permits applicable to it, or applicable to the conduct and operations of the Business, or

relating to or affecting the Purchased Assets, except for such failures to comply that would not, individually or in the aggregate, have or be reasonably expected to have a Material Adverse Effect. Seller has not received any written notice from any Governmental Authority specifically alleging (i) any actual, alleged, possible or potential material violation of, or failure to comply with, any such Permits or (ii) any actual, alleged, possible or potential revocation, withdrawal, suspension, cancellation or termination of, or any modification to, any Permit.

Section 7.11 <u>Insurance</u>. Seller is not in material default under any of its insurance policies or binders, and Seller has not failed to give any notice or to present any claim under any such policy or binder in a due and timely fashion.

Section 7.12 <u>Taxes; Tax Returns</u>. Seller has not received any outstanding notice of audit, and is not undergoing any audit, of Tax Returns relating to the Business and has never received any written notice of deficiency or assessment from any taxing authority with respect to liability for Taxes relating to the Business which has not been fully paid or finally settled. Seller has complied in all material respects with all applicable Laws, rules and regulations relating to the payment and withholding of Taxes and has withheld all amounts required by law to be withheld from the wages or salaries of employees and independent contractors of the Business and is not liable for any Taxes with respect to the employees and independent contractors of the Business for failure to comply with such laws, rules and regulations, except for such liabilities that would not be reasonably expected to be material to the Purchased Assets after the Closing, taken as a whole.

Section 7.13 <u>Compliance with Laws</u>. Seller and the conduct of the Business are and at all times have been in compliance with all Laws applicable to them or to the conduct and operations of the Business or relating to or affecting the Purchased Assets, except for such failures to comply that would not, individually or in the aggregate, have or be reasonably expected to have a Material Adverse Effect. Seller has not received any written notice to the effect that, or otherwise been advised of and to the Knowledge of Seller there has not occurred with respect to the Purchased Assets or the Business (a) any actual, alleged, possible or potential violation of, or failure to comply with, any such Laws, or (b) any actual, alleged, possible or potential obligation on the part of Seller to undertake, or to bear all or any portion of the cost of, any remedial action of any nature, except for any such violations or failures to comply that would not, individually or in the aggregate, have or be reasonably expected to have a Material Adverse Effect.

## ARTICLE VIII
## PURCHASER'S REPRESENTATIONS

Purchaser represents and warrants to Seller that the statements contained in this Article VIII are true, correct and complete as of the date of this Agreement.

Section 8.1 <u>Organization; Qualification and Corporate Power</u>. Purchaser is a corporation duly organized, validly existing and in good standing under the Laws of the State of Delaware. Purchaser has all necessary power and authority to (a) own and operate its properties, carry on its business as it is now being conducted, (c) perform its obligations under this

Agreement and the other Transaction Documents, and to undertake and carry out the transactions contemplated hereby and thereby, and (d) own and operate the Purchased Assets and Business.

Section 8.2     Authorization, Execution and Delivery of Agreement and Transaction Documents. All necessary consents and approvals have been obtained by Purchaser for the execution and delivery of this Agreement and the Transaction Documents. The execution, delivery and performance of this Agreement and the other Transaction Documents in accordance with their terms by Purchaser have been duly and validly authorized and approved by all necessary corporate action. Purchaser has full power, right and authority to acquire the Purchased Assets. This Agreement is, and each of the other Transaction Documents when so executed and delivered will be, a valid and binding obligation of Purchaser, enforceable against it in accordance with its terms, except to the extent such enforceability may be limited by bankruptcy, insolvency or other similar laws affecting creditors.

Section 8.3     Brokers.  Purchaser has not engaged any agent, broker or other Person acting pursuant to the express or implied authority of Purchaser which is or may be entitled to a commission or broker or finder's fee in connection with the transactions contemplated by this Agreement or otherwise with respect to the sale of the Purchased Assets.

Section 8.4     No Violation of Laws or Agreements.  The performance by Purchaser of its obligations contemplated hereunder and the consummation by Purchaser of the transactions contemplated herein will not violate, (i) any Laws or any judgment, decree, order, regulation or rule of any court or Governmental Authority to which Purchaser is subject; or (ii) contravene, conflict with or result in a violation of any provision of any organizational documents of Purchaser.

Section 8.5     Parent Financial Condition.  Seller has been provided a copies of recent bank statements of Parent showing cash balances in excess of $2,500,000.  Any such bank statements provided are true and correct in all respects.

Section 8.6     Debt Financing.

(a)     As of the date of this Agreement, Purchaser has delivered to Seller true, correct and complete copies of the fully executed Debt Commitment Letter pursuant to which TPC has committed to provide, subject to the terms and conditions therein, debt financing in the amounts set forth therein for the purposes of financing the transactions contemplated by this Agreement (the "Debt Financing").

(b)     The net proceeds (after applicable fees and expenses) of the Debt Financing, together with Purchaser's cash on hand, will, in the aggregate be sufficient for Purchaser to consummate the transactions contemplated hereby, including the payment of all fees, costs and expenses to be paid by Purchaser related to the transactions contemplated by this Agreement and to satisfy the Assumed Liabilities.

(c)     The Debt Financing is not subject to any conditions precedent, arrangements or other contingencies to obtaining any amount of the Debt Financing other than as expressly set forth in the Debt Commitment Letter and, as of the date of this Agreement, (x) the Debt Commitment Letter is in full force and effect, (y) no breach of any term of, or default

under, the Debt Commitment Letter exists on the part of Purchaser or its Affiliates and, to the Knowledge of Purchaser, any of the other parties thereto and (z) the Debt Commitment Letter constitutes the legal, valid, binding and enforceable obligation of Purchaser and, to the Knowledge of Purchaser, each of the other parties thereto. As of the date of this Agreement, assuming the accuracy of all the representations and warranties made by Seller herein and Seller's compliance with this Agreement, Purchaser has no reason to believe that (i) Purchaser will be unable to satisfy on a timely basis any of the conditions that are required to be satisfied by it as a condition to the obligations under the Debt Commitment Letter prior to the expiration thereof or (ii) any portion of the Debt Financing will not be made available to Purchaser at the Closing.

(d)     Purchaser expressly acknowledges and agrees that, notwithstanding anything in this Agreement to the contrary, its obligations hereunder, including its obligations to consummate the Closing, are not subject to, or conditioned on, receipt of the Debt Financing or any alternative financing.

**ARTICLE IX**
**SELLER'S AND PURCHASER'S COVENANTS AND AGREEMENTS**

Section 9.1     <u>Conduct of Business</u>.  Except as otherwise expressly contemplated by this Agreement or with the prior written consent of Purchaser or except as described on <u>Schedule 9.1</u>, from the date hereof until the Closing Date, Seller shall use commercially reasonable efforts to preserve intact the Purchased Assets.  Without limiting the generality of the foregoing (but subject to the express limitation set forth in the immediately preceding sentence), Seller will, other than in the Ordinary Course of Business or with Purchaser's consent, refrain from doing any of the following in respect of the Purchased Assets: (i) disposing of, or transferring, any Purchased Asset, (ii) transferring any tangible Purchased Asset to any other location to the extent that such other location is not otherwise part of the Purchased Assets, or (iii) except as otherwise provided or required in this Agreement, terminating, amending or modifying the material terms of any of the Assumed Contracts, Personal Property Leases or Real Property Leases; <u>provided</u>, <u>however</u>, notwithstanding anything to the contrary in the preceding sentence, Seller may, in its reasonable discretion and upon prior written notice to Purchaser take such actions in connection with or as a result of the consequences (adverse or otherwise) of filing the Bankruptcy Case, if any, to cure defaults in respect of the Assumed Contracts, Personal Property Leases or Real Property Leases.

Section 9.2     <u>Mutual Covenants</u>.  The parties hereto mutually covenant (and subject to the other terms of this Agreement):

(a)     from the date of this Agreement to the Closing Date, to cooperate with each other in determining whether filings are required to be made or consents (including any Required Consents) required to be obtained in any jurisdiction in connection with the consummation of the transactions contemplated by this Agreement and in making or causing to be made any such filings promptly and in seeking to obtain timely any such consents including any Required Consents (each party hereto shall furnish to the other and to the other's counsel all such information as may be reasonably required in order to effectuate the foregoing action),

which consents shall not, in any event, include any consent the need for which is obviated by the Sale Order or otherwise by the provisions of the Bankruptcy Code; and

(b) from the date of this Agreement to the Closing Date, to advise the other parties promptly if such party determines that any condition precedent to its obligations hereunder will not be satisfied in a timely manner.

Section 9.3    Access to Information.  Prior to and through the date on which the Closing occurs or this Agreement is terminated, Seller shall cooperate with Purchaser and shall give Purchaser and its representatives (including Purchaser's accountants, consultants, counsel and employees), upon reasonable notice and during normal business hours, full access to the properties, contracts, leases, equipment, employees, affairs, books, documents, records and other information of Seller to the extent relating to the Business, the Purchased Assets, Assumed Liabilities, and any other aspect of this Agreement and shall cause their respective officers, employees, agents and representatives to furnish to Purchaser all available documents, records and other information (and copies thereof), to the extent relating to the Business, the Purchased Assets, Assumed Liabilities, and any other aspect of this Agreement, in each case, as Purchaser may reasonably request.

Section 9.4    Public Announcement.  Subject to the provisions of the Bankruptcy Code and Seller's right to make such filings and disclosures as it in good faith deems necessary or appropriate in connection with the Bankruptcy Case, no party hereto shall make or issue, or cause to be made or issued, any public announcement or written statement concerning this Agreement or the transactions contemplated hereby without the prior written consent of the other party hereto (which will not be unreasonably withheld or delayed), unless counsel to such party advises that such announcement or statement is required by law (such as an obligation to disclose under federal securities laws of the United States) (in which case the parties hereto shall make reasonable efforts to consult with each other prior to such required announcement).  Purchaser and Seller shall issue the previously agreed upon form of joint press release announcing the execution and delivery of this Agreement, promptly after the execution of this Agreement.

Section 9.5    Taxes.

(a) Seller shall be responsible for all Taxes in connection with, relating to or arising out of the Business or the ownership of the Purchased Assets, or the Assumed Liabilities attributable to taxable periods, or portions thereof, ending on or before the Closing, which Taxes shall be an Excluded Liability. All state and local sales and use Taxes, to the extent attributable to periods prior to the Closing, shall be paid or otherwise discharged by Seller, including any and all sales or transfer taxes incurred or owed as a result of the transactions contemplated by this Agreement.

(b) Seller and Purchaser shall (i) provide the other with such assistance as may reasonably be requested by either of them in connection with the preparation of any Tax Return, any audit or other examination by any taxing authority or any judicial or administrative proceeding with respect to Taxes, (ii) retain and provide the other with any records or other information which may be relevant to such return, audit, examination or proceeding, and (iii) provide the other with any final determination of any such audit or examination proceeding or

determination that affects any amount required to be shown on any Tax Return of the other for any period (which shall be maintained confidentially).

Section 9.6    Good Faith Efforts.  Without limiting the specific obligations of any party hereto under any covenant or agreement hereunder, each party hereto shall use its good faith efforts to take all action and do all things necessary to consummate the transactions contemplated in this Agreement as soon as reasonably practicable.

Section 9.7    Employees.

(a)    Subject to and in accordance with the provisions of this Section 9.7, Purchaser shall, effective upon the Closing, offer employment to the employees who are employed by Seller as of the Closing and are listed on Schedule 9.7 hereto (the "Employees"). Purchaser shall hire all of the Employees who accept such offer. Employees who accept such offers and become either full-time or part-time employees of Purchaser, consistent with their employment status with Seller, upon the Closing are hereinafter referred to as "Transferred Employees." Seller shall use reasonable efforts to assist Purchaser in securing the employment of the Employees.

(b)    The employment of each Transferred Employee by Seller shall end effective as of the close of business on the day before the Closing and the employment of the Transferred Employees by Purchaser shall commence at or after 12:01 a.m. on the day of the Closing.

Section 9.8    Further Assurances.  From time to time after the Closing and without further consideration, Purchaser and Seller, at the request of the other, will execute and deliver such other instruments of conveyance and transfer or other instruments or documents, and take or arrange for such other actions, as may reasonably be required to effect any of the transactions contemplated by this Agreement or to provide any party hereto with the benefits intended to be conferred and conveyed by this Agreement; provided that, notwithstanding anything to the contrary in this Section 9.8 or any other provision of this Agreement, neither Purchaser nor Seller shall be required to execute any document or take any action that would (i) increase the liability or obligation of the party of whom such document or action is requested beyond that such party would have pursuant to the other provisions of this Agreement, (ii) require or cause the party of whom such action or document is requested to initiate, join in or otherwise become a party to any Legal Proceeding, or (iii) cause such party to incur any material cost or expense that is not already imposed upon it by another provision of this Agreement.

Section 9.9    Confidentiality.

(a)    Each party acknowledges that it currently has and will directly or indirectly disclose Confidential Information to the other party in the course of negotiation of and performance of this Agreement.  All such Confidential Information disclosed hereunder shall remain the sole property of the disclosing party (or other third party), and the receiving party shall have no interest in, or rights with respect thereto, except as set forth herein.  For avoidance of doubt, any Confidential Information of Seller relating to the Purchased Assets and the Assumed Contracts shall be deemed to be Confidential Information of Purchaser as of the

Closing ("Deemed Purchaser Confidential Information"), notwithstanding the fact that Seller or any of its officers, directors, employees or representatives have knowledge of such Deemed Purchaser Confidential Information obtained prior to the negotiation and performance of this Agreement. Each party agrees to treat such Confidential Information with the same degree of care and security as it treats its Confidential Information and, in any event, no less degree of care and security than a reasonably prudent business person would utilize to protect from disclosure and keep confidential its Confidential Information. Each party may disclose such Confidential Information only to those employees and agents who require such knowledge to perform services under this Agreement and each party shall be liable for the acts of such employees and agents in breach of this Section 9.9. Except as otherwise contemplated by this Agreement, neither party shall disclose the Confidential Information of the other party to any third party without the prior written consent of the disclosing party, and the duty of confidentiality created by this section shall survive any termination of the Agreement for a period of five (5) years.

        (b)    As used herein, "Confidential Information" means all information or data relating to a party and its affiliates, operations, employees, products or services, clients, customers or potential customers. Confidential Information shall include vendor and customer information, pricing information, and the terms and conditions of this Agreement. Information shall not be considered Confidential Information to the extent, but only to the extent, that such information is: (i) not Deemed Purchaser Confidential Information and is already lawfully known to the receiving party as of the Closing Date as evidenced by reasonable documentary proof, free of any restriction at the time it is obtained; (ii) subsequent to the Closing Date is learned of by the receiving party from an independent third party free of any restriction and without breach of this Agreement; (iii) becomes publicly available through no wrongful act of or breach of this Agreement by the receiving party; (iv) independently developed by the receiving party without reference or access to any Confidential Information of the disclosing party; or (v) required to be disclosed by law.

     Section 9.10   Survival of Representations and Warranties. None of the representations and warranties of Seller or Purchaser contained in this Agreement or made in any other documents or instruments delivered pursuant to this Agreement shall survive the Closing hereunder.

     Section 9.11   "AS IS" Transaction; Disclaimer of Implied Warranties. Except as expressly provided in Article VII above, Purchaser hereby acknowledges and agrees that Seller makes no representations or warranties whatsoever, express or implied, with respect to any matter relating to the Purchased Assets (including income to be derived or expenses to be incurred in connection with the Purchased Assets, the physical condition of any personal property comprising a part of the Purchased Assets or which is the subject of any Assumed Contract, Personal Property Leases or Real Property Leases, the environmental condition or other matter relating to the physical condition of any real property or improvements, the zoning of any such real property or improvements, the value of the Purchased Assets (or any portion thereof), the transferability of the Purchased Assets, the terms, amount, validity, collectability or enforceability of any Assumed Liabilities, Assumed Contracts, Personal Property Leases or Real Property Leases, the title of the Purchased Assets (or any portion thereof), the merchantability or fitness of the personal property comprising a portion of the Purchased Assets or any other portion of the Purchased Assets for any particular purpose, or any other matter or thing relating

to the Purchased Assets (or any portion thereof). Without in any way limiting the foregoing, except as otherwise expressly provided in Article VII above, Sellers hereby disclaim any warranty (express or implied) of merchantability or fitness for any particular purpose as to any portion of the Purchased Assets.

Section 9.12    Debt Financing.

(a)    Purchaser shall use its commercially reasonable efforts to take or cause to be taken all actions and to do, or cause to be done, all things reasonably necessary, proper or advisable to arrange and obtain the proceeds of the Debt Financing at or prior to the Closing, including using its commercially reasonable efforts to: (i) maintain in effect the Debt Commitment Letter in accordance with the terms and subject to the conditions thereof, (ii) comply with its obligations under the Debt Commitment Letter, (iii) satisfy on a timely basis (or obtain the waiver of) all conditions to funding that are within the control of Purchaser in the Debt Commitment Letter, (iv) enforce its rights pursuant to the Debt Commitment Letter, and (v) in the event that all conditions in the Debt Commitment Letter have been satisfied, cause the financing sources to fund the Debt Financing at the Closing.

(b)    Subject to the terms and conditions of this Agreement, Purchaser will not permit any amendment or modification to be made to, or any waiver of any provision or remedy pursuant to, the Debt Commitment Letter without the consent of Seller if such amendment, modification or waiver would (i) reduce the aggregate amount of the Debt Financing to be funded on the Closing Date, (ii) impose new or additional conditions or other terms to the Debt Financing or otherwise expand, amend or modify any of the conditions to the receipt of the Debt Financing, in a manner that would reasonably be expected to: (A) delay, prevent or materially impede the consummation of the Closing, or (B) make the timely funding of the Debt Financing, or the satisfaction of the conditions to obtaining the Debt Financing, less likely to occur in any material respect, or (iii) adversely impact the ability of Purchaser to enforce its rights against the other parties to the Debt Commitment Letter.  Purchaser shall promptly (i) furnish Seller complete, correct and executed copies of any amendments, restatements, supplements, amendments and restatements, modifications, waivers or replacements to the Debt Commitment Letter and (ii) give Seller prompt notice of any breach (or threatened breach asserted in writing) by any party of the Debt Commitment Letter of which Purchaser becomes aware or any termination thereof.

## ARTICLE X
## CONDITIONS PRECEDENT TO PURCHASER'S OBLIGATION TO CLOSE

The obligation of Purchaser under this Agreement with respect to the purchase and sale of the Purchased Assets shall be subject to the fulfillment on or prior to the Closing of each of the following conditions, any of which may be waived in writing by Purchaser:

Section 10.1    Accuracy of Representations and Warranties; Performance of this Agreement.  Each of the representations and warranties made by Seller shall be true and correct on and as of the date hereof (unless such representation or warranty is given as of a particular date in which case such representation or warranty will be considered only as of such particular date) and at and as of the Closing Date, except for any failure to be so true and correct that,

individually or in the aggregate, has not had and would not reasonably be expected to have a Material Adverse Effect. Seller shall have complied with and performed in all material respects all of the agreements and covenants required by this Agreement and each other Transaction Document to be performed or complied with by it on or prior to the Closing.

Section 10.2    Officer's Certificate. Seller shall have delivered to Purchaser a certificate executed by an executive officer of Seller (including incumbency certificates) as Purchaser may reasonably request in order to evidence compliance with the conditions set forth in Section 10.1.

Section 10.3    Bill of Sale; Assumption Agreement. Seller shall have delivered to Purchaser an executed Bill of Sale and Assumption Agreement pursuant to Sections 4.1 and 4.2 hereof.

Section 10.4    Bankruptcy Matters. The Sale Order shall have been entered by the Bankruptcy Court. All such orders must be in effect and must not have been reversed or stayed or modified in any material respect.

Section 10.5    Required Consents.  Purchaser shall have received all Required Consents set forth on Schedule 10.5 hereto.

Section 10.6    No Material Adverse Effect.  Since the date of this Agreement, there shall have been no Material Adverse Effect to the Purchased Assets or the Business.

## ARTICLE XI
## CONDITIONS PRECEDENT TO SELLER'S OBLIGATION TO CLOSE

The obligations of Seller under this Agreement with respect to the purchase and sale of the Purchased Assets shall be subject to the fulfillment on or prior to the Closing of each of the following conditions, any of which may be waived in writing by Seller:

Section 11.1    Accuracy of Representations and Warranties; Performance of this Agreement. Each of the representations and warranties made by Purchaser in this Agreement shall be true and correct on and as of the date hereof (unless such representation or warranty is given as of a particular date in which case such representation or warranty will be considered only as of such particular date) and at and as of the Closing Date, except for any failure to be so true and correct that, individually or in the aggregate, has not had and would not reasonably be expected to have a material adverse effect on the ability of Purchaser to timely consummate the transactions contemplated hereunder (including having sufficient funds to pay the Consideration and any other payments, fees or expenses contemplated hereby).  Purchaser shall have complied with and performed in all material respects all of the agreements and covenants required by this Agreement and each other Transaction Document to be performed or complied with by it on or prior to the Closing.

Section 11.2    Authorizing Resolutions. Purchaser shall have delivered to Seller copies of the authorizing resolutions of its Board of Directors authorizing the execution, delivery and performance of this Agreement and the other Transaction Documents and all instruments and documents to be delivered in connection herewith and the transactions contemplated hereby or thereby.

Section 11.3    Assumption Agreement. Purchaser shall have delivered to Seller an executed Assumption Agreement pursuant to Section 4.2 hereof.

Section 11.4    Bankruptcy Matters. The Sale Order shall have been entered by the Bankruptcy Court. The Sale Order must be in effect and must not have been reversed or stayed or modified in any material respect.

## ARTICLE XII
## TERMINATION

Section 12.1    Breaches and Defaults; Opportunity to Cure.  Prior to the exercise by a party of any termination rights afforded under this Agreement, if either party (the "Non-Breaching Party") believes the other (the "Breaching Party") to be in breach hereunder, the Non-Breaching Party shall provide the Breaching Party with written notice specifying in reasonable detail the nature of such breach, whereupon if such breach is curable the Breaching Party shall have thirty (30) calendar days from the receipt of such notice to cure such breach to the reasonable satisfaction of the Non-Breaching Party. If the breach is not cured within such time period, then the Non-Breaching Party's sole remedy shall be to terminate this Agreement if the breach is such that the condition set forth in Section 10.1 or 11.1, as applicable, shall not be satisfied (as provided in Section 12.2); provided, however, that the Non-Breaching Party shall not be entitled to terminate this Agreement if it is in material breach of this Agreement. Upon any termination pursuant to Section 12.2 (other than Section 12.2(d)), Seller shall cause the Deposit to be promptly returned to Purchaser.  Upon any termination pursuant to Section 12.2(d), Seller be entitled to retain the Deposit and be paid an additional One Million Three Hundred Fifty Thousand U.S. Dollars ($1,350,000) for a total of One Million Five Hundred Thousand U.S. Dollars ($1,500,000) as liquidated damages, and in lieu of any other rights Seller may otherwise have under applicable Law.

Section 12.2    Termination. This Agreement may be terminated and the transactions contemplated herein may be abandoned, by written notice given to the other party hereto, at any time prior to the Closing:

(a)    by mutual written consent of Seller and Purchaser;

(b)    by Seller or Purchaser if (i) the Sale Procedures Order is not approved by the Bankruptcy Court at the initial hearing on the Sale Procedures Motion, (ii) the Bankruptcy Court enters an Order approving the sale of the Purchased Assets to a third-party purchaser following the entry of the Sale Procedures Order, or (iii) an order granting the relief requested in the Debtor's MOTION TO APPROVE RESELLER AGREEMENT is not entered by the Bankruptcy Court by July 27, 2018, in each case unless due to the failure of the party seeking to terminate this Agreement to perform in any material respect its obligations under this Agreement required to be performed by it at or prior to the Closing;

(c)    subject to the right to cure set forth in Section 12.1 at any time prior to the Closing Date, by Purchaser if Seller is in breach of any covenant, representation, undertaking or warranty such that the condition set forth in Section 10.1 shall not be satisfied, and Purchaser has not waived such condition in writing on or before the Closing Date;

(d)    subject to the right to cure set forth in Section 12.1, at any time prior to the Closing Date by Seller if Purchaser is in breach of any covenant, representation or warranty such that the condition set forth in Section 11.1 shall not be satisfied, and Seller has not waived such condition in writing on or before the Closing Date;

(e)    at or prior to the Bankruptcy Court hearing regarding approval of this Agreement, by either Seller or Purchaser, if an Alternative Bid is accepted and approved by the Bankruptcy Court;

(f)    by Seller or Purchaser if the Closing shall not have occurred on or before September 7, 2018, unless the failure to have the Closing shall be due to the failure of the party seeking to terminate this Agreement to perform in any material respect its obligations under this Agreement required to be performed by it at or prior to the Closing; or

(g)    by Purchaser, if (i) the Sale Hearing does not occur within two (2) business days after the date of the Auction, (ii) if any party (other than Purchaser) seeks to appeal the order described in Section 12.2(a)(iii), or (iii) if the RESELLER AGREEMENT is otherwise not in full force and effect as of the Closing Date; *provided* that such conditions set forth in Section 12.2(g)(i)-(iii) were not the direct result of the actions or omissions of Purchaser.

### ARTICLE XIII
### MISCELLANEOUS

Section 13.1    Notices. All notices and other communications required or permitted to be given hereunder shall be in writing and shall be deemed to have been duly given if delivered personally, sent by telecopier, electronic mail, recognized overnight delivery service or registered or certified mail, return receipt requested, postage prepaid, to the following addresses:

If to Purchaser:

c/o DataDirect Networks, Inc.
9351 Deering Ave
Chatsworth, CA 91311
Attention:  Alex Bouzari
Facsimile:  (818) 837-2298
Email:  abouzari@ddn.com

with a required copy to:

Manatt, Phelps & Phillips, LLP
11355 W. Olympic Blvd.
Los Angeles, CA 90064
Attention:         Blase Dillingham
Facsimile:         (310) 312-4224
Email:             BDillingham@manatt.com

If to Seller:

Attention:
Facsimile:
Email:

with required copies to:

Wilson Sonsini Goodrich & Rosati, P.C.
650 Page Mill Road
Palo Alto, CA  94304
Attention:        Tony Jeffries
Facsimile:        650-493-6811
Email:            TJeffries@wsgr.com

and

Wilson Sonsini Goodrich & Rosati, P.C.
One Market Street, Spear Tower
San Francisco CA  94105
Attention:        Robert T. Ishii
Facsimile:        415-947-2099
Email:            RIshii@wsgr.com

Notices delivered personally shall be effective upon delivery against receipt. Notices transmitted by telecopy shall be effective when received, provided that the burden of proving notice when notice is transmitted by telecopy shall be the responsibility of the party providing such notice.  Notices transmitted by electronic mail (with hard copy to follow) shall be effective when sent.  Notices delivered by overnight mail shall be effective when received. Notices delivered by registered or certified mail shall be effective on the date set forth on the receipt of registered or certified mail, or seventy-two (72) hours after mailing, whichever is earlier.

Section 13.2    Expenses. To the extent that Purchaser is otherwise entitled thereto in accordance with the provisions of this Agreement, each party shall bear its own expenses and costs, including the fees of any attorney retained by it, incurred in connection with the preparation of this Agreement and the consummation of the transactions contemplated hereby.

Section 13.3    Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware (without application of principles of conflicts of law). In connection with any controversy arising out of or related to this Agreement, Seller and Purchaser hereby irrevocably consent to the exclusive jurisdiction of the Bankruptcy Court, or if, and only if, the Bankruptcy Case has been closed, the courts of the State of Delaware. Seller and Purchaser each irrevocably consents to service of process out of the aforementioned courts and waives any objection which it may now or hereafter have to the laying of venue of any action or proceeding arising out of or in connection with this Agreement brought in the aforementioned courts.

Section 13.4    Assignment. This Agreement binds and benefits the parties and their respective successors and assignees. No party hereto shall have the right to freely assign any of its rights under this Agreement, without the prior written consent of the other parties, except that the Purchaser may collaterally assign its rights under this Agreement to TPC in connection with the Debt Financing. No party may delegate any performance of its obligations under this Agreement, except that Purchaser may at any time delegate the performance of its obligations to any Affiliate of Purchaser so long as Purchaser remains fully responsible for the performance of the delegated obligation.

Section 13.5    Successors and Assigns. All agreements made and entered into in connection with this transaction shall be binding upon and inure to the benefit of the parties hereto, their successors and permitted assigns.

Section 13.6    Amendments; Waivers. No alteration, modification or change of this Agreement shall be valid except by an agreement in writing executed by the parties hereto. Except as otherwise expressly set forth herein, no failure or delay by any party hereto in exercising any right, power or privilege hereunder (and no course of dealing between or among any of the parties) shall operate as a waiver of any such right, power or privilege. No waiver of any default on any one occasion shall constitute a waiver of any subsequent or other default. No single or partial exercise of any such right, power or privilege shall preclude the further or full exercise thereof.

Section 13.7    Entire Agreement. This Agreement (including the Exhibits and Disclosure Schedules which are hereby incorporated by reference into and made a part of this Agreement for all purposes) merges all previous negotiations and agreements between the parties hereto, either verbal or written, and constitutes the entire agreement and understanding between the parties with respect to the subject matter of this Agreement.

Section 13.8    Counterparts. This Agreement may be executed in one or more counterparts, each of which when so executed shall be an original, but all of which together shall constitute one agreement.  Facsimile and/or PDF signatures shall be deemed original signatures.

Section 13.9    Severability. If any provision of this Agreement or the application thereof to any person or circumstance shall be invalid or unenforceable to any extent, the remainder of this Agreement and the application of such provision to other persons or circumstances shall not be affected thereby and shall be enforced to the greatest extent permitted by law, but only as long as the continued validity, legality and enforceability of such provision or application does not materially (a) alter the terms of this Agreement, (b) diminish the benefits of this Agreement or (c) increase the burdens of this Agreement, for any person.

Section 13.10   Section Headings. The section headings contained in this Agreement are solely for the purpose of reference, are not part of the agreement of the parties and shall not in any way affect the meaning or interpretation of this Agreement.

Section 13.11   Interpretation. As both parties have participated in the drafting of this Agreement, any ambiguity shall not be construed against either party as the drafter. Unless the context of this Agreement clearly requires otherwise, (a) "or" has the inclusive meaning

frequently identified with the phrase "and/or," (b) "including" has the inclusive meaning frequently identified with the phrase "including, but not limited to" and (c) references to "hereof," "hereunder" or "herein" or words of similar import relate to this Agreement.

Section 13.12 <u>Third Parties</u>. Nothing herein, expressed or implied, is intended to or shall confer on any person other than the parties hereto any rights, remedies, obligations or liabilities under or by reason of this Agreement. Without limiting the foregoing and notwithstanding anything to the contrary contained in the foregoing or in any other provision of this Agreement, (a) none of the Seller nor any representative of the estate of Seller nor any of Seller's successors or assigns (Seller and such other Persons, the "<u>Seller Persons</u>") shall have any rights or claims against TPC or any of its affiliates, equityholders, members, partners, officers, directors, employees, agents, advisors or other representatives involved in the Debt Financing (TPC and such other Persons, the "<u>TPC Persons</u>") in any way relating to this Agreement or any of the transactions contemplated by this Agreement, or in respect of any oral representations made or alleged to have been made in connection herewith or therewith, including any dispute arising out of or relating in any way to the Debt Financing or the documentation evidencing the Debt Financing, whether at law or equity, in contract, in tort or otherwise, (b) no TPC Person shall have any liability (whether in contract, in tort or otherwise) to any Seller Person for any obligations or liabilities of any party hereto under this Agreement or for any claim based on, in respect of, or by reason of, the transactions contemplated hereby and thereby or in respect of any oral representations made or alleged to have been made in connection herewith or therewith, including any dispute arising out of or relating in any way to the Debt Financing or the documentation evidencing the Debt Financing, whether at law or equity, in contract, in tort or otherwise and (c) the TPC Persons are intended third-party beneficiaries of, and shall be entitled to the protections of, this provision and the same shall be enforceable by each TPC Person and each of their respective successors and assigns.

Section 13.13 <u>Specific Performance</u>. The Parties agree that irreparable damage would occur and that the Parties would not have any adequate remedy at law in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. It is accordingly agreed that the Parties shall be entitled to an injunction or injunctions to prevent breaches or threatened breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in the Bankruptcy Court without proof of actual damages or otherwise (and, to the fullest extent permitted by Law, each Party hereby waives any requirement for the securing or posting of any bond in connection with such remedy), this being in addition to any other remedy to which they are entitled at law or in equity.

Section 13.14 <u>Parent Guaranty</u>. Parent hereby guarantees all obligations of Purchaser under this Agreement (the "<u>Obligations</u>"); provided that in no event shall the total liability to Parent pursuant to this guarantee exceed Two Million Five Hundred Thousand U.S. Dollars ($2,500,000). Parent agrees that its guarantee obligation shall not be released or discharged, in whole or in part, or otherwise affected by (i) any change in the time, place or manner of payment of the Obligations or any rescission, waiver, compromise, consolidation or other amendment or modification of any of the terms or provisions of this Agreement made in accordance with this Agreement hereof or any other agreement executed by Purchaser in connection with the Obligation; (ii) any change in the corporate existence, structure or ownership of Purchaser; or (iii) the existence of any claim, set-off or other right which Parent may have at any time against

Purchaser, whether in connection with the Obligations or otherwise. Parent waives promptness, diligence, notice of the acceptance of the Obligations and all suretyship defenses generally; provided that Parent shall retain and have the benefit of, and shall be entitled to assert, all defenses to the payment of the Obligations that are available to Purchaser. Parent agrees at all times from the Execution Date through the earlier of the Closing Date or the termination of this Agreement pursuant to Article XII hereof, it shall maintain available cash balances in excess of Two Million Five Hundred Thousand U.S. Dollars ($2,500,000).

Section 13.15 <u>Definitions</u>. For purposes of this Agreement (including the Disclosure Schedules hereto) the terms defined in this Agreement shall have the respective meanings specified herein, and, in addition, the following terms shall have the following meanings:

"<u>Affiliate</u>" means, as to any Person, any other Person, which, directly or indirectly, is in control of, is controlled by, or is under common control with, such Person. The term "control" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as applied to any Person, means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or other direct or indirect ownership interest, by Contract or otherwise; provided, however, that the Seller's Affiliates shall not be deemed to include any stockholder of the Company, in its capacity as such, including Lightspeed, NEA and Silver Lake.

"<u>Bankruptcy Code</u>" means 11 U.S.C. Section 101, et. seq., and any amendments thereof.

"<u>Code</u>" means the Internal Revenue Code of 1986, as amended.

"<u>Contract</u>" means any written or oral contract, agreement, lease, license, instrument, or other document or commitment, arrangement, undertaking, practice or authorization that is binding on any Person or its property under any applicable Law.

"<u>Disclosure Schedule</u>" means the schedule executed and delivered by Seller to Purchaser as of the Execution Date setting forth the exceptions to the representations and warranties contained in Article VII and certain other information called for by this Agreement. Unless otherwise specified, each reference in this Agreement to any numbered schedule is a reference to the corresponding numbered schedule that is included in the Disclosure Schedule (unless, and to the extent, the relevance to other representations and warranties is readily apparent from the actual text of the disclosures).

"<u>Employee Plans</u>" means any employment, consulting, severance or other similar contract, plan, arrangement or policy, and each plan, arrangement (written or oral), program, agreement or commitment providing for insurance coverage (including any self-insured arrangements), workers' compensation, disability benefits, supplemental unemployment benefits, vacation benefits, retirement benefits, life, health, disability or accident benefits or for deferred compensation, profit-sharing bonuses, stock options, stock purchases or other forms of incentive compensation or post-retirement insurance, compensation or benefits which is entered into, maintained, contributed to or required to be contributed to, by Seller or an ERISA Affiliate or under which Seller or any ERISA Affiliate may incur any liability including under any "employee pension benefit plan" as defined in Section 3(2) of ERISA and any "employee

welfare benefit plan" as defined in Section 3(1) of ERISA which Seller or any ERISA Affiliate maintains, administers, contributes to or is required to contribute to, or has maintained, administered, contributed to or was required to contribute to, or under which Seller or any ERISA Affiliate may incur any liability.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, or any successor law, and regulations and rules issued pursuant to that Act or any successor law.

"Governmental Authority" means any federal, state, provincial, municipal and foreign governmental entity, authority, or agency, or any other political subdivision, or any entity exercising executive, legislative, judicial, regulatory or administrative functions of government.

"Knowledge" means in the case of Seller, the actual, current knowledge of Kieran Harty, George di Urioste or Guy Colpitts.

"Laws" means any federal, state, provincial, local or foreign statute, law, ordinance, regulation, rule, code, order or other requirement or rule of law.

"Legal Proceeding" means any action, arbitration, audit, hearing, investigation, litigation or suit (whether civil, criminal, administrative, investigative or informal) commenced, brought, conducted or heard by or before, or otherwise involving, any Governmental Authority or arbitrator.

"Liability" means any liability, indebtedness, obligation, expense, claim, loss, cost, damage, obligation, responsibility, guaranty or endorsement of or by any Person, absolute or contingent, accrued or unaccrued, known or unknown, due or to become due, liquidated or unliquidated, whether or not secured.

"Liens" means any security interests, mortgages, interests, liens, pledges, charges, defects of title, options and other rights of third parties, rights of first refusal, claims (as defined in Section 101 of the Bankruptcy Code), or any other encumbrance or restriction on ownership provided such encumbrance or restriction on ownership can be overridden by Section 363 of the Bankruptcy Code. "Liens" shall not include Permitted Liens.

"Material Adverse Effect" means any event or change or circumstance, in respect of the operation of the Business and Purchased Assets that, individually or when aggregated with any one or more of the other such changes, events or circumstances, has had or could reasonably be expected to have a material adverse effect on (i) the Purchased Assets, taken as a whole, or (ii) the ability of Purchaser to own or use the Purchased Assets after the Closing; provided, however, that none of the following events, changes or circumstances (individually or when aggregated with any one or more of the other such changes, events or circumstances) shall be deemed to be or constitute a Material Adverse Effect, and none of the following changes, events or circumstances (individually or when aggregated with any one or more of the other such changes, events or circumstances) shall be taken into account when determining whether a Material Adverse Effect has occurred: (a) war, acts of nature, general strike, acts of terror, (b) general economic, market or political changes or conditions, (c) events, changes or circumstances which generally affect the industries in which Seller conducts business, (d) changes in Laws, unless such Laws or conditions apply solely or principally to the Business or Seller, (e) actions or

omissions taken or not taken by or on behalf of Seller in compliance with a specific request from or consented to in writing by Purchaser following the execution of this Agreement, or in compliance with an order from the Bankruptcy Court, and (f) events, changes or circumstances arising from or caused by the announcement of this Agreement or commencement of the Bankruptcy Case or the events, changes or circumstances that substantially contributed to, or resulted in, the commencement of the Bankruptcy Case.

"Ordinary Course of Business" means the ordinary course of business of Seller consistent with the current custom and practice of Seller (including with respect to quantity and frequency) in light of the Seller's current financial condition, financial distress and pending Bankruptcy Case.

"Permitted Liens" means (i) liens for Taxes on that are not yet due and payable, (ii) easements, covenants, conditions, restrictions and other matters of record affecting real property, leasehold estates or personalty or any interest therein that do not in any material respect detract from the value thereof and do not individually or in the aggregate in any material respect interfere with the use, ownership or operation of the property subject thereto in the Business, excluding Liens that will be removed and stricken as against the Purchased Assets pursuant to the Sale Order, (iii) the effect of any building and zoning regulations, now existing or hereafter in effect, (iv) oil, mineral and/or water rights, and claims of title thereto, shown by the public records, and (v) discrepancies, conflicts in boundary lines, shortages in area or encroachments which an inspection or survey would disclose.

"Person" means any corporation, partnership, limited liability company, joint venture, business association, entity or individual.

"Prepetition TPC Loan Documents" means that certain *Plain English Growth Capital Loan and Security Agreement* dated as of February 6, 2015, among Seller and TPC, as amended, supplemented, or modified from time to time, and all such ancillary documents executed therewith.

"Sale Motion" means the motion to be filed with the Bankruptcy Court by Seller seeking (a) approval of the terms and conditions of the Transaction Documents, and (b) authorization for (i) the sale of the Purchased Assets pursuant to Section 363 of the Bankruptcy Code and the assumption and assignment of the Purchased Assets that are executory contracts pursuant to Section 365 of the Bankruptcy Code, free and clear of all Liens.

"Sale Order" means the order of the Bankruptcy Court granting the relief requested in the Sale Motion and authorizing the sale of the Purchased Assets pursuant to Section 363 of the Bankruptcy Code and the assumption and assignment of the Purchased Assets that are executory contracts pursuant to Section 365 of the Bankruptcy Code, free and clear of all Liens, claims and interests.

"Sale Procedures Motion" means the motion to be filed with the Bankruptcy Court seeking approval of the bidding procedures as contemplated pursuant to Article III hereof.

"Sale Procedures Order" means the order entered by the Bankruptcy Court with respect to the Sale Procedures Motion and more fully described in Section 3.1 hereof.

"Stipulated Value" means, solely for the purposes of establishing the minimum value of a Qualified Bid, the amount, as stipulated between the Purchaser and the Seller, as to the value of the Purchaser's offer to acquire the Purchased Assets and Assumed Liabilities, which for purposes of this Agreement shall be $40,000,000.

"Taxes" means taxes, charges, fees, levies, penalties or other assessments imposed by any federal, state, territorial, local or foreign taxing authority, including income, gross receipts, excise, property, sales, transfer, franchise, payroll, withholding, social security and other taxes, and shall include any interest, penalties or additions attributable thereto.

"Tax Return" means any return, report, information return or other document (including any related or supporting information).

***[Remainder of Page Intentionally Left Blank]***

DocuSign Envelope ID: D73D08FB-9398-4585-9779-677D1FA458A1

IN WITNESS WHEREOF, each of the parties hereto has caused this Asset Purchase Agreement to be executed by its duly authorized representative as of the day and year first above written.

SELLER:

TINTRI, INC., Debtor and Debtor in Possession

By: _____

Name: Kieran Harty

Title: Chief Technical Officer

IN WITNESS WHEREOF, each of the parties hereto has caused this Asset Purchase Agreement to be executed by its duly authorized representative as of the day and year first above written.

SELLER:

TINTRI, INC., Debtor and Debtor in Possession

By: _____
Name: _____
Title: _____

PURCHASER:

TI ACQUISITION CORP.

By: _____
Name: Alex Bouzari
Title: CEO

PARENT:

DATADIRECT NETWORKS, INC. (solely for purposes of Section 13.14 hereof)

By: _____
Name: Alex Bouzari
Title: CEO and Co-Founder

**Exhibit A**

<u>Debt Commitment Letter</u>

Attached.

July 18, 2018

TI Acquisition Corp.
9351 Deering Avenue
Chatsworth, CA 91311
Attention: Mr. Alex Bouzari, Chief Executive Officer

**Re: Debt Commitment Letter**

Ladies and Gentlemen:

TI Acquisition Corp., a Delaware corporation ("Borrower" or "you") wholly owned by DataDirect Networks, Inc. ("Holdings" and, together with the Borrower, the "Credit Parties"), has advised TriplePoint Capital LLC, a Delaware limited liability company ("TriplePoint" and sometimes referred to herein as "we" or "us"), that you are seeking debt financing for the acquisition of substantially all of the assets of Tintri (collectively, "Target", and such acquisition being referred to herein as the "Acquisition"), pursuant to an Acquisition Agreement (as defined in Exhibit A hereto). You have further advised us that, in connection with the foregoing, you intend to consummate the other Transactions described in the Transaction Description attached hereto as Exhibit A (the "Transaction Description"). Capitalized terms used but not defined herein are used with the meanings assigned to them in the Transaction Description and the Summary of Terms attached hereto as Exhibit B (together with all Annexes attached thereto, the "Summary of Terms"; the Summary of Terms and this commitment letter and all other of its Exhibits attached hereto are collectively referred to hereinafter as this "Commitment Letter").

1.  Commitments; Titles and Roles

You have further advised that Borrower has requested that TriplePoint provide a $22.5 million term loan facility (the "Term Loan Facility") upon the terms and conditions expressly set forth in this Commitment Letter (including the Summary of Terms). TriplePoint hereby commits to provide the Term Loan Facility to Borrower subject to the satisfaction of the conditions set forth in Annex I of the Summary of Terms (collectively, the "Conditions Precedent to Closing") on the date of the consummation of the Transactions ("Closing Date"). The Term Loan Facility shall be evidenced by definitive financing documentation, which shall include a senior secured credit agreement (the "Term Loan Agreement") and related security and ancillary documentation (together with the Term Loan Agreement, the "Term Loan Documents") and shall include the terms, conditions and other provisions as are set forth in this Commitment Letter (including, without limitation, the Summary of Terms and the Conditions Precedent to Closing).

In the event that the Closing Date does not occur on or before October 15, 2018 for any reason (i) other than Borrower's failure to close the Acquisition notwithstanding the satisfaction of all conditions precedent to Borrower's obligation to close as set forth in the Acquisition Agreement, (ii) not resulting from Borrower's actions or omissions, or (iii) resulting from a material breach of the Acquisition Agreement by Borrower, we shall reimburse Borrower, within 30 days of our receipt of notice and proper documentation of the amount of the Operating Costs (as defined below) from Borrower, in an amount equal to all actual and verifiable costs, expenses, and obligations paid or incurred by Borrower, up to $3,000,000, which are directly

attributable to supporting, stabilizing and sustaining the business of the Target from the date of signing of the Acquisition Agreement through and including October 15, 2018, and consisting of (I) salaries, commissions, bonuses, and benefits for salespersons, sales managers, system engineers, marketing people, support people and management, (II) marketing and travel expenses related to VMWorld, (III) equipment costs, and (IV) other reasonable and properly documented expenses (collectively, the "Operating Costs").  For the avoidance of doubt, we do not endorse and are not in a position to approve the actions being taken by each Credit Party to support, stabilize and instill confidence in Target's customer base, prospects and ecosystem.  The Credit Parties agree that the agreement by us to reimburse Borrower for the Operating Costs is being made to facilitate the Acquisition and should not be deemed to be or otherwise construed as TriplePoint controlling the actions, or directing or causing the direction of the management, of the Credit Parties or the Target.

2.    Information

Each Credit Party hereby represents and warrants with respect to such Credit Party that (a) all written information (other than the Projections (as defined below) and information of a general economic or industry-specific nature) that has been or will be made available to us by or on behalf of the Credit Parties (the "Information"), when taken as a whole, is and will be, when furnished, complete and correct in all material respects and does not or will not, when furnished, contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein, when taken as a whole, not materially misleading in light of the circumstances under which such statements are made, as such Information may be supplemented and updated from time to time prior to the Closing Date, and (b) the projections, budgets, estimates, forward-looking statements or information of a forward-looking nature pertaining to the Credit Parties (collectively, the "Projections") that have been or will be made available to us by or on behalf of the Credit Parties have been or will be prepared in good faith based upon assumptions believed by such Credit Party and the preparer thereof to be reasonable at the time furnished (it being recognized that (i) such Projections are (A) not to be viewed as facts or a guarantee of performance or achievement of any particular results and (B) subject to significant uncertainties and contingencies many of which are beyond the control of such Credit Party and (ii) no assurance can be given that any particular Projections will be realized, and that actual results during the period or periods covered by any such Projections may differ from the projected results, and such differences may be material). Subject to the provisions relating to Projections in the foregoing sentence, each Credit Party agrees that if, at any time prior to the Closing Date, such Credit Party becomes aware that any of the representations and warranties in the preceding sentence would be incorrect if the Information (excluding the Projections), as the case may be, were being furnished, and such representations and warranties were being made, at such time, then such Credit Party agrees to supplement such Information so that (with respect to such Information relating to Target, to its knowledge) such representations are true and correct, in all material respects, under those circumstances. Each Credit Party acknowledges that we will be using and relying upon the Information and the Projections without independent verification thereof.

3.    Conditions

TriplePoint's commitments and agreements hereunder are subject to the satisfaction of the conditions set forth in the Conditions Precedent to Closing. The Term Loan Agreement and the other Term Loan Documents (i) shall be negotiated in good faith by the Credit Parties and us to finalize such documents as promptly as reasonably practicable, (ii) shall contain the terms and conditions set forth in this Commitment Letter (including, without limitation, the Summary of Terms and the Conditions Precedent to Closing), and, (iii) to the extent any terms or conditions are not set forth in this Commitment Letter, such terms and conditions shall otherwise be usual and customary for transactions of this type.

4.    Reserved

5.    Absence of Fiduciary Relationship

Each Credit Party agrees that TriplePoint will act pursuant to a contractual relationship created by this Commitment Letter and that nothing in this Commitment Letter or otherwise will be deemed to create an advisory, fiduciary or agency relationship or fiduciary or other implied duty between

6.    Confidentiality

This Commitment Letter is furnished for your benefit, and may not be relied on by any other person or entity without the consent of TriplePoint or its advisors. This Commitment Letter is delivered to you on the condition that, except as may be compelled in a judicial or administrative proceeding or as otherwise required by law, TriplePoint and any of its affiliates, on the one hand, and the Credit Parties, the Target and each party's respective shareholders or affiliates, on the other hand, or except in connection with any disclosure to the Bankruptcy Court or any other parties in interest in the Case (as defined below), neither it nor its contents will be disclosed by either Credit Party publicly or privately after it is accepted except (i) to those individuals who are officers, directors, employees, agents or advisors of the Credit Parties in connection with their evaluation hereof, and to Manatt, Phelps & Phillips LLP and other legal advisors of the Credit Parties, and then only on the condition that such matters may not, except as required by law, be further disclosed, and (ii) the Credit Parties may disclose the Commitment Letter, its terms and substance to Target and any statutory creditors committee in connection with the Case and its professional advisors; provided, that the members of such committee and its professional advisors agree to keep this Commitment Letter and any of the terms or substance thereof strictly confidential in accordance with the terms of this paragraph. No person or entity, other than the parties signatory hereto, is entitled to rely upon this Commitment Letter or any of its contents.

7.    Miscellaneous

(a)    This Commitment Letter and the commitment of TriplePoint shall not be assignable by you without the prior written consent of TriplePoint, and any purported assignment without such consent shall be void. Headings are for convenience only.

(b)     This Commitment Letter may not be amended or any provision hereof waived or modified except by an instrument in writing signed by each Credit Party and TriplePoint. This Commitment Letter may be executed in any number of counterparts, each of which shall be an original and all of which, when taken together, shall constitute one agreement. Delivery of an executed counterpart of a signature page of this Commitment Letter by facsimile or electric transmission (e.g., "pdf" or "tif") shall be effective as delivery of a manually executed counterpart of this Commitment Letter.

(c)     This Commitment Letter (including the exhibits hereto) embodies the entire agreement and understanding among us and the Credit Parties and their affiliates with respect to the Term Loan Facility and supersede all prior agreements and understandings relating to the specific matters contemplated herein. This Commitment Letter is intended to be for the benefit of the parties hereto and is not intended to confer any benefits upon, or create any rights in favor of, any person or entity other than the parties hereto. No party has been authorized by us to make any oral or written statements that are inconsistent with this Commitment Letter.

(d)     This Commitment Letter shall be governed by, and construed in accordance with, the laws of the State of California without regard to principles of conflicts of law to the extent that the application of the laws of another jurisdiction will be required thereby. ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO ANY CLAIM OR ACTION ARISING OUT OF THIS COMMITMENT LETTER IS HEREBY WAIVED. Each Credit Party hereby submits to the exclusive jurisdiction of the federal and California courts located in Santa Clara County, California (and appellate courts thereof) in connection with any dispute related to this Commitment Letter or any of the matters contemplated hereby, and agree that service of any process, summons, notice or document by registered mail addressed to such Credit Party to be served shall be effective service of process against that Credit Party for any suit, action or proceeding relating to any such dispute. Each Credit Party irrevocably and unconditionally waives any objection to the laying of such venue of any such suit, action or proceeding brought in any such court and any claim that any such suit, action or proceeding has been brought in an inconvenient forum. A final judgment in any such suit, action or proceeding brought in any such court may be enforced in any other courts to whose jurisdiction the Credit Party against whom the final judgment is to be enforced is or may be subject by suit upon judgment.

(e)     IN THE EVENT THAT THE FOREGOING JURY TRIAL WAIVER IS NOT ENFORCEABLE, ALL CLAIMS, INCLUDING ANY AND ALL QUESTIONS OF LAW OR FACT RELATING THERETO, SHALL, AT THE WRITTEN REQUEST OF ANY PARTY, BE DETERMINED BY JUDICIAL REFERENCE PURSUANT TO THE CALIFORNIA CODE OF CIVIL PROCEDURE ("REFERENCE"). THE PARTIES SHALL SELECT A SINGLE NEUTRAL REFEREE, WHO SHALL BE A RETIRED STATE OR FEDERAL JUDGE.  IN THE EVENT THAT THE PARTIES CANNOT AGREE UPON A REFEREE, THE REFEREE SHALL BE APPOINTED BY THE COURT.  THE REFEREE SHALL REPORT A STATEMENT OF DECISION TO THE COURT.  NOTHING IN THIS PARAGRAPH SHALL LIMIT THE RIGHT OF ANY PARTY AT ANY TIME TO EXERCISE LAWFUL SELF-HELP REMEDIES OR OBTAIN PROVISIONAL REMEDIES.   THE PARTIES SHALL BEAR THE FEES AND EXPENSES OF THE REFEREE EQUALLY UNLESS THE REFEREE ORDERS OTHERWISE.   THE REFEREE SHALL ALSO DETERMINE ALL ISSUES RELATING TO THE APPLICABILITY, INTERPRETATION,

AND ENFORCEABILITY OF THIS SECTION. THE PARTIES ACKNOWLEDGE THAT THE CLAIMS WILL NOT BE ADJUDICATED BY A JURY. THIS WAIVER EXTENDS TO ALL SUCH CLAIMS, INCLUDING CLAIMS THAT INVOLVE PERSONS OTHER THAN ANY OF THE PARTIES; CLAIMS THAT ARISE OUT OF OR ARE IN ANY WAY CONNECTED TO THE RELATIONSHIP BETWEEN THE PARTIES; AND ANY CLAIMS FOR DAMAGES, BREACH OF CONTRACT, SPECIFIC PERFORMANCE, OR ANY EQUITABLE OR LEGAL RELIEF OF ANY KIND, ARISING OUT OF THIS COMMITMENT LETTER.

(f)     We hereby notify each Credit Party that pursuant to the requirements of the USA PATRIOT Act, Title III of Pub. L. 107-56 (signed into law October 26, 2001, as amended from time to time, the "PATRIOT Act"), TriplePoint may be required to obtain, verify and record information that identifies the Credit Parties, which information may include their names, addresses, tax identification numbers and other information that will allow TriplePoint to identify the Credit Parties in accordance with the PATRIOT Act. This notice is given in accordance with the requirements of the PATRIOT Act.

8.     Acceptance and Termination

If the foregoing correctly sets forth our agreement, please indicate acceptance of the terms of this Commitment Letter by returning to TriplePoint an executed counterpart hereof, in each case, not later than 11:59 p.m., California time, on July 18**,** 2018. TriplePoint's commitment hereunder and the obligations and agreements of TriplePoint contained herein will expire at such time in the event that TriplePoint has not received such executed counterparts in accordance with the immediately preceding sentence. If each Credit Party does so execute and deliver to us this Commitment Letter, this Commitment Letter and the commitments of TriplePoint and the obligations and agreements of TriplePoint hereunder shall remain effective and available for you until the earliest to occur of (i) prior to the consummation of the Acquisition, the termination of the Acquisition Agreement by you (or your affiliates) or with your (or your affiliates') written consent or otherwise in accordance with its terms, (ii) the consummation of the Acquisition without the funding of the Term Loan Facility, (iii) the due execution and delivery by the Credit Parties and TriplePoint of the Term Loan Documents and the initial funding of the Term Loan Facility, and (iv) 11:59 p.m., California time, on October 15, 2018. Upon the occurrence of any of the events referred to in the preceding sentence, this Commitment Letter, the commitments of TriplePoint and the agreements of TriplePoint to provide the services described herein shall automatically terminate unless TriplePoint shall, in its sole discretion, agree to an extension or waiver with respect to such event. Notwithstanding anything in this paragraph to the contrary, the termination of any commitment pursuant to this paragraph does not prejudice our or your rights and remedies in respect of any breach of this Commitment Letter.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

Sincerely,

**TRIPLEPOINT CAPITAL LLC**

By: _____
Name: _____ Jim Labe _____
Title: ____ Chief Executive Officer ____

Agreed and accepted by Borrower
as of this 18 day of July, 2018:


TI Acquisition Corp.


By: _____

Name: Alex Bouzari

Title: CEO


Agreed and accepted by Holdings
as of this 18 day of July, 2018:


DataDirect Networks, Inc.


By: _____

Name: Alex Bouzari

Title: CEO and Co-Founder

## EXHIBIT A

## TRANSACTION DESCRIPTION

Capitalized terms used but not defined in this Exhibit A shall have the meanings set forth in the other Exhibits to the Commitment Letter to which this Exhibit A is attached (the "Commitment Letter") or in the Commitment Letter.

The Credit Parties intend to consummate the Acquisition as described below.

In connection with the foregoing, it is intended that:

(a)     TI Acquisition Corp., a Delaware corporation ("Buyer"), a wholly-owned subsidiary of Holdings, intends to acquire (the "Acquisition") substantially all of the assets of Tintri, Inc. (the "Target") pursuant to that certain Asset Purchase Agreement entered into on July 18, 2018 (together with all annexes, exhibits and schedules attached thereto, the "Acquisition Agreement"), by and among, *inter alia*, Buyer, Target, and Holdings. Target is a debtor and debtor in possession in the chapter 11 bankruptcy filed by Target on July 10, 2018, styled as *In re Tintri, Inc.*, Case No. 18-11625 (the "Case") pending before the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). The Acquisition shall be consummated under section 363 of the United States bankruptcy code, subject to Bankruptcy Court approval.

(b)     Holdings will make a cash investment, directly or indirectly, in all of the common stock of Buyer representing the total capitalization of Buyer on the Closing Date, and Holdings shall own, in the aggregate, directly or indirectly, beneficially, 100% of the issued and outstanding common stock of Buyer and shall control the board of directors of Buyer.

(c)     The Borrower will borrow $22.5 million under the Term Loan Facility which, together with the proceeds of the Holdings investment, will be used to fund the cash portion of the purchase price for the Acquisition.

(d)     In addition, the Borrower will assume Target's obligations with respect to a portion of the indebtedness currently owed by the Target to TriplePoint in an amount equal to $27.5 million (the "Assumed Debt").

The date of the initial funding of the Term Loan Facility is referred to herein as the "Closing Date". The transactions described above and the payment of related expenses are collectively referred to herein as the "Transactions."

Ex. A - 1

## EXHIBIT B

## SUMMARY OF TERMS

Summary of Terms

$22,500,000 Secured Credit Facilities

Set forth below is a summary of the principal terms and conditions for the Term Loan Facility (as defined below). Capitalized terms used but not defined in this Summary of Terms (this "Summary of Terms") will have the meanings set forth in the commitment letter (including the other attachments thereto, the "Commitment Letter") to which this Summary of Terms is attached.

| | |
|---|---|
| ***Borrower***: | TI Acquisition Corp., a Delaware corporation ("Borrower"), all of the outstanding stock of which will be owned by DataDirect Networks, Inc. ("Holdings"). |
| ***Guarantors***: | Holdings and the Borrower's existing and subsequently acquired or formed direct and indirect subsidiaries (together with Holdings, the "Guarantors" and each a "Guarantor"). |
| | The Borrower and Guarantors are herein referred to collectively as the "Credit Parties" and each a "Credit Party". |
| ***Lender***: | TriplePoint Capital LLC ("Lender"). |
| ***Term Loan Facility***: | A first-priority (subject to liens granted pursuant to the loan facility between Holdings and Preferred Bank securing a maximum amount of $10,000,000 (the "Data Direct Credit Line")) secured term loan facility (the "Term Loan Facility") in the amount of $22,500,000. |
| ***Maturity and Amortization***: | The Term Loan Facility will mature on December 31, 2023 (the "Maturity Date"). |
| | Annual amortization (payable in equal installments on December 31 of each year, with the first installment being paid on December 31, 2019 (each such yearly installment payment date, a "Yearly Payment Date")) of the Term Loan Facility will be required for each year following the Closing Date as follows: |

| *Payment Date* | *Amount Payable* |
|---|---|
| Year 1 (payment date of December 31, 2019) | 25% |
| Year 2 (payment date of December | 25% |

Ex. B - 1

| | |
|---|---|
| 31, 2020) | |
| Year 3 (payment date of December 31, 2021) | 25% |
| Year 4 (payment date of December 31, 2022) | 25% |
| Maturity Date | Any remaining obligations, including without limitation the Success Fees (as defined below) |

***Purpose and Availability***:     The Term Loan Facility will be made in a single drawing on the Closing Date and will be used to finance a portion of the acquisition of substantially all of the assets, properties and rights of Tintri, Inc. (the "Acquisition").

Repayments and prepayments of the Term Loan Facility may not be reborrowed.

***Interest Rates, Payment Dates and Basis***:     Interest on the Term Loan Facility will accrue and be payable at a rate per annum equal to 1.00%, will be payable on each Yearly Payment Date, and will be calculated based on a year of 360 days for actual days elapsed.

***Default Rate***:     Upon the occurrence of a payment or bankruptcy event of default, the principal, interest and all other obligations outstanding under the Term Loan Facility will bear interest at 6.00% per annum.

***Success Fee; Reduction of Assumed Debt***:     In addition to the annual principal amortization and interest payments made on each Yearly Payment Date, Borrower hereby agrees to pay to TriplePoint, which payment shall be in full satisfaction of the Assumed Debt, a success fee of $27,500,000 (the "Success Fee"), which shall be due and payable on each Yearly Payment Date in accordance with the table below until the entire Success Fee has been paid in full:

| *Payment Date* | *Amount Payable* |
|---|---|
| Year 1 (payment date of December 31, 2019) | 5% of the annual gross revenues of Borrower and all other revenues, however derived, or payments received by Borrower or Holdings in respect of the products, software, patents or other intellectual property, and technology developed or formerly owned by Target (collectively, "Revenues") for the |

| | |
|---|---|
| | period beginning on the Closing Date and ending 12 months after the Closing Date |
| Year 2 (payment date of December 31, 2020) | 5% of annual Revenues for the period beginning on the date that is 12 months after the Closing Date and ending 24 months after the Closing Date |
| Year 3 (payment date of December 31, 2021) | 5% of annual Revenues for the period beginning on the date that is 24 months after the Closing Date and ending 36 months after the Closing Date |
| Year 4 (payment date of December 31, 2022) | 5% of annual Revenues for the period beginning on the date that is 36 months after the Closing Date and ending 48 months after the Closing Date |
| Year 5 (payment date of December 31, 2023) | 5% of the annual Revenues for the period beginning on the date that is 48 months after the Closing Date and ending 60 months after the Closing Date |
| To the extent that the entire Success Fee has not become due and payable on or before the Yearly Payment Date of December 31, 2023, the portion thereof which has not yet become due and payable (the "Success Fee Carryover") shall be payable in accordance with the following: | |
| For each year after Year 5 (with the payment date as of December 31st of such year) (each, a "Successive Year") | 3% of the annual Revenues for each Successive Year beginning on the date that is 60 months after the Closing Date |

Notwithstanding the above, the follow conditions shall apply:

(i) to the extent that the Closing occurs on or after August 7, 2018, the Success Fee otherwise payable to TriplePoint shall be reduced by the Operating Costs incurred by Borrower from and after the date of signing of the Acquisition Agreement through and including October 15, 2018 (the "Expense Reimbursement Offset");

(ii) to the extent that (a) the Closing Date occurs on or after August 7, 2018 and (b) annual Revenues exceed $250

Ex. B - 3

million for the 2022 fiscal year, then on March 31, 2023 Borrower shall make a payment (the "<u>Reimbursement Catch-Up Payment</u>") in an amount equal to the Expense Reimbursement Offset; and

(iii) to the extent that, as of the Payment Date of December 31, 2023 (the "<u>Year 5 Payment Date</u>"), the aggregate amount of Success Fee paid or due and payable is less than $5,000,000, then on the Year 5 Payment Date Borrower shall make a payment (the "<u>Minimum Catch-up Payment</u>") for application to the Success Fee in an amount equal to the difference between (a) $5,000,000 and (b) the amount of Success Fee paid or due and payable up to and including the Year 5 Payment Date.

| | |
|---|---|
| ***Voluntary Prepayments and Commitment Reductions***: | The Term Loan Facility may be prepaid and commitments may be reduced, in whole or in part, without premium or penalty, and voluntary prepayments of the Term Loan Facility shall be applied in inverse order of maturity. |
| ***Collateral***: | All obligations of the Borrower under the Term Loan Facility and of the Guarantors under the guarantees will be secured by a first-priority (subject to the liens granted under the Data Direct Credit Line) perfected security interest in (i) all existing and after-acquired assets (whether consisting of real property, personal property or otherwise) of the Credit Parties, including, without limitation, a pledge of 100% of all outstanding equity interests owned by the Credit Parties in their subsidiaries and (ii) all of the equity securities of all Credit Parties (other than a pledge of the equity interests in Holdings) (collectively, the "<u>Collateral</u>"). |
| | All of the above-described pledges, security interests and mortgages will be created on terms, and pursuant to documentation satisfactory to Lender, and none of the Collateral will be subject to any other liens, claims or encumbrances, except permitted liens and encumbrances acceptable to Lender to be set forth in the Loan Documents (as defined below). |
| ***Conditions Precedent to Closing***: | The conditions precedent to closing are as set forth in Annex I (collectively, the "<u>Conditions Precedent to Closing</u>") (the date on or before the termination date in the Commitment Letter, on which all Conditions Precedent to Closing are satisfied or waived, the "<u>Closing Date</u>"). |
| ***Loan Documents***: | The Term Loan Facility will be subject to the terms and conditions set forth in a definitive Loan and Security Agreement (the "<u>Loan</u> |

Agreement"), guarantees, pledge agreements, assignment agreements, an intercreditor agreement with Preferred Bank, subordination agreements, and other instruments, documents, certificates, opinions and third-party agreements (as applicable) (collectively, the "Loan Documents"), all of which will be reasonably satisfactory to Lender and the Borrower.

***Representations and Warranties*:**     Representations and warranties applicable to the Credit Parties customary for this type of transaction, to include, without limitation the following, in each case with customary exceptions, limitations and qualifications to be mutually agreed: (i) collateral title; (ii) granting of liens; (iii) due organization; (iv) authorization, validity and enforceability; (v) no violation of law, contracts or organizational documents; (vi) no litigation; (vii) compliance with applicable laws; (viii) no conflict; (ix) no further consent; (x) no material adverse effect; (xi) no other defaults; (xii) no other restrictive agreements; (xiii) information correct; (xiv) filing of taxes; (xv) ERISA compliance; (xvi) no hazardous waste; (xvii) operation of business; (xviii) Trading with the Enemy Act, OFAC, and Patriot Act; (xix) investment company act; (xx) information with respect to Collateral; (xxi) intellectual property; and (xxii) cash management systems and other accounts.

***Covenants*:**     Covenants applicable to the Credit Parties and their subsidiaries customary for this type of transaction, to include, without limitation the following, in each case with customary exceptions, limitations and qualifications to be mutually agreed: (i) legal existence and qualification; (ii) compliance with laws; (iii) management rights; (iv) further assurances; (v) protection of Lender's lien; (vi) maintenance of properties; (vii) financial statements; (viii) audits and inspections; (ix) taxes; (x) intellectual property; (xi) subsidiaries; (xii) dispositions, liens and encumbrances; (xiii) mergers or acquisitions; (xiv) compromise of accounts; (xv) other indebtedness; (xvi) investments; (xvii) dividends and distributions; (xviii) Collateral locations, name changes; (xix) line of business; (xx) change of jurisdiction; (xxi) deposit and investment accounts; (xxii) transactions with affiliates; (xxiii) indebtedness; and (xxiv) OFAC and Patriot Act.

***Reporting Requirements*:**     The Loan Agreement will contain reporting requirements customary for this type of transaction, to include, without limitation the following: (i) unaudited income statement, statement of cash flows, and an unaudited balance sheet monthly consolidated financial statements (prepared in accordance with GAAP) for Borrower and

its subsidiaries within 30 days after the end of each month (accompanied by copies of all board packages delivered to the board of directors of Credit Parties in connection with board meetings or otherwise); (ii) certificate of compliance within five (5) business days after the end of each calendar quarter; and (iii) annual audited consolidated financial statements (prepared in accordance with GAAP) for Borrower and its subsidiaries within 120 days after the end of each fiscal year (accompanied by an audit report and an unqualified opinion of the independent certified public accounts).

*Events of Default*:
Events of default customary for this type of transaction, to include, without limitation, the following (subject to materiality, thresholds, cure periods and exceptions to be mutually agreed): (i) failure to pay principal, interest or any other amount when due; (ii) failure to comply with covenants in the Loan Agreement or other Loan Documents; (iii) material adverse change; (iv) representations and warranties incorrect in any material respect when made or deemed made; (v) bankruptcy, insolvency or similar proceeding (voluntary or involuntary); (vi) the occurrence of other defaults within the Loan Documents; (vii) occurrence of defaults under any lease, loan or other agreement with respect to any obligation in excess of an amount to be mutually agreed or which could reasonably be expected to have a material adverse effect; (viii) failure to satisfy or stay execution of final judgments for money in excess of an amount to be mutually agreed (to the extent not paid or fully covered by insurance maintained in accordance with the requirements of the Loan Agreement and as to which the relevant insurance company has acknowledged coverage); (ix) change of control or management; or (x) actual or asserted invalidity, termination or impairment of any part of guaranties of the obligations by the Guarantors and occurrence of any of clauses (iii)-(viii) above with respect to any Guarantor.

*Miscellaneous*:
The Loan Documents will include standard provisions which provide the Lender with a tax gross up and other miscellaneous provisions customary for this type of transaction.

*Fees and Expenses; Indemnification*:
After the Closing Date, Credit Parties will, jointly and severally, reimburse Lender from time to time on demand for all reasonable fees, costs and expenses (including expenses of Lender's due diligence investigation, consultants' fees, travel expenses and the fees, disbursements and other charges of counsel and other non-legal advisors to Lender), in each case, incurred after the Closing Date in connection with any legal, litigation, administrative, arbitration, or out of court proceeding in connection with or related

to the Credit Parties or the Collateral, and any appeal or review thereof; and any bankruptcy, restructuring, reorganization, assignment for the benefit of creditors, workout, foreclosure, or other action related to the Credit Parties, the Collateral, or the Loan Documents, including representing Lender in any adversary proceeding or contested matter commenced or continued by or on behalf of the estate of any of any Credit Party, and any appeal or review thereof.

The Credit Parties agree to indemnify and hold Lender, its officers, directors, employees, agents, attorneys, representatives and shareholders (each, an "Indemnitee") harmless from and against any and all claims, costs, expenses, damages and liabilities (including such claims, costs, expenses, damages and liabilities based on liability in tort, including strict liability in tort), including reasonable attorneys' fees and disbursements and other costs of investigation or defense (including those incurred upon any appeal), that may be instituted or asserted against or incurred by Lender or any such Indemnitee as the result of credit having been extended, suspended or terminated under the Loan Agreement and the other Loan Documents or the administration of such credit, or in connection with or arising out of the transactions contemplated or any actions or failures to act in connection with, or arising out of the disposition or utilization of the Collateral, excluding in all cases, claims, costs, expenses, damages and liabilities resulting solely from Lender's gross negligence or willful misconduct.

| | |
|---|---|
| ***Governing Law and Forum; Waiver of Jury Trial:*** | The Loan Documents will be governed by California law. The Loan Documents will provide that the parties thereto (i) will waive the right to trial by jury, (ii) will consent to jurisdiction of the state and federal courts located in San Mateo County, California, and (iii) will consent to determination by judicial reference if the jury trial waiver is not enforceable. |
| ***Counsel to the Lender:*** | McDermott Will & Emery LLP |

## **CONDITIONS PRECEDENT TO CLOSING**

The advance under the Term Loan Facility will be subject to the satisfaction of the following conditions. Capitalized terms used but not defined in this <u>Annex I</u> have the meanings set forth in the commitment letter (including the other attachments thereto, the "<u>Commitment Letter</u>") to which this <u>Annex I</u> is attached.

1. ***Documentation and Other Customary Deliverables***. Subject to the preparation, execution (as applicable) and delivery of (i) mutually acceptable and customary loan documentation (including, without limitation, the Term Loan Agreement and the other Term Loan Documents), which will (a) incorporate the terms and conditions set forth herein and in the Commitment Letter and such other terms and conditions as are not inconsistent with the terms and conditions set forth herein and therein as the Borrower and Lender may agree, and (b) be usual and customary for credit facilities of this type as reasonably determined by Lender, (ii) customary legal opinions; (iii) evidence of authorization; (iv) officer's certificates (with organizational documents attached); (v) good standing certificates (or equivalent documentation) in the jurisdiction of organization of each Credit Party and each foreign jurisdiction where such Credit Party has registered as a foreign limited liability company or corporation, as applicable; (vi) UCC and other lien searches; (vii) closing certificates; (viii) certificates of insurance, which evidence satisfaction of the insurance requirements included in the Loan Documents and name Lender as mortgagee, lender loss payee and additional insured, as applicable; (ix) material governmental and material third party consents and approvals for the Term Loan Facility; (x) an intercreditor agreement between Lender and Preferred Bank in form satisfactory to each of Lender and Preferred Bank, and (xi) customary documents and instruments required to create and perfect Lender's first priority security interest (subject to Permitted Liens) in the Collateral (which, if applicable, will be in proper form for filing).

2. ***Financial Statements***. Lender shall have received (i) the audited consolidated balance sheets of the Holdings and its subsidiaries for the fiscal years ended December 31, 2016, and December 31, 2017, together with the related consolidated statements of income and cash flow for the fiscal years then ended and (ii) the unaudited consolidated balance sheets and related statements of income and cash flows of Holdings as of the last day of the most recent fiscal month ended at least 45 days prior to the Closing Date, prepared after giving *pro forma* effect to the Acquisition as if the Acquisition has occurred as of such date.

3. ***Required Information***. Lender will have received, at least five (5) business days prior to the Closing Date, documentation and other information with respect to the Credit Parties that is required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the PATRIOT Act and OFAC, in each case as has been reasonably requested in writing by Lender at least 10 days prior to the Closing Date.

4. ***No Material Adverse Effect.*** Since the date of the last audited financial statements of Holdings, there has not been any event, change, effect, occurrence, circumstance or condition, individually or in the aggregate, which has, or could reasonably be expected to have, (i) a material adverse change in the business, financial or other condition of Holdings and its

subsidiaries taken as a whole, the industry in which Holdings operates, or (ii) a Material Adverse Effect (as such term is defined in the Acquisition Agreement).

5. ***Representations and Warranties***.

(a)      Except to the extent that would not materially impair Borrower's or Holding's ability to perform their respective obligations hereunder, (i) Borrower is a corporation duly organized, validly existing and in good standing under the Laws of the State of Delaware; (ii) Holdings is a corporation duly organized, validly existing and in good standing under the Laws of the State of California; (iii) each of Borrower and Holdings are in good standing with respect to state franchise tax in the jurisdictions in which they are organized and those in which they are registered as foreign corporations; (iv) neither Borrower nor Holdings is subject to any UCC, tax or judgment lien (except as previously disclosed in UCC searches for Holdings in California and Borrower in Delaware previously delivered to TriplePoint) in the jurisdictions in which they are organized or those in which they are registered as foreign corporations; (v) Borrower at this time is a recently formed Delaware corporation, wholly owned by Holdings, without material assets or liabilities; (vi) Holdings had a verifiable cash balance of at least $20 million as of June 30, 2018; and (vii) the Credit Parties shall obtain an amendment to or other documentation with respect to the Preferred Bank credit agreement dated as of January 12, 2015 (as amended to date) permitting (a) the Credit Parties to consummate the Transaction, (b) Borrower to incur $22.5 million of direct indebtedness under the Term Loan Facility, (c) Holdings to incur $22.5 million of guaranty indebtedness related to the Term Loan Facility, and (d) liens granted by each of Holdings and Borrower on all of their respective assets in favor of TriplePoint; <u>provided</u> that the failure to obtain an amendment or other documentation as contemplated in subsection (vii) in a form acceptable to TriplePoint in its sole discretion shall constitute a Material Adverse Effect.

(b)      With respect to the Credit Parties and their subsidiaries, the representations and warranties set forth in the Loan Documents will be true and correct on and as of the Closing Date except to the extent that the breach of such representation or warrant does not have, or could not reasonably be expected to have, a material adverse change in the business, financial or other condition of Holdings and its subsidiaries, the industry in which Holdings operates, or the prospects of Holdings and its subsidiaries.

6. ***Acquisition***. The Acquisition has been or, substantially concurrently with the borrowing under the Term Loan Facility will be, consummated in accordance with the terms of the Acquisition Agreement, without giving effect to any modifications, amendments or express waivers thereto that are materially adverse to Lender without the prior written consent of Lender (not to be unreasonably withheld or delayed).

7. ***Litigation***. There will be (i) no claim, action, suit, litigation or proceeding, pending or, the knowledge of the Credit Parties, threatened in writing or, (ii) to the knowledge of the Credit Parties, no investigation, pending or threatened in writing, in each case, in any court or before any governmental agency with respect to the Transactions (including, without limitation, the Acquisition), any Loan Documents or any of the transactions contemplated thereby or hereby.

8.     ***Required Consents***. Receipt by Lender of certified copies of all (i) material consents, approvals, authorizations, registrations, or filings required to be made or obtained by the Credit Parties and their subsidiaries with any governmental authority, if any, and (ii) other third party consents, approvals, authorizations, registrations, or filings required to be made or obtained by the Credit Parties and their subsidiaries, in each case, in connection with the Term Loan Facility and any transaction being financed with the proceeds of the Term Loan Facility, including, without limitation, the Acquisition, and such consents, approvals, authorizations, registrations, filings and orders will be in full force and effect and no investigation or inquiry by any governmental authority regarding the Term Loan Facility or any transaction being financed with the proceeds thereof will be ongoing.

9.     ***Security.*** All actions necessary to grant to the Lender a first priority (subject to Permitted Liens), perfected security interest in the Collateral will have been taken (including, without limitation, receipt of all certificates evidencing pledged equity interests or other certificated securities, as applicable, with accompanying instruments of transfer or powers (executed in blank), all UCC financing statements to be filed in the applicable government UCC filing offices, and all intellectual property security agreements to be filed with the United States Copyright Office or the United States Patent and Trademark Office, as applicable), and all filings, recordations and searches necessary or desirable in connection with the security interests in and liens on the Collateral will have been duly made or obtained and all filing and recording fees and taxes in connection therewith will have been duly paid.

**Exhibit B**

<u>Form of Bill of Sale</u>

To be provided

**Exhibit C**

<u>Form of Assumption Agreement</u>

To be provided

**Exhibit D**

**(Highlighted Provisions Pursuant to Del. Bankr. L.R. 6004-1)**

In accordance with Local Rule 6004-1,[1] the Debtor respectfully represents the following:

(1)    **Sale to an Insider**:  The Stalking Horse Purchaser is not an insider of the Debtor.

(2)    **Agreements with Management**:  To the Debtor's knowledge, the Stalking Horse Purchaser has not entered into any agreements with management or key employees regarding compensation or future employment.

(3)    **Releases**:  The Purchase Agreement does not provide for any releases by and between the Stalking Horse Purchaser and the Debtor of any claims or causes of action.

(4)    **Private Sale/No Competitive Bidding**:  The Sale is being conducted pursuant to the competitive bidding process detailed in the Motion.

(5)    **Closing and Other Deadlines**:  Articvles X and XI of the Purchase Agreement set forth the conditions and terms for the Closing of the Sale, and the Purchase Agreement provides an outside Closing date of September 7, 2018.

(6)    **Good Faith Deposit**:  The Stalking Horse Purchaser will provide a good faith deposit in the amount of $150,000,000.  The proposed Bid Procedures provide that all bidders will be required to post a good faith deposit in the form of a wire transfer (to a bank account specified by the Debtor), certified check or such other form acceptable to the Debtor, payable to the order of the Debtor (or such other party as the Debtor may determine) in the amount of $150,000.

(7)    **Interim Arrangements with Proposed Buyer**:  Section 9.1 of the Purchase Agreement contains customary provisions regarding the Debtor's conduct of its business pending the Closing Date.  Section 9.3 of the Purchase Agreement provides that the Debtor will permit the Stalking Horse Purchaser reasonable access during Debtor's regular business hours with respect to certain matters.  Additionally, the Debtor is seeking the approval of its entry into a Reseller Agreement with the Stalking Horse Purchaser and seeks to have that motion heard on shortened time prior to the hearing on the Motion.

(8)    **Use of Proceeds**:  Upon Closing, the net sale proceeds shall be, to the extent permitted and appropriate, distributed or reserved in accordance with applicable cash collateral and financing orders, or as otherwise permitted by the Bankruptcy Code and applicable Bankruptcy Court Order.

(9)    **Tax Exemption**:  No tax exemptions under section 1146(a) of the Bankruptcy Code are contemplated in connection with the Sale.

---

[1] The foregoing is intended to summarize certain of the provisions of the Purchase Agreement (the "LR 6004-1 Summary").  In the event of any inconsistency between this summary and the Purchase Agreement, the Purchase Agreement controls.  Unless otherwise noted, defined terms used in this LR 6004-1 Summary have the meanings ascribed in the Purchase Agreement.

(10) **Record Retention**:  Section 9.3 of the Purchase Agreement provides for Debtor's access to books and records prior to Closing.  There are no post-Closing obligations with repect to records retention by the Debtor.

(11) **Sale of Avoidance Actions**:  Section 2.2(f) specifies that all claims and actions of the Debtor arising under sections 544, 547, 548, 549, and 550 of the Bankruptcy Code are Excluded Assets.

(12) **Requested Findings as to Successor Liability**:  The proposed sale order provides that Successful Bidder is not a successor to Debtor or this bankruptcy estate by any reason or theory of law or equity, and that Successful Bidder shall not be subject to successor liability for any products sold prior to Closing.  All creditors or other persons are hereby barred from bringing any claim or asserting any Liens, Claims and Encumbrances, and other interests against Successful Bidder or the Assets, except as relates to Assumed Liabilities.

(13) **Sale Free and Clear of Unexpired Leases**:  The Debtor is seeking to sell the Assets free and clear of all Liens, Claims and Encumbrances, and other interests, claims, encumbrances, and other interests pursuant to Section 363(f) of the Bankruptcy Code.

(14) **Credit Bid**:  The proposed Bid Procedures do not purport to limit or restrict credit bid rights under section 363(k) of the Bankruptcy Code.

(15) **Relief from Bankruptcy Rule 6004(h)**:  As noted in the Motion, the Debtor is requesting relief from the 14-day stay imposed by Rules 6004(h) and 6006(d).